UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| MIDWEST RENEWABLE ENERGY ASSOCIATION, INC., and CITIZENS ACTION COALITION OF INDIANA, INC., <br><br> Plaintiffs, <br><br> **v.** <br><br> ANDREW ZAY, Chairman, Indiana Utility Regulatory Commission, and DAVID VELETA, DAVID ZIEGNER, ROBERT DEIG, and ANTHONY SWINGER, Commissioners, Indiana Utility Regulatory Commission, <br><br> Defendants. | Case No. 1:26-cv-632 |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, Midwest Renewable Energy Association and Citizens Action Coalition of Indiana, Inc., bring this action against the Defendants, Andrew Zay, David Veleta, David Ziegner, Robert Deig, and Anthony Swinger, the Commissioners of the Indiana Utility Regulatory Commission, for declaratory and injunctive relief and allege as follows:

1. Despite Indiana's historic support of free market competition, the state, through its utility regulatory agency, created and is operating a protectionist racket for the benefit of five incumbent Indiana utility companies.

1

2.     The Indiana Utility Regulatory Commission issued a series of orders in 2009 through 2011 (the "Demand Response Orders") that violate the United States Constitution and the Indiana Constitution:

- February 25, 2009, "Order on Requests for Interim Relief" in Cause No. 43566.

- July 28, 2010, order and decision in Cause No. 43566 known as the "Generic DR Order."

- March 2, 2011, order in Cause No. 43566 MISO 1, approving Northern Indiana Public Service Company's Demand Response Resource, Type 1 ("DRR-1") and Emergency Demand Response ("EDR") tariffs.

- March 2, 2011, order in Cause No. 43566 MISO 2, approving Indianapolis Power & Light Company's Rider 23.

- March 2, 2011, order in Cause No. 43566 MISO 3, approving Duke Energy Indiana's Market Based Demand Response Rider, Standard Contract Rider No. 22 ("Rider MBDR").

- March 2, 2011, order in Cause No. 43566 MISO 4, approving Southern Indiana Gas and Electric Company's Rider DR.

- April 27, 2011, order in Cause No 43566 PJM 1, Phase I, approving Indiana Michigan Power Company Demand Response Service-Emergency ("DRS 1") tariff.

- May 18, 2011, order in Cause No. 43566 PJM 1, Phase II, approving Indiana Michigan Power Company Demand Response Service-Economic ("DRS 2") tariff.

- October 5, 2011, order in Cause No. 43566 PJM 1 Phase III, approving Indiana Michigan Power Company Demand Response Service-Ancillary Services ("DRS 3") tariff.

3.     The Demand Response Orders prevent Indiana businesses and families from providing a clean energy service called "demand response"[1] to interstate power

---

[1] Demand response is a consumer's change in electric usage from their normal consumption pattern in response to a change in the price of electricity or to an incentive payment designed to induce lower electricity use at times of high prices or when system reliability is jeopardized.

markets through competitive businesses. Instead, under the Orders Indiana businesses and families can only provide demand response services through incumbent Indiana utilities. And to do that, the Orders also require those Indian businesses and families to pay the utilities a kickback of the market revenues earned from providing demand response services as well as other fees and charges to access the interstate power markets.

4.      The IURC's Demand Response Orders are rank protectionism that violate both the United States Constitution's Commerce Clause and the Indiana Constitution's Privileges or Immunities Clause. By blocking competition, they also result in higher electricity prices for consumers in Indiana at a time when electricity prices are already too high and continue to rise.

5.      Plaintiffs bring this action against Defendants under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908) for declaratory and injunctive relief to prevent Defendants from continuing to enforce the Demand Response Orders. Enjoining enforcement will permit Indiana consumers and third-party aggregators to sell demand response services directly to interstate wholesale power markets. In turn, this will provide business opportunities for competitors to Indiana's utility companies and will allow wholesale power auctions to settle at lower prices, reducing power bills for all electricity consumers.

## Parties

6.      Plaintiff Midwest Renewable Energy Association ("MREA") is a nonstock corporation and a registered 501(c)(3) non-profit organization that promotes

renewable energy, energy efficiency, and sustainable living through education and demonstration. MREA works with its partners around the Midwest to expand clean and renewable energy adoption through innovative programs, renewable energy training, and educational events. MREA members include companies incorporated and domiciled outside of Indiana that develop and implement competitive demand response services that they sell into interstate wholesale power markets. The Indiana Utility Regulatory Commission's Demand Response Orders discriminate against MREA's members and prevent them from aggregating demand response from Indiana businesses and families and selling those aggregated services directly into interstate wholesale power markets. That causes economic harm to MREA's members by depriving them of revenue.

7.    Plaintiff Citizens Action Coalition of Indiana, Inc. ("CAC"), is Indiana's oldest and largest consumer and environmental advocacy organization. Since 1974, CAC has helped Hoosiers save more than $10 billion in excess utility charges by advocating on energy policy and utility reform, including by creating public awareness, lobbying legislators, intervening in utility cases before the Indiana Utility Regulatory Commission, and litigating when necessary. Many CAC members would seek to provide demand response through competitive demand response aggregators who are currently blocked or dissuaded from doing business in Indiana by the Commission's Demand Response Orders at issue here. The Orders directly injure those CAC members by depriving them of direct financial compensation. The Orders also cause secondary harm to consumers, including CAC members, by preventing

4

competition in wholesale power markets that would drive down power costs. CAC members therefore pay more for electricity than they otherwise would if the Orders did not artificially reduce wholesale market competition.

8.    Defendant Andrew Zay is the Chairman of the Indiana Utility Regulatory Commission. Indiana Governor Mike Braun appointed Chairman Zay effective January 12, 2025.

9.    Defendant Robert Deig is a Commissioner of the Indiana Utility Regulatory Commission. Indiana Governor Mike Braun appointed Commissioner Deig effective January 12, 2025.

10.    Defendant Anthony Swinger is a Commissioner of the Indiana Utility Regulatory Commission. Indiana Governor Mike Braun appointed Commissioner Swinger effective January 12, 2025.

11.    Defendant David Veleta is a Commissioner of the Indiana Utility Regulatory Commission. Former Indiana Governor Eric Holcomb appointed Commissioner Veleta on September 14, 2022. Commissioner Veleta was reappointed January 26, 2024.

12.    Defendant David Ziegner is a Commissioner of the Indiana Utility Regulatory Commission. Commissioner Ziegner was initially appointed by former Indiana Governor Evan Bayh on August 25, 1990, and has been continuously reappointed for 35 years. Commissioner Ziegner was most recently reappointed in March 2023 by former Indiana Governor Eric Holcomb.

13. In their roles as Commissioners, Defendants regulate public utilities and retail electricity service provided by those utilities in Indiana. They have the "power" and "duty" to enforce "all laws... relating to public utilities." Ind. Code § 8-1-2-115.

14. Each Defendant has the lawful responsibility to enforce and is enforcing each of the Demand Response Orders at issue.

### Jurisdiction and Venue

15. This Court has subject matter jurisdiction over the claims asserted here pursuant to 28 U.S.C. §§ 1331, 1332, 1343(a)(3) and 1367.

16. Plaintiffs assert under 42 U.S.C. § 1983 and the Constitution of the United States that the Demand Response Orders violate Article I, Section 8 of the United States Constitution.

17. Plaintiffs also assert a claim under the Indiana Constitution that is so related to Plaintiffs' federal law claims that it forms part of the same Article III case or controversy. The Court has jurisdiction over that claim under 28 U.S.C. § 1367.

18. Plaintiffs sue Defendants in their official capacities as Commissioners of the Indiana Utility Regulatory Commission. The Court has jurisdiction under *Ex parte Young*, 209 U.S. 123 (1908), notwithstanding any limitations in the Eleventh Amendment.

19. The Court has personal jurisdiction over Defendants because all Defendants are residents of Indiana and conduct their business as utility regulators in Indiana.

20.    Venue is proper in this Court because Defendants reside and conduct their duties as commissioners in this District and because a substantial part of the events that give rise to the claims occurred in this District. 28 U.S.C. § 1391(b).

## Statement of Facts and Background

### A. Regulatory Background

21.    Electricity regulation is divided between state and federal jurisdiction. State regulatory commissions, like the Indiana Utility Regulatory Commission, may regulate certain aspects of retail electricity service, but their authority is constrained by the United States Constitution's Commerce Clause, the 1935 Federal Power Act, and state law.

22.    When power is sold across state lines, only Congress and the Federal Energy Regulatory Commission ("FERC") can regulate it. State may not regulate sales of electricity across state lines because such state regulation "places a direct burden upon interstate commerce." *Pub. Utils. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 89 (1927).

23.    Historically, utilities primarily operated as self-contained islands. Each utility generated, transmitted, and distributed nearly all of the power it sold to captive retail customers. *Energy Mich. v. Mich. Pub. Serv. Comm'n*, 126 F.4th 476, 480 (6th Cir. 2025). Transactions between utilities were rare and interstate sales of power were even less prevalent. That kept most utility activities within the state's jurisdiction.

24.    But state-based utility regulation was economically inefficient. Each utility had to build duplicative excess capacity that sat unused most of the time, just in case it was needed for a few peak hours. *Id.* (citing *Elec. Power Supply Ass'n v. FERC*, 89 F.4th 546 (6th Cir. 2023)).

25.    Over time and with technological innovations, interstate power markets developed and grew.  States continue to regulate the intrastate sale of electricity at retail to the end-use consumer. But the federal government and interstate power markets have a larger role in electricity regulation.

## B. Federal Regulation of Interstate Wholesale Power Prices Through Competition

26.    Federal energy policy and the market for wholesale power have changed significantly in the last 30 years. Wholesale markets are "no longer dominated by vertically integrated monopolies, but instead consist of many players involved in generation, transmission, or distribution services." *Energy Mich.*, 126 F.4th at 480. The market is now "adapted to meet demand in a more economically efficient manner." *Id.*

27.    In 1935 Congress codified and expanded the sphere of exclusive federal jurisdiction through the Federal Power Act, which provides the FERC with exclusive authority over wholesale power sales in interstate commerce and all interstate electricity transmission. 16 U.S.C. §§ 824(a), (b), 824d(a); *N.Y. v. FERC*, 535 U.S. 1, 21–2 (2002). Wholesale power is power sold "to any person for resale." 16 U.S.C. § 824(d).

8

28.    Under the Federal Power Act FERC must set the "just and reasonable" price for all wholesale power, which it does by overseeing competitive auctions. 16 U.S.C. § 824d(a); *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 266–7 (2016) ("*EPSA*"); *see also* Final Rule, *Wholesale Competition in Regions with Organized Elec. Mkts.*, 125 FERC ¶ 61,071, Order No. 719 ¶¶ 1, 13–9 (Oct. 17, 2008) ("Order No. 719"); Energy Markets 101: How Electricity is Bought and Sold, MISO Energy, https://www.misoenergy.org/meet-miso/about-miso/industry-foundations/market-basics/.

29.    The auctions are run by FERC-supervised nonprofit entities called independent system operators ("ISOs") or regional transmission operators ("RTOs"). *See EPSA*, 577 U.S. at 267–8 (discussing the nonprofit entities that operate wholesale markets generally).

30.    Parts of Indiana are within the Midcontinent Independent System Operator ("MISO"), and other parts are within the PJM Interconnection LLC ("PJM"). MISO covers all or part of 15 states and Manitoba, Canada. PJM covers all or part of 14 states.



*Energy Mich.,* 126 F.4th at 481.

31.    Power plants are the primary sellers in the federal market and local utilities (called "Load Serving Entities" or "LSEs") are the buyers. LSEs submit orders for the power they need—typically on an hour-by-hour basis twenty-four hours in advance (called the "day-ahead market"). Power plant operators submit bids to supply specified amounts of electricity at specific prices each hour and the market operator fills LSEs' requests for power with the lowest-price bids until all LSEs' orders are filled. *See EPSA,* 577 U.S. at 268–9.

32.    The bid price for the last megawatt hour of power needed to fill all LSEs' requests for power sets the market clearing price—called the "locational marginal price"—which becomes the price paid for all energy transacted in that period. *Id.* The Load Serving Entities are charged for their share of power based on the locational marginal price for power and the amount of power they requested.

33.     Thus, through the basic economic concepts of supply and demand, as the total demand by LSEs for power increases—such as on a hot day when consumers run their air conditioning—the cost of wholesale power increases. *Id.* at 268–70.

34.     Although retail utility consumers' consumption drives the LSEs' demand for power from wholesale markets, and therefore the wholesale power price, the consumers are usually unaware of the wholesale price because they do not pay the wholesale price directly. Instead, wholesale costs are passed along through LSEs' retail prices set by state regulators. Those retail rates are typically flat prices based on long-run average costs. Thus, retail consumers see the same price for power in an hour when wholesale prices are low as in an hour when wholesale prices are high. That masks the wholesale market's price signal based on short-run supply and demand and undermines the economic efficiency of wholesale markets. Price-sensitive consumers do not adjust their consumption based on the cost of the electricity they are consuming. *See EPSA*, 577 U.S. at 269–70. Thus, "[e]ven in peak periods, as costs surge in the wholesale market, consumers feel no pinch, and so keep . . . [consuming] . . . no matter that wholesale prices spiral out of control and increased usage risks overtaxing the grid." *Id.*

## C. The Role of Competitive Demand Response in Wholesale Power Markets

35.     Congress sought to correct wholesale market distortions caused by state-set retail prices by allowing retail consumers to voluntarily respond to wholesale prices. Congress ordered FERC to allow retail customers to bid demand response into the wholesale market, making it possible for consumers to voluntarily

11

choose whether and when to use electricity in response to short-run wholesale market prices. *Id.* at 271–2 (citing the Energy Policy Act of 2005, 119 Stat. 594, 966, 16 U.S.C. § 2642 note).

36.     FERC implemented Congress's mandate by promulgating regulations that require independent system operators, including MISO and PJM, to allow consumers to bid "commitments *not* to use power at certain times" as an alternative to "paying power plants to ramp up their production." *EPSA*, 577 U.S. at 265, 270–2 (emphasis original); *see also* 18 C.F.R. § 35.28(g)(1)(iii). Under FERC's rules, those demand response offers flow through competitive entities called Aggregators of Retail Customers ("ARCs") that contract with individual customers, aggregate those customers' demand response actions into products meeting the wholesale market's specifications, and bid the aggregate demand response products in the wholesale markets.

37.     For example, an ARC may aggregate a factory's agreement to reduce its typical production rate, a homeowner's agreement to dial back her air conditioner a couple degrees, an electric vehicle owner's offer to pause charging for an hour, and a big box store's offer to dim its overhead lights into a bid to reduce overall consumption by a few megawatts at peak times on the electric grid when prices are high.

38.     The ARC bids that aggregated demand response service into the wholesale market where it competes in an auction with power plants' bids to produce the same number of megawatts by cranking up production. If the ARC's bid is lower,

it is selected by the auction instead of the power plants' bids to produce more megawatt hours.

39.     Thus, in effect, ARCs enable consumers to voluntarily band together through ARCs to compete with power plant operators for the marginal unit of electricity, which balances supply and demand at the lowest cost, "reduce[s] the need to construct and use more costly resources during periods of high demand," and "ratchets down the rates wholesale purchasers pay." Order No. 719-A at P 47; *EPSA*, 577 U.S. at 279. Demand response of only a few percent during peak hours can reduce wholesale electricity prices by 6–12%. *EPSA*, 577 U.S. at 271.

40.     Importantly, demand response is not the sale or resale of electricity. It is a service created by consumers, reflecting their *non-use* of power, that is sold to and competes in interstate wholesale power markets as an alternative to producing and selling power.

41.     FERC's rule requires MISO and PJM to accept bids of demand response aggregated from Indiana consumers of large utilities that sell more than 4 million megawatt hours of electricity. 18 C.F.R. § 35.28(g)(1)(iii).

42.     Indianapolis Power & Light (which currently does business under the trade name "AES Indiana"), Duke Energy Indiana ("Duke"), Indiana Michigan Power Company ("I&M"), Northern Indiana Public Service Company ("NIPSCO"), and Southern Indiana Gas and Electric Company (doing business as "CenterPoint") sell more than 4 million megawatt hours of electricity. Therefore, by default, customers

of those utilities could sell the demand response services they create through competitive ARCs into the MISO and PJM interstate wholesale power markets.

43.    However, the FERC rule contains an "opt-out" provision stating that MISO and PJM should not accept bids of demand response aggregated from electricity customers if "the relevant electric retail regulatory authority prohibits such customers' demand response to be bid into organized markets by an aggregator of retail customers." 18 C.F.R. § 35.28(g)(1)(iii).

44.    No Indiana statute or administrative rule prohibits consumers of large utilities from selling demand response services to wholesale markets. Yet the IURC's Demand Response Orders purport to prohibit ARCs from offering demand response from Indiana consumers into the wholesale power markets without going through, and paying kickbacks to, incumbent Indiana utilities.

### D. The Demand Response Orders

45.    On February 25, 2009, the Commission issued an "Order on Requests for Interim Relief" (the "2009 Interim Order"). A true and accurate copy of that order is attached as Exhibit 1.

46.    The 2009 Interim Order sought to block customers from offering demand response through competitive ARCs by announcing that "Indiana end-use customers are prohibited from participating in" wholesale markets and offering demand response "pending further order of the Commission." Ex. 1, 2009 Interim Order at 7.

14

47.    On July 28, 2010, the IURC issued an order making the prohibition permanent. The Commission refers to its July 28, 2010 order as its "Generic DR Order." A true and accurate copy is attached as Exhibit 2.

48.    The IURC held a notice and comment proceeding leading up to the Generic DR Order in which it solicited public comments on whether to prohibit customers and ARCs from participating in wholesale markets. Indiana utilities submitted comments making contradictory arguments that (1) incumbent monopoly utilities are more effective in obtaining and offering aggregated demand response from their customers than competitive ARCs; and that (2) incumbent utilities nevertheless need government protection from out-of-state ARCs out-competing the utilities for the supply of demand response by offering better terms and prices, which would cause the utilities to lose market share to the ARCs. Ex. 2, Generic DR Order at 8, 32. The utilities' comments also proposed that, if customers are allowed to offer their demand response to wholesale markets, they should be forced to pay kickbacks of their wholesale market revenues to the utilities. *Id.* at 25.

49.    The Generic DR Order granted the utilities' requests. The Order bans consumers and competitive ARCs from selling directly into the MISO and PJM markets. Instead, the Order provides that only the incumbent Indiana utilities can sell demand response into wholesale markets. Indiana consumers and ARCs seeking to offer demand response must therefore go through the Indiana utilities to do so. *Id.* at 43–4, 47, 51.

50.    The Generic DR Order's express purpose is economic protectionism. While the Order suggests that direct customer participation in wholesale markets can affect utility resource planning, reliability, and rates, those impacts are indirect effects of competition. To the extent the Order seeks to bolster utility planning, reliability and rates, it does so by ensuring the utilities do not have to compete with ARCs for the supply of demand response available within Indiana.

51.    The Generic DR Order states that "demand response reductions are an integral part of the provision... of retail electric service" by Indiana utilities and can be a resource input to those utilities' "short and long term energy and capacity planning." Generic DR Order at 45. The Order claims that if the incumbent Indiana utilities must compete for the available supply of demand response in Indiana with competitive ARCs, the utilities could face "significant degree of additional uncertainty" when planning which resources to acquire. *Id.* The Order also claims that the utilities are "harmed" when they do not have exclusive access to demand response because they may lose out on some demand response to competitive ARCs, and are therefore not be able to count that demand response "toward satisfying [the utility's] energy or capacity requirements." *Id.*

52.    The Generic DR Order concludes that because the IURC "regulate[s] and oversee[s] the utility planning process" and determines the "reasonableness" of utilities' resource procurement, and utilities can only use data of demand response and "evaluate demand side resources" when those resources are "within their operational control," the IURC will prohibit sale of demand response resources to

interstate wholesale markets, except through the incumbent Indiana utilities. *Id.* at 45–6. The Generic Order concludes that this will allow the Indiana utilities "to provide reasonably adequate electric service and facilities at the lowest reasonable cost to their Indiana retail customers ..." *Id.* at 47.

53.     Thus, because demand response is valuable and helpful to Indiana utilities, the IURC created an artificial monopsony in which only the incumbent utility can use customer-created demand response and an artificial monopoly in which only the incumbent utility can offer that aggregated demand response into the interstate wholesale market in order to benefit the Indiana utilities.

54.     In other words, while the Order attempts to justify its prohibition on competitive utility planning and secondary impacts on retail ratepayers, it seeks to achieve those ends by restraining the interstate trade of demand response. It does not directly regulate utility planning, reliability, or rates.

55.     The Generic DR Order also required the Indiana utilities to "file, with the Commission for approval ... tariffs or riders authorizing the participation of its retail customers in [wholesale market] demand response programs through the Respondent Utility ..." *Id.* at 51.

56.     To comply with the Generic DR Order, Duke filed its Rider 22 tariff ("Rider MBDR") on December 13, 2010, and a revised Rider MBDR on February 16, 2011. A copy of Duke's December 13, 2010, filing is attached as Exhibit 3. A copy of Duke's February 16, 2011, revised Rider MBDR is attached as Exhibit 4. The

Commission approved Duke's revised Rider MBDR tariff through an order in Cause No. 43566 MISO 3 on March 2, 2011. A copy of the order is attached as Exhibit 5.

57.    Duke's Rider MBDR prohibits customers from selling demand response services to the interstate wholesale power market through ARCs. Instead, only certain large customers and ARCs that register with Duke may offer customer-created demand response. But all such demand response must be offered to interstate wholesale markets through Duke as the seller and must pay Duke a kickback of 5% of gross wholesale market revenues, a $1,000 annual registration fee for each customer, and additional charges. Exh. 3, Rider MBDR. Yet Duke assumes no risk; the customer or ARC is responsible for all penalties and charges for any under-performance in the MISO market.

58.    The restrictions and kickbacks imposed through the Generic DR Order and Rider MBDR have made wholesale demand response infeasible for customers and competitive ARCs. In February 2025, Duke filed an annual report stating that during 2024 there were no demand response participants in Rider MBDR and "no implementation of Rider MBDR has occurred." On March 2, 2026, Duke filed an annual report stating that in 2025 there were no participants in Rider MBDR, "no agreements have been reached" with aggregators, and "no implementation of Rider MBDR has occurred."

59.    NIPSCO filed its DRR-1 and EDR tariffs with the Indiana Commission on February 1, 2011. A copy of the tariffs is attached as Exhibit 6. The Commission

approved NIPSCO's DRR-1 and EDR on March 2, 2011. Cause 43566 MISO 1 (March 2, 2011). A copy of the Commission's order is attached as Exhibit 7.

60.    Consistent with the Generic DR Order, NIPSCO's DRR-1 and EDR tariffs prohibit customers and ARCs from directly selling demand response into the wholesale market. Instead, only certain large customers and ARCs registered with NIPSCO may offer customer-created demand response and only through NIPSCO as the seller. Customers and ARCs must pay NIPSCO a kickback of 5% of all market revenues, $1,000 per customer annually, and other fees. NIPSCO also charges customers who provide wholesale demand response services a "Marginal Foregone Retail Rate"—effectively charging them for electricity they would have used, but did not use, when they reduce consumption to provide demand response to the wholesale markets. Exh. 6, DRR & EDR Tariffs. NIPSCO assumes no risk of performance; the customer or ARC providing demand response to NIPSCO must pay any penalties or charges assessed by MISO for underperformance.

61.    The restrictions and kickbacks imposed through the Generic DR Order and NIPSCO's DRR-1 and EDR tariffs have made wholesale demand response infeasible for customers and competitive ARCs. In March 2025, NIPSCO reported that during 2024, no customer or ARC participated in NIPSCO's DRR-1 or EDR tariff and no customers enrolled for 2025. On March 16, 2026, NIPSCO reported that during 2025, no customer or ARC participated in NIPSCO's DRR-1 or EDR tariff.

62.    In February 2011, Southern Indiana Gas and Electric Company (doing business at the time as Vectren Energy Delivery of Indiana, Inc. and now doing

business as CenterPoint) filed its Midcontinent Independent System Operator Demand Response Rider ("Rider DR") tariff with the Commission. The Commission approved the tariff on March 2, 2011, in Cause No. 43566 MISO 4. A copy of the order is attached as Exhibit 8. Following the Commission's order, CenterPoint filed final tariff sheets. A copy of the tariff sheets is attached as Exhibit 9.

63.    Consistent with the Generic DR Order, CenterPoint's Rider DR prohibits customers and ARCs from offering demand response directly to MISO markets. Instead, only certain large customers and ARCs can offer demand response and must do so through CenterPoint as the seller. To offer demand response to wholesale markets through CenterPoint, the customers and competitive ARCs must pay CenterPoint a kick-back of 10% of gross market revenues, a $1,000 annual fee per customer, and other fees. Exh. 9, Rider DR. ARCs seeking to offer demand response through CenterPoint must also provide the utility with confidential business information, including financial statements, corporate records, and other information deemed "satisfactory" to CenterPoint. The utility assumes no risk; customers and ARCs must pay all underperformance penalties and charges assessed by MISO plus an extra $500 to CenterPoint. *Id.*

64.    The restrictions and kickbacks imposed through the Generic DR Order and Rider DR make wholesale demand response infeasible for customers and competitive ARCs. In March 2025, CenterPoint reported that during 2024 it had no participants in Rider DR. On March 13, 2026, CenterPoint reported that during 2025 it still had no participants in Rider DR.

65.    AES Indiana (Indianapolis Power & Light Company) submitted its Rider 23 tariff to the Commission in February 2011. A copy of Rider 23 is attached as Exhibit 10. The Commission approved Rider 23 tariff on March 2, 2011, in Cause No. 43566 MISO 2. A copy of the Commission's order is attached as Exhibit 11.

66.    Consistent with the Generic DR Order, IPL's Rider 23 prohibits customers and competitive ARCs from selling demand response services directly to the wholesale market. Instead, only certain large customers and ARCs that register with IPL can offer demand response and only through AES Indiana as the seller and paying the utility kickbacks of 10% of all gross market revenue,  a $1,000 annual registration fee, and other fees. Exh. 10, IPL Rider 23. Rider 23 also charges a customer for the electricity the customer would have used when the customer reduces consumption to provide wholesale demand response. *Id.* ("The Company will deduct the Retail Rate for the energy not consumed by the Customers pursuant to this Rider..."). AES Indiana assumes no risk; customers and ARCs must pay all penalties or charges for underperformance plus a $500 fee to AES Indiana.

67.    The restrictions and kickbacks imposed through the Generic DR Order and Rider 23 have made wholesale demand response infeasible for customers and competitive ARCs. In March 2025, AES Indiana reported that during 2024, the utility had no customers participating in either the Emergency or Demand Response Resource Type 1 programs and that no customers had expressed any interest in participating.

68.    I&M filed tariff DRS 1 with the IURC in October 2010, and a revised DRS 1 tariff on November 19, 2010. A copy of I&M's revised DRS 1 tariff is attached as Exhibit 12. The Commission approved the revised DRS 1 tariff on April 27, 2011, in Case No 43566 PJM 1, Phase I Order. A copy of the Commission's order is attached as Exhibit 13.

69.    On January 28, 2011, I&M filed DRS 2. A copy of I&M's DRS 2 tariff is attached as Exhibit 14. The Commission approved DRS 2 on May 18, 2011, in Cause No. 43566 PJM 1 Phase II Order. A copy of the Commission's order is attached as Exhibit 15.

70.    On July 8, 2011, I&M filed DRS 3. A copy of I&M's DRS 3 tariff is attached as Exhibit 16. The Commission approved DRS 3 through Cause No. 43566 PJM 1 Phase III Order on October 5, 2011. A copy of the Commission's order is attached as Exhibit 17.

71.    Consistent with the Generic DR Order, I&M's DRS 1, 2, and 3 tariffs prohibit customers and competitive ARCs from offering demand response directly into wholesale markets. Instead, only certain large customers and ARCs that register with I&M may offer demand response and only through I&M as the seller. Customers and ARCs providing demand response through I&M must pay the utility kickbacks of 10% of their gross PJM energy market revenues, monthly fees for each customer providing demand response, and for all PJM market charges.  I&M does not assume or incur any liability; any charges for non-compliance with PJM market requirements are passed through to the customer and competitive ARC.

72.     The Generic DR Order and the I&M DRS 1, 2 and 3 tariffs have made demand response largely uneconomic. While there are a few I&M customers participating—unlike the other Indiana utilities that have no participation—the level of participation is meager compared to participation elsewhere in the PJM market and decreasing year-over-year. In March 2025, I&M reported that during 2024: 68 customers participated under DRS 1 with total interruptible capacity of approximately 98 megawatts (MW) in summer and 120 MW in winter; five customers participated under DRS 2 totaling 45.6 MW; and 8 customers participated under DRS 3 totaling 53.8 MW of capacity. On March 13, 2026, I&M reported that during 2025: 69 customers participated under DRS 1 with a total capacity of 85 MW in summer and 102 MW in winter; five customers participated in DRS 2 totaling approximately 46 MW; and eight customers totaling approximately 54 MW participated in DRS 3. The same customer can register in more than one of the tariffs, so it is unclear whether the same customers participating in DRS 2 and DRS 3 are also included in the count of DRS 1 customers.

**First Cause of Action**
**Commerce Clause**
**42 U.S.C. § 1983**

73.     Plaintiffs reallege and incorporate paragraphs 1 through 72 here.

74.     Article I, section 8, clause 3 of the United States Constitution provides that "Congress shall have the power... [t]o regulate commerce... among the several states." Although framed as an affirmative grant, it "also prohibits state laws that unduly restrict interstate commerce" or that "adopt protectionist measures." *Tenn.*

*Wine & Spirits Ass'n v. Thomas*, 588 U.S. 504, 514–5, 538 (2019). That prohibition is known as the "[D]ormant Commerce Clause." *Id.*

75.    The fundamental purpose of the Dormant Commerce Clause is to "preserv[e] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Gen. Motors v. Tracy*, 519 U.S. 278, 299 (1997). It therefore prohibits state regulatory measures—such as the Demand Response Orders here—that confer "economic protectionism... to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988); *see also Tenn. Wind & Spirits*, 588 U.S. at 518 ("by its own force," the Dormand Commerce Clause "restricts state protectionism.").

76.    Among other prohibitions, the Dormand Commerce Clause prohibits state regulations that block interstate commerce at a state's boarders, *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978), or reserve a segment of a market for in-state businesses. *Wyoming v. Oklahoma*, 502 U.S. 437, 455 (1992). The Demand Response Orders violate the Dormant Commerce Clause in both ways.

77.    There is no exception to the Dormant Commerce Clause for regulated public utilities. *Gen. Motors Corp.,* 519 U.S. 278, 291 n.8 ("utilities should not be insulated from our contemporary dormant Commerce Clause jurisprudence"); *New England Power Co. v. New Hampshire*, 455 U.S. 331, 339 (1982) (finding a state law regulating a utility's sale of electricity outside the state to violate the Commerce Clause); *Energy Mich., Inc.,* 126 F.4th 476, 495 ("a state's generic interest in local

energy reliability does not exempt it from Commerce Clause scrutiny"), 496 (original understanding of the Commerce Clause did not treat energy differently than any other trade); *NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 318 (5th Cir. 2022) ("Utilities, despite their history as monopolies... are not immune from [ ] ordinary Commerce Clause jurisprudence." (internal quotes, citations omitted)).

78.    The Dormant Commerce Clause's discrimination prohibition applies to "substantially similar entities." *Gen. Motors Corp.*, 519 U.S. 278, 298 (1997). Entities are similarly situated where "actual or prospective competition [exists] between the supposedly favored and disfavored entities in a single market." *Id.* at 300. While natural monopolies are generally not substantially similar to competitive entities operating in a separate market, the fact that a utility has a monopoly in providing retail electricity to captive customers does not permit a state to confer an artificial monopoly to the utility in a separate, competitive market. Here, Indiana utilities selling aggregated demand response services to interstate wholesale power markets are similarly situated with and compete with non-utility ARCs in that market.

79.    State regulation violates the Dormant Commerce Clause in one of three ways: (1) by discriminating against interstate commerce in favor of in-state commerce—either on its face, in effect, or as its underlying purpose; (2) by imposing a burden on interstate commerce that outweighs any benefits to the state; or (3) by exerting extraterritorial control on interstate commerce. The Commission orders challenged here implicate the first two categories.

80.    The IURC's Demand Response Orders here (1) restrict the interstate market by requiring demand response services be sold only through in-state utilities and prohibiting sale across state lines directly to interstate markets or out-of-state ARCs, and (2) discriminate by favoring in-state utilities over out-of-state ARCs as the buyers of customer demand response services and seller of bundled demand response services to wholesale markets.

81.    In particular, by requiring all demand response be sold to wholesale markets through five incumbent Indiana utilities, rather than directly by out-of-state ARCs to wholesale markets, the Demand Response Orders violate the Dormant Commerce Clause's prohibition on state laws mandating "that its residents be given a preferred right of access, over out-of-state consumers, to natural resources located within its borders or to the products derived therefrom." *New England Power Co.*, 455 U.S. at 338 (internal quotes omitted); *see also C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 389–92 (1994) (Dormant Commerce Clause prohibits "local processing requirements" that require use of local businesses and "hoard a local resource... for the benefit of local businesses").

82.    It is irrelevant that the IURC claims demand response is "required to satisfy local demands" or are needed by the people of the State. *New England Power*, 455 U.S. at 339. The Orders' requirement that demand response be sold to Indiana utilities is "precisely the sort of protectionist regulation that the Commerce Clause declares off-limits to the states." *Id.*

83.    Because they discriminate, the IURC's Demand Response Orders are "virtually per se invalid" and subject to strict scrutiny. *Or. Waste Sys. Inc. v. Dep't of Envt'l Quality of Or.*, 511 U.S. 93, 94, 99 (1994). To justify the Demand Response Orders as consistent with the Commerce Clause, the Defendants would have to identify legitimate (non-protectionist) local benefits flowing from the Orders and show that no nondiscriminatory alternative for achieving such benefit is feasible. *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338–9, 346 (2007). So high is that burden that "state laws that discriminate against interstate commerce face 'a virtually *per se* rule of invalidity.'" *Granholm v. Heald*, 544 U.S. 460, 476 (2005) (*quoting City of Philadelphia*, 437 U.S. 617, 624).

84.    Defendants have not made, and cannot make, those demonstrations. The purpose of the orders is explicitly economic protectionist: reserving demand response resources created in Indiana for the benefit of Indiana utilities and, purportedly, other Indiana consumers. Economic protectionism is not a legitimate state interest.

85.    It is irrelevant that the Generic DR Order claims that granting five Indiana utilities exclusive access to demand response is part of a "regulatory bargain" in which Indiana electricity consumers obtain "adequate, reliable and low cost retail service" and, "in exchange" should be prohibited from selling their demand response services to interstate wholesale markets through competitive ARCs rather than "through the host utility." Ex. 2, Generic DR Order at 47. The IURC has no authority

27

to strike that "bargain" by discriminating against interstate commerce. The so-called "bargain" is simply economic protectionism in favor of in-state utilities.

86.    Even if the Orders served a different, compelling, and non-discriminatory purpose, the Defendants cannot show that all non-discriminatory alternatives are infeasible. For example, the Generic DR Order suggests that customer demand response sold to ARCs, rather than to the Indiana utilities, could impose wholesale market Revenue Sufficiency Guarantee charges or administrative charges on the utilities. *Id.* at 46. Those claims are unsupported and speculative. But even if substantiated, such concerns can be addressed through specific fees to collect any such costs rather than discriminatorily blocking demand response sales through competitive ARCs.

87.    Moreover, even if the orders were not discriminatory and had only incidental effects on interstate commerce, they still violate the Dormant Commerce Clause because any putative local benefits conferred are significantly outweighed by the burden imposed on interstate commerce under the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 141–2 (1970).

88.    Other states in the region, including Iowa, Minnesota, Missouri, Wisconsin and Michigan previously barred all ARCs from offering demand response from their residents to wholesale power markets based on vague and unsubstantiated concerns about impacts on utility operations and planning. All five of those states lifted their prior bans, in whole or in substantial part, with no documented negative impacts on service to retail customers—likely because ARCs are subject to regulation

by FERC, MISO, and PJM and both the state regulator and local utility are informed about the identity and loads of all customers registered by an ARC as part of a demand response resource. Given that experience in other states, any putative local benefit from barring competitive ARCs from offering customer demand response directly to wholesale markets is minimal to non-existent and outweighed by the burden.

89.    The uptick in participation by ARCs in wholesale markets after prior bans were lifted in other states, compared to the non-existent participation in the service area of four Indiana utilities and nominal participation by ARCs in the fifth utility's service area, evidences the significant burden that the Demand Response Orders impose. That burden significantly outweighs the small, and likely non-existent, putative local benefits from the Demand Response Orders.

90.    The fact that the Demand Response Orders discriminate in favor of only five Indiana businesses and therefore discriminate against any in-state ARCs as well as all out-of-state ARCs, does not excuse the discrimination. A state regulatory act that favors just a sliver of in-state entities violates the Dormant Commerce Clause. *C & A Carbone,* 511 U.S. at 391 (a law "is no less discriminatory because in-state or in-town processors are also covered by the prohibition"); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 268 (1984); *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 n.4 (1951).

91.    Congress has not authorized the Demand Response Order's discrimination. While Congress can confer an ability to discriminate or restrict the

flow of interstate commerce to states, it must make its intent "unmistakably clear." *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984). Congress has not conferred such authority on states to restrict the flow of electricity services, generally, nor demand response, specifically, in interstate commerce. *Cf. New England Power*, 455 U.S. at 341 (the Federal Power Act "is in no sense an affirmative grant of power to the states to burden interstate commerce in a manner which would otherwise not be permissible" (internal quotes omitted)); *Energy Mich.*, 126 F.4th at 500.

92.    For these reasons, the Demand Response Orders, individually and collectively, violate the Dormant Commerce Clause.

93.    Defendants continue to enforce the orders. If an ARC sought to register demand response resources created by Indiana consumers directly with the MISO or PJM market, rather than registering through the local utility and paying the kickbacks imposed by the Demand Response Orders, the Defendants would object to MISO or PJM based on their Demand Response Orders, thereby blocking the resource from the markets.

94.    Plaintiffs request a declaration that the Commission orders violate the United States Constitution by unlawfully interfering with interstate commerce and an injunction prohibiting the Defendants from enforcing the orders.

### Second Cause of Action
### Indiana Privileges and Immunities Clause
### 28 U.S.C. § 1367

95.    Plaintiffs reallege and incorporate paragraphs 1 through 94 here.

96.     The Demand Response Orders granting incumbent utilities exclusive rights to offer customer-created demand response services to wholesale power markets violate the Indiana Constitution's Privileges or Immunities Clause.

97.     Section 23 of the Indiana Constitution provides that the "General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens." Ind. Const. art. I, § 23. The prohibition applies to state agency actions such as the Commission orders in this case. *Palin v. Ind. State Pers. Dept.*, 698 N.E.2d 347, 353 (Ind. Ct. App. 1998) (citing *Haas v. S. Bend Cmty. School Corp.*, 289 N.E.2d 495 (Ind. 1972)).

98.     The original intent and understanding of the Indiana Constitution's Privileges or Immunities Clause was to prohibit the state government from creating monopolies or granting special privileges to commercial enterprises favored by the political elite. *Paul Stieler Enters., Inc. v. City of Evansville*, 2 N.E.3d 1269, 1276 (Ind. 2014); *Collins v. Day*, 644 N.E.2d 72, 76–7 (Ind. 1994); *Ind. Gaming Comm'n v. Moseley*, 643 N.E.2d 296, 303 (Ind. 1994). The clause gives effect to the framers' belief that state-sanctioned monopolies constitute "robbery upon the citizens." 1 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana* 646 (1850). It prohibits selling monopoly status to preferred companies based on perceived benefits flowing to the state government or the preferred in-state companies. *Paul Steiler Enterprises*, 2 N.E.3d at 1276.

99. Politically powerful in-state utilities are the "political elite" in Indiana and protectionism of them through the Demand Response Orders is the "robbery upon the citizens" the framers worried about.

100. The Demand Response Orders violate Indiana's Privileges or Immunities Clause by granting special privileges to incumbent utility companies, prohibiting ARCs from directly selling customer-created demand response services to wholesale markets, and requiring kickbacks of market revenues to incumbent utilities.

101. The Defendants cannot show that those "special privileges" are "reasonably related to" an "inherent difference" between incumbent utilities and competitive ARCs associated with selling aggregated demand response to wholesale power markets. *Id.* at 1274–5; *Myers v. Crouse-Hinds Div. of Cooper Indus., Inc.*, 53 N.E.3d 1160, 1165–6 (Ind. 2016).

102. Any inherent difference between retail utilities and ARCs is limited to utilities selling bundled electricity at retail. There is no inherent difference between the utilities and ARCs related to providing bundled customer demand response to competitive, interstate, wholesale markets.

103. The Commission orders therefore violate the Indiana Privileges and Immunities Clause.

104. Plaintiffs request a declaration that the orders violate the Indiana Constitution and are invalid as well as an injunction prohibiting Defendants from enforcing the orders.

## Relief Requested

For these reasons, Plaintiffs hereby respectfully ask the Court to grant the following relief:

a.      A declaratory order under 28 U.S.C. § 2201 that the Commission's orders are unconstitutional, invalid, and unenforceable and therefore do not bar aggregators of retail customers from bidding customers' demand response into organized markets under 18 C.F.R. § 35.28(g)(1)(iii);

b.      An injunction prohibiting Defendants from enforcing the Commission's orders, including, but not limited to, by objecting to ARCs registering demand response from Indiana consumers directly with the MISO or PJM markets;

c.      An order awarding Plaintiffs the costs and expenses incurred in the instant litigation, including reasonable attorneys' fees under 42 U.S.C. § 1988(b); and

d.      Any order for such other relief, including preliminary injunctive relief, and further relief as may be just and appropriate under the circumstances.

Dated:        March 31, 2026

Respectfully submitted:

EARTHJUSTICE
*/s/ David C. Bender*
David C. Bender
180 Steuart Street, #194330
San Francisco, CA 94105
(202) 667-4500
dbender@earthjustice.org

Lisa Perfetto
48 Wall Street, 15th Floor
New York, NY 10005
Tel: (212) 845-7388
lperfetto@earthjustice.org

*Counsel for Plaintiffs*

## Exhibits

| Number | Date | Description |
| --- | --- | --- |
| 1 | 2/25/2009 | IURC 2009 Interim Order |
| 2 | 7/28/2010 | IURC Generic DR Order |
| 3 | 12/13/2010 | Duke Energy Rider MBDR tariff |
| 4 | 2/16/2011 | Duke Energy revised Ride MBDR tariff |
| 5 | 3/2/2011 | IURC Order, Cause No. 43566 MISO 3, approving Rider MBDR |
| 6 | 2/1/2011 | NIPSCO DRR-1 and EDR tariff |
| 7 | 3/2/2011 | IURC Order, Cause 43566 MISO 1, approving NIPSCO DRR-1 and EDR tariff |
| 8 | 3/2/2011 | IURC Order, Cause No. 43566 MISO 4, approving CenterPoint Rider DR |
| 9 | 3/9/2011 | CenterPoint (Vectren/SIGECO) Rider DR tariff compliance filing |
| 10 | 2/2011 | IPL Rider 23 tariff |
| 11 | 3/2/2011 | IURC Order, Cause No. 43566 MISO 2, approving IPL Rider 23 |
| 12 | 11/19/2010 | I&M DRS 1 tariff |
| 13 | 4/27/2011 | IURC Order, Case No 43566 PJM 1, Phase I, approving DRS 1 tariff |
| 14 | 1/28/2011 | I&M DRS 2 tariff |
| 15 | 5/18/2011 | IURC Order, Cause No. 43566 PJM 1 Phase II, approving DRS 2 tariff |
| 16 | 7/8/2011 | I&M DRS 3 tariff |
| 17 | 10/5/2011 | IURC Order, Cause No. 43566 PJM 1 Phase III, approving DRS 3 tariff |