# Exhibit 3



FILED

DEC 13 2010

INDIANA UTILITY
REGULATORY COMMISSION

## EXHIBIT 1

**Proposed MBDR Rider**

**Proposed EDR Service Agreement for Customers**

**Proposed DRR Type 1 Service Agreement for Customers**

**Proposed EDR Service Agreement for Aggregators**

**Proposed DRR Type 1 Service Agreement for Aggregators**

DUKE ENERGY INDIANA, INC.                                          IURC No. XX
1000 East Main Street                                        Original Sheet No. 22
Plainfield, IN  46168

**STANDARD CONTRACT RIDER NO. 22
DUKE ENERGY MARKET BASED DEMAND RESPONSE (MBDR) RIDER
APPLICABLE TO HLF AND LLF RATE GROUPS**

## AVAILABILITY

Applicable to Customers served under Rates HLF or LLF who enter into a service agreement and can demonstrate to the Company's satisfaction the ability to reduce energy consumption in accordance with the Midwest Independent Transmission System Operator's requirements. Customers desiring participation in this Rider under multiple programs will be required to have a service agreement for each program desired and may not participate in multiple programs under this Rider with the same curtailable load amount.  Customers participating in Standard Contract Rider No. 23, Peak Load Management can participate in this Rider only with load not curtailable under Standard Contract Rider No. 23.  Customers receiving service under special contracts with Company may not participate in this rider.

Customer must be in good credit standing with Company.  Company reserves the right to refuse participation or terminate participation in this Rider based on Customer credit standing with Company.  Credit requirements, if any, will be specified in the service agreement.

ARCs, defined below, may also aggregate Customers in accordance with a service agreement and participate in this Rider.

Customer/ARC must assist and coordinate with Company to complete all MISO registration requirements.  Participation under this Rider may not begin or continue unless MISO has accepted and approved all applicable requirements for resource participation.

Company reserves the right to limit MW participation in this Rider as set forth in applicable MISO BPMs and/or as needed by Company.

## DEFINITIONS

ARC:                         Aggregator of Retail Customers.

MISO:                        Midwest Independent Transmission System Operator, Inc.

BPM:                         MISO Business Practice Manual

CPNode:                      Commercial Pricing Node as such term is defined by MISO

EDR                          Emergency Demand Response, a type of demand response resource as defined by MISO.

DRR Type I                   Demand Response Resource Type I, a type of demand response resource as defined by MISO.

LMP:                         Locational Marginal Price

MFRR:                        Marginal Foregone Retail Rate, the full marginal retail rate inclusive of trackers excluding any demand component effects.

Issued:                                   **Effective: The First Billing Cycle of _____**

**DUKE ENERGY INDIANA, INC.**
**1000 East Main Street**
**Plainfield, IN  46168**

**IURC No. XX**
**Original Sheet No. 22**

**STANDARD CONTRACT RIDER NO. 22**
**DUKE ENERGY MARKET BASED DEMAND RESPONSE (MBDR) RIDER**
**APPLICABLE TO HLF AND LLF RATE GROUPS**

Consumption Baseline:  An estimate of the electric consumption amount absent load curtailment for a demand response event.

Curtailment Amount  The amount of load the Customer is capable to reduce from its Consumption Baseline as specified in the service agreement.

## MINIMUM CURTAILMENT AMOUNT
At a minimum, Customer must provide a Curtailment Amount equal to the greater of:
- (i)  1 MW,
- (ii)  10% of Customer's maximum demand over the past 12 months,
- (iii)  the minimum MW amount for participation as specified by MISO in the applicable BPM for the type of resource offered.

Any load curtailable under Rider No. 23 will not be included toward the minimum Curtailment Amount.

ARC can meet required minimum Curtailment Amount through aggregation of Customers.

## RIDER DESCRIPTION
Participation in this Rider is voluntary and offers Customers the opportunity to reduce their electric costs through participation with Company in the MISO wholesale energy market and to help preserve reliable electric service by managing their electric usage during MISO-declared emergency events. Customer and/or ARC and Company will enter into a service agreement under this Rider, which will specify the terms and conditions under which Customer agrees to reduce usage.

## DUKE ENERGY MARKET BASED PROGRAMS
Duke Energy Indiana will offer programs specified in the service agreements.  Additional programs consistent with this Rider's provisions may be offered in future service agreements as customer preferences and demand develop.  Program participation requirements will be detailed in the service agreement including the ability to specify certain offer parameters.  Programs to be offered under this Rider include:
1) PowerShare® EDR Program and
2) PowerShare® DRR Type I Energy Program

Customer/ARC participation in the programs will be offered by Company to MISO for potential load reduction daily, as applicable, through an established default offer.  Customer has the option of revising the default offer, as applicable, on any particular day provided Customer notifies Company prior to the specified time in the service agreement.

## METERING REQUIREMENTS
Customers must have a meter capable of providing the load metering frequency and telemetry required by the MISO in the applicable BPM for each participating account.   Duke Energy Indiana will install the MISO-compliant and Commission-compliant metering and telemetry required upon Customer approval of the estimated installed cost as provided by Company.  Installation must be completed before participation may begin. After installation, Company will invoice Customer/ARC for the installed cost of the compliant telemetry and metering.

**Issued:**                      **Effective: The First Billing Cycle of _____**

DUKE ENERGY INDIANA, INC.
1000 East Main Street
Plainfield, IN 46168

IURC No. XX
Original Sheet No. 22

### STANDARD CONTRACT RIDER NO. 22
### DUKE ENERGY MARKET BASED DEMAND RESPONSE (MBDR) RIDER
### APPLICABLE TO HLF AND LLF RATE GROUPS

**CURTAILMENT PLAN COMPLIANCE OPTIONS**
Customers/ARC may elect to participate in this Rider by either choosing to:
a) reduce demand to a specified level, Firm Demand Level ("FDL"), or
b) reduce energy usage a specified amount below a baseline, Guaranteed Load Drop ("GLD").

**Firm Demand Level (FDL)**
Customers/ARCs electing this option agree, upon notification by Company, to limit their demand to a firm load level. The method to compute the amount of the demand reduction during events will be specified in the service agreement under the Measurement and Verification section.

**Guaranteed Load Drop (GLD)**
Customers/ARCs electing this option agree, upon notification by Company, to reduce energy usage below their consumption baseline level by the customer specified, and agreed upon by Company, amount. The method to compute the amount of the demand reduction during events will be specified in the service agreement under the Measurement and Verification section.

The curtailment plan compliance option(s) available for a particular program will be specified in the service agreement.  In addition, special processing, if any, will be specified in the service agreement for Rider No. 23 participants to ensure Curtailment Amounts of all load under this Rider and Standard Contract Rider No. 23 are coordinated and not double counted.  Under no circumstance will Customer/ARC be compensated for the same load reduction under both Standard Contract Rider No. 23 and Rider MBDR.

Customer and/or ARC must agree to the consumption baseline method specified in the service agreement.  MISO must approve the baseline methodology prior to the start of participation.  Participants in Rider MBDR must agree to the consumption baseline method used in Standard Contract Rider No. 23 if they are a participant in Standard Contract Rider No. 23 unless Customer and Company mutually agree on an alternative consumption baseline method acceptable to MISO.

**CHARGES FOR FAILURE TO PERFORM**
If the Customer/ARC does not reduce load in accordance with the service agreement, MISO may charge the Company a penalty for failure to perform.  Such penalty will be imposed on the Customer/ARC plus a fee for the Company's use of funds and personnel used to determine, verify and pay the penalty to MISO. The fee will be specified in the service agreement. The Customer/ARC's participation shall be suspended if payment of any fees become past due.  Further, the Company and the Customer/ARC will discuss methods to comply during future events.  If the MISO terminates the ability of the resource to participate, the Company shall immediately terminate the Customer's/ARC's participation.  If there are system reliability issues created by the Customer/ARC's failure to perform, the Company reserves the right to suspend participation of the Customer/ARC under this Rider for 90 days or to terminate the Customer/ARC participation.

**SETTLEMENTS**
Based upon Customer performance related to MISO-cleared offers and applicable fees, Company will establish a bill credit and structure of bill credit or debit to be given to Customers that enroll directly under this Rider.  Customer will receive credits or debits on its Company-issued electric bill.  Depending on the Customer's billing cycle and when credits or debits are issued within the month, posting of the credits or debits to the Customer's bill may be delayed one billing cycle.  All applicable fees and charges as

Issued:                                    Effective: The First Billing Cycle of _____

**DUKE ENERGY INDIANA, INC.**
1000 East Main Street
Plainfield, IN  46168

IURC No. XX
Original Sheet No. 22

## STANDARD CONTRACT RIDER NO. 22
## DUKE ENERGY MARKET BASED DEMAND RESPONSE (MBDR) RIDER
## APPLICABLE TO HLF AND LLF RATE GROUPS

specified in the service agreement and this Rider will be applied on Customer's electric bill.  If necessary, adjustments will be applied to subsequent customer bills for revised settlement amounts.

Company shall pay or charge an ARC for the ARC's customer portfolio performance amount under this Rider under separate check or wire transfer as specified in the applicable service agreement.  Credits or debits will be provided as specified in the service agreement.

The value of the credit or debit will take into consideration the Customer/ARC specified offer parameters, the MISO LMP for the CPNode applicable to the customer's participating site, any appropriate bill savings from reducing load under the applicable Standard Rates (MFRR), program administrative costs, and other factors determined and specified in the service agreement.

**BILLING UNDER STANDARD RATES**
Customers served under Rates LLF or HLF will be billed for all demand and energy used under the terms and conditions and at the rates and charges of the applicable Standard Rate. In addition, Customers will receive credits on their electric bill, where applicable, for participation in this Rider based upon the elected program as outlined above and in the service agreement.

**AGGREGATORS OF RETAIL CUSTOMERS**
An ARC may aggregate Duke Energy Indiana Customers to facilitate Customer participation with Company in this Rider. Each individual Customer in such an aggregation of Customers must be identified by the ARC and provide all information needed for and requirements for participation and registration, as set forth in the applicable service agreement.  The ARC will be subjected to the same requirements set forth for Customers as specified in this Rider and the applicable service agreement.  A Customer may serve as an ARC.  No Customer shall be represented by more than one ARC.  No Customer may participate through an ARC while simultaneously participating directly in this Rider.

**PROGRAM EQUIPMENT**
Company will specify a communication plan in the service agreement, which may include software, to be used to provide Company with Customer specified offer parameters and participation elections. Customer will be responsible for providing its own internet access if needed.  Customer may purchase from either Company or other third-party suppliers any other necessary equipment or software packages to facilitate participation in this Rider. While Customers are encouraged to use such equipment or software packages to maximize benefits under this Rider, it is not a requirement for program participation. It is Customer's responsibility to ensure the compatibility of third-party equipment or software packages with any Company owned equipment or software packages.

**TERM AND CONDITIONS**
Except as provided in this Rider, all terms, conditions, rates, and charges outlined in the applicable Standard Rates will apply.

Any interruptions or reductions in electric service caused by outages of Company's facilities, other than as provided under this Rider and the service agreement, will not be deemed an event period under this Rider.  Agreements under this Rider will in no way affect Customer's or Company's respective obligations regarding the rendering of and payment for electric service under the applicable electric tariff and its applicable rate schedules. It will be Customer's responsibility to monitor and control their demand and energy usage before, during, and after a notice period under this Rider.

Issued:                                                      Effective: The First Billing Cycle of _____

## DUKE ENERGY INDIANA POWERSHARE® EDR SERVICE AGREEMENT

This Power Share® EDR Service Agreement ("Agreement") is made and entered into this _____ day of _____, 20_____, the Effective Date and is between the customer receiving service from Duke Energy Indiana, Inc. as identified on the customer information page ("Customer") and Duke Energy Indiana, Inc. ("Duke Energy" or "Company"). Company and Customer may sometimes be referred to herein as a "Party" and collectively as the "Parties."

WHEREAS, the Indiana Utility Regulatory Commission ("Commission"), through its July 28, 2010 Order in Cause No. 43566, has required all jurisdictional electric utilities in Indiana, including Company, to offer programs allowing customers to participate through their respective electric utilities in RTO demand response programs. Pursuant to the Commission Order in Cause No. 43566, the Company has implemented Rider MBDR, as set forth in Duke Energy Indiana's Standard Contract Rider No. 22 ("Rider No. 22"), which is attached hereto as Attachment A and incorporated herein by this reference; and

WHEREAS, the Commission has authorized the participation of Customer in Rider MBDR, and Customer desires to participate in Rider MBDR subject to the applicable Company tariff rules and rate schedules.

NOW, THEREFORE, in consideration of the mutual undertakings set forth below, the Parties agree as follows:

## GENERAL TERMS AND CONDITIONS

1.  This Agreement is subject to the terms and conditions of Duke Energy's Rates, Terms and Conditions for Electric Service, IURC No. 14 and any successor electric tariff, as filed with the Indiana Utility Regulatory Commission and as amended from time to time ("Tariff"), including without limitation Standard Contract Rider No. 22, Market Based Demand Response Rider, as may periodically be revised ("Rider MBDR").

2.  Service under Rider MBDR shall commence upon the completion of (i) full execution of this Service Agreement, (ii) acceptance of the resource registration and the EDR offer by Midwest ISO (or "MISO"), (iii) installation and operational readiness of required electric metering and dedicated communication links with applicable electric meters, (iv) collection of the minimum amount of interval meter data required to calculate baseline load.

3.  This Agreement supersedes and replaces all other PowerShare® EDR agreements between Customer at the address set forth on the Customer Information Sheet and Duke Energy.

1

4.  Company will utilize phone and email to notify Customer of events and to process Customer participation updates. Customer will be responsible for providing their own Internet access. Customer is responsible to notify Company if their internet system is not available to accept email. In the event that the Internet system is temporarily unavailable, Company will notify Customer and process participation updates by phone. Company will provide written documentation and training on the process to be used by Customer. Customer must provide and maintain 24-hour contact information.

5.  This Agreement shall not be construed as any promise or warranty by Company to provide continuous or uninterrupted power to Customer.

6.  All participants will be subject to the current testing requirements of the Midwest ISO for EDR resources as this term is defined by Midwest ISO and as specified in the appropriate Midwest ISO business practice manuals. Further, Customers using a generator(s) to provide load reduction for this program will be required to test their generator(s) annually in a manner consistent with MISO requirements.

7.  Customer load curtailment enrolled under this Agreement must be solely committed to Duke Energy Indiana and not enrolled in any other demand response program.

## EDR TERMS AND CONDITIONS

1.  EVENT NOTIFICATION: Company may notify Customer, consistent with notification time specified by Customer, that it is declaring an EDR Event when Midwest ISO dispatches the program as registered with and offered to Midwest ISO. Company shall utilize phone and e-mail, or other means of communication as mutually agreed, to apprise Customer of an EDR Event. Company will notify Customer that it is declaring an EDR Event within 30 minutes of receiving the dispatch instruction from MISO. Customer should account for this time in their Notification Time specified.

2.  CUSTOMER REDUCTION OBLIGATION: Customer is obligated to reduce load as specified in this Agreement and the current, applicable offer in accordance with the Midwest ISO dispatch instruction as communicated by Company to Customer. Failure to meet the Demand Reduction Tolerance amount will result in charges for load not reduced. Load reduction under this PowerShare® EDR program is incremental to any other load reduction required from Customer under participation in other demand response programs.

2

3.    CURTAILMENT STATUS and OTHER DAILY EDR OFFER CHANGES: Customer may update their EDR Offer with Company daily subject to fees specified in Attachment B. Status updates must be received by 8 AM EST the day prior to the day the status will be effective.

4.    DEFAULT OFFER: Customer's default offer will be available to MISO daily unless updated by notifying Company by 8 AM EST the day prior to the day of the update.

5.    CUSTOMER OFFER COST PARAMETERS: Customer may specify a shutdown cost and energy offer amount associated with demand reduction including direct labor and equipment costs and/or opportunity costs. Customer may update their Shutdown Cost quarterly by notifying Company in writing prior to the day before the first day of the quarter. New Shutdown Cost values will be effective on the next earliest date of April 1, July 1, October 1, and January 1.

6.    CUSTOMER BASELINE/MEASUREMENT & VERIFICATION: Company will utilize a regression based method to determine the EDR Baseline Load. If applicable, the baseline will be coordinated with Customer's baseline load projections from other programs in which Customer participates. The EDR Baseline Load will be calculated shortly after the end of the month in which the event occurs but always within the time limitations specified by MISO and subject to coordination with baseline loads from other programs. An estimated EDR Baseline Load may be provided to the customer prior to the event if available. Alternatively, at the mutual agreement of Customer and Company, the Midwest ISO default baseline for EDR resources or other specified baseline calculation acceptable to the MISO may be used. Customer may select either the Firm Demand Level (FDL) or Guaranteed Load Drop (GLD) curtailment compliance methods as specified in Rider MBDR.

7.    DEMAND REDUCTION TOLERANCE: The Demand Reduction Tolerance is defined as 95% * Midwest ISO EDR Dispatch Amount, as defined in Midwest ISO Schedule 30. The 95% value may change as Midwest ISO changes this value in Schedule 30.

8.    GENERATOR SOURCED CURTAILMENT: If Customer plans to utilize a behind the meter generator ("BTMG") to accomplish load curtailment during an EDR Event, the Customer must affirm in writing that: (1) it holds all necessary permits; (2) it possesses the necessary rights to operate the unit; (3) the BTMG is not a Network Resource, as this term or its successor term is defined by MISO; and (4) if the resource(s) is historically operated during non-emergency conditions, that the energy available for participation under this Rider MBDR program is the increase in output that produces the demand reduction. By signing this Agreement, Customer affirms these items.

3

9.    SETTLEMENT:

a.    Customer will be eligible for compensation for load reduction for participating in an EDR Event when cleared and dispatched by MISO. If Customer reduces load greater than or equal to the Demand Reduction Tolerance, compensation will equal the greater of the applicable real time LMP revenue less the Marginal Foregone Retail Rate (MFRR) savings, as defined in this Agreement, less applicable fees and charges, or EDR Production Costs less MFRR savings less applicable fees and charges. EDR Production Costs equal a) Shutdown Cost plus b) EDR Energy Offer times minimum of i) verified load reduction amount or ii) Midwest ISO EDR Dispatch Amount.

b.    Under no circumstance will customer receive compensation for load reduced and compensated for under another demand response program. For clarification purposes,
    i.    Customer may not participate in the PowerShare® QuoteOption program while participating in PowerShare® EDR.
    ii.    Customer participation in PowerShare® CallOption will settle first,
    iii.    Customer participation in PowerShare® DRR Type I will settle next,
    iv.    Customer participation in PowerShare® EDR will settle last.

c.    The MFRR savings is Customer's full marginal retail rate inclusive of trackers excluding any demand component effects multiplied by the amount of curtailment under this program.

d.    If Customer does not reduce load greater than or equal to the Demand Reduction Tolerance, compensation will be the applicable real time LMP revenue less MFRR savings less the non-compliance energy charges less applicable fees and charges. EDR Production Costs will not be considered.

e.    Load reduction less than the Demand Reduction Tolerance will result in charges for the load not reduced, known as non-compliance energy charges. The Midwest ISO Real Time LMP at the Customer's associated CPNode will be applied to the Load Reduction Shortfall to determine the charges to be applied to Customer's bill. The calculation of these non-compliance charges will be (Demand Reduction Tolerance – Demand Reduction Delivered) * Real Time LMP; not to be less than zero. This amount will be increased by 10% to cover related expenses of Company. The 10% increase will not exceed $500

f.    Customer will receive EDR Energy credits or debits on its Company-issued electric bill. Depending on the Customer's billing cycle and when EDR Energy credits or debits are issued within the month, posting of the credits or debits to the Customer's bill may be delayed one billing cycle. Subsequent revisions, as needed, will be applied to future bills.

4

g.  Company will not provide incentives for any additional load reduction beyond the amount determined through the EDR Baseline Load, FDL and GLD.

h.  Company shall apply applicable fees and charges monthly to customer bill as shown on Attachment B.

i.  EDR settlements are not provided for curtailments planned or unplanned for any reason other than notification by Company of a cleared EDR offer. Customer shall not receive an EDR credit for any EDR Event during which Customer's load is already reduced from their EDR Baseline Load due to planned or unplanned outage as a result of renovation, repair, refurbishment, force majeure, strike, or any event other than Customer's normal operating conditions.

10. POWER INTERRUPTION: If power is interrupted to Customer during an EDR Event, then Company shall not be responsible for paying an EDR credit for energy reductions in excess of the minimum of the reduction based on Customer's EDR Baseline Load and FDL or GLD amount and the MISO dispatch amount. Examples of reasons that power may be interrupted include without limitation accidents, storm outages, equipment failures or malfunctions, and periods of involuntary load curtailment.

11. CUSTOMER MAINTENANCE: Customer must inform Company of any planned or unplanned plant maintenance that will significantly change the load level at the enrolled site.

12. NUMBER OF CURTAILMENTS PER DAY: Customer must specify the number of curtailment events permitted per day.

13. METERING and TELEMETRY REQUIREMENTS: Customers who do not have an electric meter capable of providing the load metering frequency and telemetry required by the MISO in the applicable business practice manual for each participating account or a more frequent interval must request and have installed by Duke Energy Indiana appropriate metering before participation may begin. The cost of incremental metering and communication equipment needed to fulfill MISO requirements will be paid by Customer.

14. TERM OF CONTRACT and TERMINATION: The initial term of this contract will be for 15 months. Participation will continue after the initial period until Company or Customer request termination of this agreement through 60-day written notice. Notice may be given 60 days prior to the end of the initial term. If the Customer fails to comply with the provisions of curtailment under Rider MBDR and this service agreement, the Company and the Customer will discuss methods to comply during future events. If there are system reliability issues created by the Customer's failure to perform, the Company reserves the right to suspend participation of the Customer under this Rider for 90 days or to terminate the Customer participation. Customer

participation will terminate immediately upon notification to Company from MISO that the Customer is no longer eligible to participate.

## MISCELLANEOUS PROVISIONS

1. NOTICES: Mailing Address. Any formal notice, request, or demand required or permitted under this Agreement shall be given in writing by Company and Customer, and shall be (a) mailed by first-class mail, (b) mailed by registered, certified, (c) mailed by overnight mail, (d) delivered by hand, or (e) faxed with confirmation as set forth below, to the other Party as indicated below, or to such other address as the parties may designate by written notice.

To Customer:

_____

_____

_____

Phone: _____

Facsimile: _____

To Company:

_____

_____

_____

Phone: _____

Facsimile: _____

Notices delivered by hand shall be deemed received when delivered. Notices sent by facsimile shall be deemed received upon receipt but must be confirmed by mail within seventy-two (72) hours. Notices delivered by first class mail shall be deemed received forty-eight (48) hours (not including weekends and holidays) after deposit, postage prepaid, in the U.S. mail, or if certified, registered or overnight mailing is used, as acknowledged by the signed receipt of mailing.

2. GOVERN ING LAW. This Agreement shall be governed by and construed in accordance with the laws of the State of Indiana except for matters and disputes with respect to which the Commission is the proper venue for dispute resolution pursuant to applicable law or this Agreement, the federal and state courts located in Indianapolis, Indiana shall constitute the sole and proper venue for resolution of any matter or dispute hereunder.

3. ENTIRE AGREEMENT. This Agreement contains the entire agreement between the Parties with respect to the subject matter herein and supersede and cancel any and all prior agreements and understandings, oral or written, between the Parties relating to the subject matter hereof.

4. <u>AMENDMENT; WAIVER</u>. Neither this Agreement nor any provision hereof may be waived, amended or otherwise modified orally, but only by (in the case of a waiver) an instrument in writing signed by the Party against which the waiver is sought to be enforced and (in the case of an amendment or other modification) an agreement in writing signed by both Parties.

5. <u>ASSIGNMENT</u>. This Agreement shall not be transferred or assigned by Customer without the prior written consent of Company. Any violation of this Section shall be void.

6. <u>FORCE MAJEURE</u>. The performance of a Party pursuant to this Agreement shall be excused to the extent the performance is delayed or prevented by reason of an event of Force Majeure, which is an event that (a) adversely and directly affects, prevents or delays either Party in the performance of its obligations in accordance with the terms of this Agreement; (b) is beyond the reasonable control of the affected Party; and (c) is not the result of the willful misconduct, negligent act or omission or unlawful conduct of, or the breach of this Agreement by, such Party. If a Party is reasonably prevented from performing its obligations under this Agreement by an event of Force Majeure, such party shall use all commercially reasonable efforts to remove the cause affecting such non-performance. If a Party claims there is an event of Force Majeure, such Party shall notify the other Party of the nature and cause of the event in writing within five (5) business days after such Party becomes aware, or should have become aware with the exercise of reasonable diligence, of the Force Majeure event; provided however that the settlement of any strike, walk out, or other labor dispute shall be entirely within the discretion of the Party involved in such labor dispute. If any condition of Force Majeure delays performance for a time period greater than 60 Days in the aggregate under the Agreement, either Party shall have the right to terminate this Agreement.

7. <u>SEVERABILITY</u>. If any provision of this Agreement is held by a court of competent jurisdiction in a final, non-appealable judgment to be invalid, illegal or unenforceable, the remainder of the provisions shall remain in full force and effect and any invalid, illegal or unenforceable provision shall be replaced with a valid, legal or enforceable provision, the effect of which comes as close as possible to that of the invalid, illegal or unenforceable provision.

8. <u>SURVIVAL</u>. Notwithstanding the expiration or termination of this Agreement, the Parties shall continue to be bound by the provisions of this Agreement, which, by their nature, survive completion or termination.

9. <u>COUNTERPART EXECUTION</u>. This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same instrument. Execution of this Agreement by facsimile signature shall have the same effect as execution by original signature.

IN WITNESS WHEREOF, the Parties hereto have entered into this Agreement as of the day and year hereinabove first written.

7

DUKE ENERGY INDIANA, INC.


By:_____

Name:_____

Title:_____


CUSTOMER

By:_____

Name:_____

Title:_____

8

**PowerShare EDR Service Agreement**
Customer Information Sheet

Customer Information

Customer Name:

_____

Service Address:        City:              State:              Zip:

_____

Account Number:

_____

Primary Contact:        E-Mail:            Fax:

_____

Phone:                  Cell Phone:        Pager:             After Hours

_____

Secondary Contact:      E-Mail:            Fax:

_____

Phone:                  Cell Phone:        Pager:             After Hours

_____

*Duke Energy Indiana, Inc. Representative*_____
Date_____

_____

For Internal Duke Energy Use Only

CP Node_____    EDR NAME_____    Other _____

9

**Program Participation Elections**

Select no more than one if desired:
☐ PowerShare EDR Program
   **Specify other programs in which Customer participates:**
   ☐ PowerShare CallOption Program (separate service agreement required)
   ☐ PowerShare QuoteOption Program (participation in PowerShare EDR not
    permitted concurrent with this program)
   ☐ PowerShare DRR Type I Program (separate service agreement required)

Number of Events Permitted per Day (Number / day)

_____

Specify Shutdown Amount ($ / shutdown)
$_____

Specify Notification Time Required (Hours)
(Note that this notification time must include 30 minutes for Duke Energy to provide
notice to Customer from MISO)

_____

Specify Energy Offer ($ / MWH)
$_____

Demand Response Compliance Plan (Select Only One)
☐ Guaranteed Load Drop from Baseline Load* (GLD)
☐ Firm Demand Level* (FDL)

FDL or GLD MUST be the same for all hours in the offer period.

    FDL _____ kW
    GLD _____ kW

Specify Baseline Method (Select only one; Must be approved by Company and MISO)
☐ Company Regression Method
☐ MISO Default Method
☐ Other: describe below or attach document

_____

_____

☐ Description Attached

Will you use a generator to curtail your consumption from Duke Energy Indiana?
☐ Yes   ☐ No

If "Yes",
What is the primary fuel source of the generator?
☐ Natural Gas  ☐ Fuel Oil/Diesel

10

## EDR Reduction Plan

_____

_____

_____

☐  Plan Attached

*I agree to accept service under the Duke Energy Indiana , Inc. PowerShare® EDR program under the terms stated in this Service Agreement.*

By:

_____          _____
(insert name of customer's company in this
space)

Date:                                       Title:

_____          _____

11

**Definitions**

| | |
|---|---|
| Real-Time LMP | The real-time locational marginal price for the appropriate Midwest ISO Load Zone CPNode as published by Midwest ISO. |
| EDR Event | A load curtailment event as dispatched by the Midwest ISO during a Midwest ISO declared emergency. |
| EDR Event Incentive | The credit or debit applied by Company to Customer for Customer's participation in an EDR Event, computed in accordance herewith. |
| Firm Load Level: | A consumption level selected by Customer to which Customer agrees to reduce its load during a declared EDR Event, as reflected on the Cover Sheet. |
| Guaranteed Load Drop: | Used when Customer will reduce load each hour during an event by a fixed amount, and is equal to the amount of load reduction from Customer's EDR Baseline Load level, as reflected on the Cover Sheet. |
| Load Zone CPNode | The commercial pricing node and such successor commercial pricing node as published by Midwest ISO. |
| Demand Reduction Tolerance | The Midwest ISO, based on information in the EDR Registration and daily offer, will provide the Midwest ISO EDR Dispatch Amount. The portion of this amount associated with Customer based on information provided in this agreement and through the PowerShare Web Site or in written notice to Company will be multiplied by 95% or the current tolerance band specified in Midwest ISO tariff Schedule 30. This is the minimum load reduction Customer must deliver during an EDR Event to avoid non-performance charges. |
| Midwest ISO | The Midwest Independent System Operator, Inc., which operates under an Open Access Transmission and Energy Markets Tariff filed with the Federal Energy Regulatory Commission. |
| Load Reduction Shortfall | This amount is the Demand Reduction Tolerance less the Demand Reduction Delivered but not to be less than 0. |
| PowerShare® Website | A Company-hosted Internet web site used to post EDR Events and related program information. |
| EDR Baseline Load | The EDR Baseline Load level is an estimate of the Customer's load during an EDR Event that would have occurred absent the Company exercising an event. |
| Demand Reduction Delivered | This amount is equal to the EDR Baseline Load less Customer's actual load level in each hour. |
| Customer Expected Load Reduction | Customer is expected to reduce load during EDR Events equal to the amount of EDR Baseline Load less the Firm Load Level or Guaranteed Load Drop amount, as specified by customer, result not to be less than zero. To avoid non-compliance charges, customer must maintain a load level during all hours of EDR Event at or below the Firm Load Level or the EDR Baseline Load less the Guaranteed Load Drop. |

12

| NERC | North American Electric Reliability Council |
|---|---|
| Regional Emergency | A NERC level EEA2 Step 1 (Midwest ISO Maximum Generation Emergency Event) or higher emergency declared by Midwest ISO. |
| EDR Settlement | A calculation, after the EDR month, to determine the Customer's Demand Reduction Delivered for EDR Events. This value is used in the computation of the Customer's monthly credit. |

**Cover Page**
**Customer Information**

| | |
|---|---|
| Customer Name: | Business name as it appears on Duke Energy Indiana, Inc. utility bill. |
| Service Address: | Service address as it appears on Duke Energy Indiana, Inc. utility bill. |
| Account Number: | Per billing account. |
| Primary Contact: | Utilized by Duke Energy Indiana, Inc. for notification purposes. |
| Secondary Contact: | Backup notification contact, utilized by Duke Energy Indiana, Inc. |
| Company Representative: | Agreement to be signed and dated by an authorized agent of Company at such time meter and dedicated communications are considered operational by Company. |
| Time Zone: | The time zone in which the premise to be served is located. |

14

STANDARD CONTRACT RIDER NO. 22
POWERSHARE EDR PROGRAM

**Attachment B**

**Company Fees & Charges**

Customer Registration with Company                          $1,000
Customer Modification to Registration with Company          $100
EDR Offer Revisions (per offer revision)                    $50

For offers cleared by Midwest ISO:  An offer clearing fee of 5% of the compensation defined in the Settlements section.  Offer clearing fee will not be less than $0.

15

## DUKE ENERGY INDIANA POWERSHARE® DRR TYPE I ENERGY SERVICE AGREEMENT

This PowerShare® DRR Type I Energy Service Agreement ("Agreement") is made and entered into this _____ day of _____, 20_____, the Effective Date and is between the customer receiving service from Duke Energy Indiana, Inc. as identified on the customer information page ("Customer") and Duke Energy Indiana, Inc. ("Duke Energy" or "Company"). Company and Customer may sometimes be referred to herein as a "Party" and collectively as the "Parties."

WHEREAS, the Indiana Utility Regulatory Commission ("Commission"), through its July 28, 2010 Order in Cause No. 43566, has required all jurisdictional electric utilities in Indiana, including Company, to offer programs allowing customers to participate through their respective electric utilities in RTO demand response programs. Pursuant to the Commission Order in Cause No. 43566, the Company has implemented Rider MBDR, as set forth in Duke Energy Indiana's Standard Contract Rider No. 22 ("Rider No. 22"), which is attached hereto as Attachment A and incorporated herein by this reference; and

WHEREAS, the Commission has authorized the participation of Customer in Rider MBDR, and Customer desires to participate in Rider MBDR subject to the applicable Company tariff rules and rate schedules.

NOW, THEREFORE, in consideration of the mutual undertakings set forth below, the Parties agree as follows:

### GENERAL TERMS AND CONDITIONS

1.      This Agreement is subject to the terms and conditions of Duke Energy's Rates, Terms and Conditions for Electric Service, IURC No. 14 and any successor electric tariff, as filed with the Indiana Utility Regulatory Commission and as amended from time to time ("Tariff"), including without limitation Standard Contract Rider No. 22, Duke Energy Market Based Demand Response Rider, as may periodically be revised ("Rider MBDR").

2.      Service under Rider MBDR shall commence upon the completion of (i) full execution of this Service Agreement, (ii) acceptance of the DRR Type I registration and the DRR Type I default offer by Midwest ISO (or "MISO"), (iii) installation and operational readiness of required electric metering and dedicated communication links with applicable electric meters, and (iv) collection of the minimum amount of interval meter data required to calculate baseline load

1

3.  This Agreement supersedes and replaces all other PowerShare® DRR agreements between Customer at the address set forth on the Cover Sheet and Duke Energy.

4.  Company will utilize phone and email to notify Customer of events and to process Customer participation updates. Customer will be responsible for providing their own Internet access. Customer is responsible for notifying Company if their internet system is not available to accept email. In the event that the Internet system is temporarily unavailable, Company will notify Customer and process participation updates by phone. Company will provide written documentation and training on the process to be used by Customer. Customer must provide and maintain 24-hour contact information.

5.  This Agreement shall not be construed as any promise or warranty by Company to provide continuous or uninterrupted power to Customer.

6.  All participants will be subject to the current testing and metering requirements of the Midwest ISO for DRR Type I resources, as this term or its successor term is defined by Midwest ISO and specified in the appropriate Midwest ISO business practice manuals.

7.  Customer load curtailment enrolled under this Agreement must be solely committed to Duke Energy Indiana and not enrolled in any other demand response program.

## POWERSHARE® DRR TYPE I ENERGY TERMS AND CONDITIONS

1.  EVENT NOTIFICATION: Company will notify Customer within 30 minutes after receiving information on cleared offers and/or dispatch instructions from Midwest ISO regarding the DRR Type I offer. Company shall utilize phone and e-mail, or other means of communication as mutually agreed to apprise Customer of a DRR Type I Event. Customer may wish to incorporate notification time from Company in the Shut-Down Notification Time and/or the Shut-Down Time offer parameters. Company notification time to Customer will not alter dispatch instructions from Midwest ISO. Company may notify day-ahead on Sundays and holidays for DRR Type I events for the following day when applicable.

2.  CUSTOMER REDUCTION OBLIGATION: Customer is obligated to reduce load as communicated by Company in accordance with the Midwest ISO dispatch instructions. Deviations in load reductions above or below the dispatch amount may result in charges as described in the applicable Midwest ISO business practice manuals.

2

3.    ENERGY COMMITMENT STATUS AND OTHER DAILY CHANGES TO OFFERS: Customer may update their Energy Commitment Status and other offer parameters daily through correspondence with Company as designated, subject to fees specified in Attachment A.  Status updates must be received by 8 AM EST the day prior to the day the status or parameter change will be effective. Customers must specify a "Not Participating" status if load reduction is unavailable due to a forced or planned outage/shutdown or other physical operating restriction.  All changes are subject to Midwest ISO limitations and will not permanently update the Customer's default offer unless specified by Customer.  Further, if Customer's status changes and Customer cannot provide load reduction as offered, Customer must immediately notify Company. Customer is responsible for meeting all offer obligations when the offer is cleared.

4.    CUSTOMER OFFER COST PARAMETERS: Customer may specify changes to their default offer parameters for the hourly Energy Offer ($/MWH), an Hourly Curtailment Offer ($/hour), and a Shut-down Offer ($) associated with demand reduction which may or may not include direct labor and equipment costs and/or opportunity costs.  All costs are subject to Midwest ISO specified limits and Midwest ISO independent market monitor review.  Company reserves the right to review daily offers and reject Customer proposed changes if offers contain errors or may create reliability concerns.  All updates must be received by 8 AM EST the day prior to the day the status or parameter change will be effective.  These updates will not permanently change the Customer's default offers unless specified by Customer.

5.    DEFAULT OFFER: Customer's default offer will be submitted to MISO daily unless updated by notifying Company by 8 AM EST the day prior to the day of the update.

6.    CUSTOMER BASELINE / MEASUREMENT and VERIFICATION: Company will utilize the default Calculated Baseline method, as this term or its successor term, is used in the applicable MISO business practice manual, specified by the Midwest ISO for DRR Type I resources providing energy to calculate the DRR Type I Baseline.  As mutually agreed by Customer and Company, a Weather Sensitive Adjustment, as defined by Midwest ISO, may be incorporated. Alternatively, at the mutual agreement of Customer and Company, a custom baseline calculation acceptable to the Midwest ISO may be used to determine the DRR Type I Baseline.  The DRR Type I Baseline will be calculated as data is available and provided to Midwest ISO and Customer within the guidelines specified by Midwest ISO in the applicable business practice manual.  If available, the baseline load or an estimated baseline load will be delivered to Customer prior to the event.  Customer may only use the Guaranteed Load Drop (GLD) curtailment compliance method as described in Rider MBDR.

3

7.    SETTLEMENT:

  a.  Customer will be eligible for compensation for load reduction for participating in a DRR Type I event when cleared and dispatched by Midwest ISO. Company will request a settlement CPNode for the DRR Type I resource from Midwest ISO. The Midwest ISO settlement information will be used as the basis for Customer compensation. Company will reduce this settlement amount to account for the Marginal Foregone Retail Rate (MFRR) savings, as defined in this Agreement, and applicable fees and charges as set forth in Attachment B.

  b.  Under no circumstance will customer receive compensation for load reduced and compensated for under another demand response program. For clarification purposes,
      i.   Customer may not participate in the PowerShare® QuoteOption program while participating in PowerShare® DRR Type I.
      ii.  Customer participation in PowerShare® CallOption will settle first,
      iii. Customer participation in PowerShare® DRR Type I will settle next,
      iv.  Customer participation in PowerShare® EDR will settle last.

  c.  The MFRR savings is Customer's marginal retail rate inclusive of trackers excluding any demand component effects multiplied by the amount of curtailment under this program.

  d.  All Midwest ISO charges for non-compliance will be Customer's responsibility.

  e.  In addition, Company will reduce Customer compensation in the event additional costs to Company are incurred as a result of the DRR Type I participation. In the event of such additional costs, Company shall provide supporting documentation to Customer upon request.

  f.  In the event that a Customer has a debit on its bill instead of a credit, if the Customer does not pay the debit by the due date indicated on the Customer's bill, the Customer shall be suspended from further participation until such time that the debit is paid.

  g.  Customer will receive DRR Type I Event Incentive credits or debits on its Company-issued electric bill. Depending on the Customer's billing cycle and when DRR Type I Event Incentive credits are issued, posting of the Credits or debits to the Customer's bill may be delayed one billing cycle. Subsequent revisions, as needed, will be applied to future bills.

  h.  Company shall apply fees and charges monthly to customer's bill as shown on Attachment B.  The offer clearing fee of 5% will be applied to the MISO settlement amount less applicable fees. The offer clearing fee will not be less than $0.

  i.  DRR Type I settlements are not provided for curtailments planned or unplanned for any reason other than notification by Company of a cleared DRR Type I offer. Customer shall not receive a DRR Type I credit for any DRR Type I Event during which Customer's load is already reduced from their DRR Type I Baseline Load due to planned or unplanned outage as a

4

result of renovation, repair, refurbishment, force majeure, strike, or any event other than Customer's normal operating conditions.

8.   POWER INTERRUPTION:  If power is interrupted to Customer during a DRR Type I Event, then Company shall not be responsible for paying DRR Type I Event Incentive Credits for energy reductions in excess of the estimated reduction based on Customer's GLD amount and the MISO Dispatch Amount.  In addition, Customer will not be exposed to any charges for excessive energy from Midwest ISO.  Examples of reasons that power may be interrupted include without limitation accidents, storm outages, equipment failures or malfunctions, and periods of involuntary load curtailment.

9.   CUSTOMER MAINTENANCE:  Customer must inform Company of any plant maintenance that will significantly change the load level at the enrolled site.

10.  DAILY CURTAILMENT EVENT LIMITS:  If Customer desires only one curtailment event to be permitted per day then Customer should set offer parameters including Minimum Interruption Duration, Maximum Interruption Duration, and Minimum Non-Interruption Interval to appropriate values. Company will not restrict dispatch to only 1 curtailment per day.

11.  METERING and TELEMETRY REQUIREMENTS:  Customers who do not have an electric meter capable of providing the load metering frequency and telemetry required by the MISO in the applicable business practice manual for each participating account or a more frequent interval must request and have installed by Duke Energy Indiana appropriate metering before participation may begin. Currently, Midwest ISO requirements specify 1-minute metering capability.  In addition, minute level consumption information for an event hour must be delivered to MISO no later than 10 minutes after the event hour through approved MISO electronic means.  The cost of incremental metering and communication equipment needed to fulfill MISO requirements will be paid by Customer.

12.  TERM OF CONTRACT and TERMINATION:  The initial term of this contract will be for 15 months.  Participation will continue after the initial period until Company or Customer request termination of this agreement through 60-day written notice.  Notice may be given 60 days prior to the end of the initial term. If the Customer fails to comply with the provisions of curtailment under Rider MBDR and this service agreement, the Company and the Customer will discuss methods to comply during future events.  If there are system reliability issues created by the Customer's failure to perform, the Company reserves the right to suspend participation of the Customer under this Rider for 90 days or to terminate the Customer participation.  Customer participation will terminate immediately upon notification to Company from MISO that the Customer is no longer eligible to participate.

5

## MISCELLANEOUS PROVISIONS

1.  NOTICES: <u>Mailing Address.</u> Any formal notice, request, or demand required or permitted under this Agreement shall be given in writing by Company and Customer, and shall be (a) mailed by first-class mail, (b) mailed by registered, certified, (c) mailed by overnight mail, (d) delivered by hand, or (e) faxed with confirmation as set forth below, to the other Party as indicated below, or to such other address as the parties may designate by written notice.

To Customer:

_____

_____

_____

Phone:      _____

Facsimile:  _____

To Company:

_____

_____

_____

Phone:      _____

Facsimile:  _____

Notices delivered by hand shall be deemed received when delivered. Notices sent by facsimile shall be deemed received upon receipt but must be confirmed by mail within seventy-two (72) hours. Notices delivered by first class mail shall be deemed received forty-eight (48) hours (not including weekends and holidays) after deposit, postage prepaid, in the U.S. mail, or if certified, registered or overnight mailing is used, as acknowledged by the signed receipt of mailing.

2. GOVERN ING LAW. This Agreement shall be governed by and construed in accordance with the laws of the State of Indiana except for matters and disputes with respect to which the Commission is the proper venue for dispute resolution pursuant to applicable law or this Agreement, the federal and state courts located in Indianapolis, Indiana shall constitute the sole and proper venue for resolution of any matter or dispute hereunder.

3. ENTIRE AGREEMENT. This Agreement contains the entire agreement between the Parties with respect to the subject matter herein and supersede and cancel any and all prior agreements and understandings, oral or written, between the Parties relating to the subject matter hereof.

4. AMENDMENT; WAIVER. Neither this Agreement nor any provision hereof may be waived, amended or otherwise modified orally, but only by (in the case of a waiver) an

6

instrument in writing signed by the Party against which the waiver is sought to be enforced and (in the case of an amendment or other modification) an agreement in writing signed by both Parties.

5.  ASSIGNMENT.  This Agreement shall not be transferred or assigned by Customer without the prior written consent of Company.  Any violation of this Section shall be void.

6.  FORCE MAJEURE.  The performance of a Party pursuant to this Agreement shall be excused to the extent the performance is delayed or prevented by reason of an event of Force Majeure, which is an event that (a) adversely and directly affects, prevents or delays either Party in the performance of its obligations in accordance with the terms of this Agreement; (b) is beyond the reasonable control of the affected Party; and (c) is not the result of the willful misconduct, negligent act or omission or unlawful conduct of, or the breach of this Agreement by, such Party. If a Party is reasonably prevented from performing its obligations under this Agreement by an event of Force Majeure, such party shall use all commercially reasonable efforts to remove the cause affecting such non-performance.  If a Party claims there is an event of Force Majeure, such Party shall notify the other Party of the nature and cause of the event in writing within five (5) business days after such Party becomes aware, or should have become aware with the exercise of reasonable diligence, of the Force Majeure event; provided however that the settlement of any strike, walk out, or other labor dispute shall be entirely within the discretion of the Party involved in such labor dispute.  If any condition of Force Majeure delays performance for a time period greater than 60 Days in the aggregate under the Agreement, either Party shall have the right to terminate this Agreement.

7.  SEVERABILITY.  If any provision of this Agreement is held by a court of competent jurisdiction in a final, non-appealable judgment to be invalid, illegal or unenforceable, the remainder of the provisions shall remain in full force and effect and any invalid, illegal or unenforceable provision shall be replaced with a valid, legal or enforceable provision, the effect of which comes as close as possible to that of the invalid, illegal or unenforceable provision.

8.  SURVIVAL.  Notwithstanding the expiration or termination of this Agreement, the Parties shall continue to be bound by the provisions of this Agreement, which, by their nature, survive completion or termination.

9.  COUNTERPART EXECUTION.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same instrument.  Execution of this Agreement by facsimile signature shall have the same effect as execution by original signature.

IN WITNESS WHEREOF, the Parties hereto have entered into this Agreement as of the day and year hereinabove first written.

7

DUKE ENERGY INDIANA, INC.

By:_____

Name:_____

Title:_____

CUSTOMER

By:_____

Name:_____

Title:_____

**PowerShare DRR Type I Energy Service Agreement**
Customer Information Sheet

Customer Information

Customer Name:

_____

Service Address:        City:            State:            Zip:

_____

Account Number:

_____

Primary Contact:        E-Mail:          Fax:

_____

Phone:            Cell Phone:        Pager:            After Hours

_____

Secondary Contact:    E-Mail:          Fax:

_____

Phone:            Cell Phone:        Pager:            After Hours

*Indiana, Inc. Representative*_____ Date_____

For Internal Duke Energy Use Only

CP Node _____    DRR NAME _____ Other _____

9

**Program Participation Elections**

Select no more than one if desired:
☐ PowerShare DRR Type I Energy Program

Demand Response Compliance Plan (Select Only One)
☐ Guaranteed Load Drop from Baseline Load* (GLD)

Specify Baseline Method (Select All that Apply)
☐ MISO Default Method
    ☐ Apply Weather Sensitive Adjustment (must be approved by Company and MISO)
☐ Custom: describe below or attach document (must be approved by Company and MISO)

_____

_____

_____

Description Attached

**DRR Reduction Plan**

(Note: MISO does not permit the use of Behind the Meter Generators, as this term is defined by MISO, for DRR Type I resources.)

_____

_____

_____

☐ Plan Attached

*I agree to accept service under the Duke Energy Indiana , Inc. PowerShare® DRR Type I program under the terms stated in this Service Agreement.*

By: _____

_____
(insert name of customer's company in this space)

Title: _____

Date: _____

10

**DRR Type I Default Offer Parameters**

DAY-Ahead Schedule Default Hourly Offer Parameters:

| Hour (EST) | Energy Offer ($/MWH) | Hourly Curtailment Offer ($/Hr) | Targeted Demand Reduction Level - GLD (MW) | Energy Commitment Status |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |

DAY-Ahead Schedule Default Daily Offer Parameters:

| | |
|---|---|
| **Shutdown Offer ($)** | |
| **Minimum Interruption Duration (hh:mm)** | |
| **Maximum Interruption Duration (hh:mm)** | |
| **Minimum Non-Interruption Interval (hh:mm)** | |
| **Shut-Down Time (hh:mm)** | |
| **Shut-Down Notification Time (hh:mm)** | |

Real-Time Schedule Default Hourly Offer Parameters:

| Hour (EST) | Energy Offer ($/MWH) | Hourly Curtailment Offer ($/Hr) | Targeted Demand Reduction Level - GLD (MW) | Energy Commitment Status |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |

Real-Time Schedule Default Daily Offer Parameters:

| | |
|---|---|
| **Shutdown Offer ($)** | |
| **Minimum Interruption Duration (hh:mm)** | |
| **Maximum Interruption Duration (hh:mm)** | |
| **Minimum Non-Interruption Interval (hh:mm)** | |
| **Shut-Down Time (hh:mm)** | |
| **Shut-Down Notification Time (hh:mm)** | |

12

**Definitions**

| | |
|---|---|
| Real-Time LMP | The real-time locational marginal price associated with the DRR Type I resource as determined by Midwest ISO. |
| DRR Type I Event | A load curtailment event as cleared and dispatched by the Midwest ISO. |
| DRR Type I Event Incentive Credit | The credit paid by Company to Customer for Customer's participation in a DRR Type I Event, computed in accordance herewith. |
| Firm Demand Level: | A consumption level selected by Customer to which Customer agrees to reduce its load during a DRR Type I Event. This curtailment compliance plan is not available for this program. |
| Guaranteed Load Drop: | Used when Customer will reduce load each hour during an event by a fixed amount, and is equal to the amount of load reduction from Customer's DRR Baseline Load level. |
| Load Zone CPNode | A load zone commercial pricing node and such successor commercial pricing node as published by Midwest ISO. |
| Midwest ISO | The Midwest Independent Transmission System Operator, Inc., which operates under an Open Access Transmission and Energy Markets Tariff filed with the Federal Energy Regulatory Commission. |
| PowerShare® Website | A Company-hosted Internet web site used to post related program information. |
| DRR Type I Baseline Load | The DRR Type I Baseline Load level is an estimate of the Customer's load during a DRR Type I Energy Event that would have occurred absent the event. |
| Demand Reduction Delivered | This amount is equal to the DRR Type I Baseline Load less Customer's actual load level in each hour. |
| Customer Expected Load Reduction | Customer is expected to reduce load during DRR Type I Energy Events equal to the GLD, as specified by customer. To avoid non-compliance charges, customer must maintain a load level during all hours of the DRR Type I Energy Event at or below the DRR Type I Baseline Load less the GLD. |
| Regional Emergency | A NERC level EEA2 Step 1 (Midwest ISO Maximum Generation Emergency Event) or higher emergency declared by Midwest ISO. |

13

**Customer Information Page Terms**

| | |
|---|---|
| Customer Name: | Business name as it appears on Duke Energy Indiana, Inc. utility bill. |
| Service Address: | Service address as it appears on Duke Energy Indiana, Inc. utility bill. |
| Account Number: | Per billing account. |
| Primary Contact: | Utilized by the Duke Energy Indiana, Inc. for notification purposes. |
| Secondary Contact: | Backup notification contact, utilized by the Duke Energy Indiana, Inc. |
| Company Representative: | Agreement to be signed and dated by an authorized agent of Company at such time meter and communication equipment are considered operational by Company. |
| Time Zone: | The time zone in which the premise to be served is located. |

14

STANDARD CONTRACT RIDER NO. 22
POWERSHARE DRR TYPE I ENERGY PROGRAM

**Attachment B**

**Company Fees and Charges**

Customer Registration with Company                        $1,000
Customer Modification to Registration with Company        $100
DRR Type I Offer Revisions (per offer revision)           $50

For offers cleared by Midwest ISO:  An offer clearing fee of 5% of the compensation defined in the Settlements section.  Offer clearing fee will not be less than $0.

15

## <u>EDR AGGREGATOR OF RETAIL CUSTOMERS SERVICE AGREEMENT FOR AGGREGATORS PARTICIPATING<br>IN DUKE ENERGY INDIANA'S MARKET BASED DEMAND RESPONSE RIDER</u>

This Service Agreement ("Agreement") for Aggregators of Retail Customers participating in Duke Energy Indiana's Market Based Demand Response Rider ("Rider MBDR") is made and entered into by and between Duke Energy Indiana, Inc. ("Duke Energy Indiana"), an Indiana corporation, and _____ (Aggregator of Retail Customers or "ARC") a _____. Duke Energy Indiana and ARC may sometimes be referred to herein as a "Party" and collectively as the "Parties."

WHEREAS, the Indiana Utility Regulatory Commission ("Commission"), through its July 28, 2010 Order in Cause No. 43566, has required all jurisdictional electric utilities in Indiana, including Duke Energy Indiana, to offer programs allowing customers to participate through their respective electric utilities in RTO demand response programs. Pursuant to the Commission Order in Cause No. 43566, Duke Energy Indiana has implemented Rider MBDR, as set forth in Duke Energy Indiana's Standard Contract Rider No. 22 ("Rider No. 22"), which is attached hereto as Attachment A and incorporated herein by this reference; and

WHEREAS, the Commission has authorized the participation of ARCs in Rider MBDR, and ARC desires to participate in Rider MBDR subject to the applicable Duke Energy Indiana tariff rules and rate schedules.

NOW, THEREFORE, in consideration of the mutual undertakings set forth below, the Parties agree as follows:

## I.    <u>ARC'S OBLIGATIONS</u>

A.    <u>Status; Subject to Applicable Duke Energy Indiana Tariffs.</u>  ARC's status in Rider MBDR shall be as an "ARC" under Rider No. 22.  ARC shall be subject to the terms and conditions of Duke Energy's Rates, Terms and Conditions for Electric Service, IURC No. 14 and any successor electric tariff, as filed with the Commission and as amended from time to time ("Tariff"), including without limitation Standard Contract Rider No. 22, Duke Energy Market Based Demand Response Rider, as may periodically be revised.

B.    <u>Representation of Customers.</u>  ARC shall represent those Customers in Duke Energy Indiana's electric service territory eligible to participate in Rider MBDR, who have elected to participate through ARC with respect to such Customer's service agreement(s), by having appropriate contractual or other arrangements with each such eligible Customer whereby such Customer authorizes ARC, as its representative, to receive payments and to pay penalty charges on behalf of such Customer in connection with the Customer's participation, through ARC, with Duke Energy Indiana, in Rider MBDR.  ARC shall be solely responsible for having the appropriate contractual or other arrangements with each Customer whom ARC represents in Rider MBDR.  Duke Energy Indiana shall not be responsible for monitoring, auditing, reviewing

1

or enforcing such arrangements. ARC acknowledges and agrees that, in its representation of Duke Energy Indiana Customers for Rider MBDR, ARC is subject to the terms and conditions of Rider MBDR and this Agreement.

C.    ARC Service Establishment. Service under Rider MBDR shall commence upon the completion of (i) full execution of this Agreement, (ii) acceptance of the resource registration and the default EDR offer by Midwest ISO, (iii) installation and operational readiness of required electric metering and dedicated communication links with applicable electric meters, and (iv) collection of the minimum amount of interval meter data required to calculate baseline load.

D.    Required Notice to Add or Delete Customers. Once ARC has entered into the appropriate contractual or other arrangements with each Customer whom ARC represents in the Rider MBDR, ARC shall deliver to Duke Energy Indiana a "Notice to Add or Delete Customers Participating in Rider MBDR" adding such Customer's service agreement(s) to ARC's portfolio. The Notice shall be executed by the ARC and each affected Customer and shall include the following information (i) Customer name; (ii) Customer address; (iii) Customer account number; and (iv) Customer's consent for ARC to receive Customer hourly electric consumption information from Duke Energy Indiana. ARC shall notify Duke Energy Indiana that it has dropped a Customer service agreement from its portfolio by delivering to Duke Energy Indiana a "Notice to Add or Delete Customers Participating in Rider MBDR". Notice must be signed by Customer and ARC. ARC shall deliver such Notices to Duke Energy Indiana as specified in the Notice section. Changes to customer participation will not be effective until all required updates are completed with and approved by Midwest ISO and Duke Energy Indiana.

Duke Energy Indiana must approve each service agreement before the service agreement can be included in the ARC's portfolio. Additions to and deletions from the ARC's portfolio will be effective as specified in Rider MBDR and the Notice. Customers may not participate with multiple ARCs concurrently.

E.    Metering and Telemetry Requirements. ARC Customers who do not have an electric meter capable of providing the load metering frequency and telemetry required by the MISO in the applicable business practice manual (or "BPM") for each participating account must request and have installed by Duke Energy Indiana appropriate metering before participation may begin. The cost of incremental metering and communication equipment needed to fulfill MISO requirements will be paid by ARC. Duke Energy Indiana will provide an estimated cost of installation to ARC for all accounts applicable prior to installation.

F.    Timeliness and Due Diligence. ARC shall exercise due diligence in meeting its obligations and deadlines under Rider MBDR and this Agreement to facilitate Customer participation through ARC in Rider MBDR.

G.    Curtailment. Customer load curtailment enrolled with ARC under this Agreement must be solely committed to Duke Energy Indiana.

2

## II.    GENERAL TERMS

A.    Customer-Specific Usage or Meter Data.  Upon the addition of a service agreement to an ARC's portfolio, Usage or meter data for the Service Agreement will become available on a going forward basis via the format available in Duke Energy Indiana's Rider MBDR Website; also known as Company's PowerShare® Website.

B.    Notice Method.  Duke Energy Indiana will utilize phone and email to notify the ARC of events and to process ARC participation updates.  ARC will be responsible for providing its own Internet access.  ARC is responsible for notifying Duke Energy Indiana if their internet system cannot accept emails.  In the event that the Internet system is temporarily unavailable from ARC or Company, Duke Energy Indiana will notify the ARC and process participation updates by phone.  Duke Energy Indiana will provide written documentation and training on the process to be used by the ARC.  ARC must provide and maintain 24-hour contact information.

C.    No Warranty.  This Agreement shall not be construed as any promise or warranty by Duke Energy Indiana to provide continuous or uninterrupted power to the Customers participating with ARC.

D.    Testing.  All participating Customers and ARC will be subject to the current testing and metering requirements of the Midwest ISO for EDR resources, as this term is defined by Midwest ISO, as specified in the appropriate Midwest ISO business practice manual.  Further, ARCs using a generator(s) to provide a portion of their load reduction for this program will be required to test their generator(s) annually in a manner consistent with MISO requirements.

E.    Event Notification.  Duke Energy Indiana will notify ARCs within 30 minutes after receiving information on cleared offers and/or dispatch instructions from Midwest ISO regarding the EDR offer.  Duke Energy Indiana shall utilize phone and e-mail, or other means of communication as mutually agreed to apprise the ARC of an EDR Event.  ARCs may wish to incorporate notification time from Duke Energy Indiana in the notification time specified in the offer parameters.  Duke Energy Indiana notification time to an ARC will not alter dispatch instructions from Midwest ISO and ARC is obligated to comply with MISO dispatch instructions as forwarded from Duke Energy Indiana.  Duke Energy Indiana may notify day-ahead on Sundays and holidays for EDR events for the following day when applicable.

F.    ARC Reduction Obligation.  ARC is obligated to reduce load from participating Customers as communicated by Company to ARC in accordance with the MISO dispatch instruction.  Failure to meet the Demand Reduction Tolerance amount will result in charges for load not reduced.  These charges are the responsibility of ARC.  Load reduction under this PowerShare EDR program is incremental to any other load reduction required from Customer under participation in other demand response programs.

G.    Curtailment Status and Other Daily EDR Offer Changes:  ARC may update their EDR Offer with Company daily subject to fees specified in Attachment B.  Status updates must be received by 8 AM EST the day prior to the day the status will be effective.

3

H.      Customer Offer Cost Parameters: ARC may specify a shutdown cost and energy offer amount associated with demand reduction including direct labor and equipment costs and/or opportunity costs. All costs are subject to MISO specified limits and MISO independent market monitor review. ARC may update their Shutdown Cost quarterly by notifying Company in writing prior to the day before the first day of the quarter. New Shutdown Cost values will be effective on the next earliest date of April 1, July 1, October 1, and January 1.

I.      Default Offer: ARC's default offer will be submitted to MISO and remain effective daily unless updated by notifying Company by 8 AM EST the day prior to the day the update is to be effective.

J.      Customer Baseline/Measurement & Verification: Company will utilize a regression based method to determine the EDR Baseline Load. If applicable, the baseline will be coordinated with Customer's baseline load projections from other programs in which Customer participates. The EDR Baseline Load will be calculated shortly after the end of the month in which the event occurs but always within the time limitations specified by MISO and subject to coordination with baseline loads from other programs. An estimated EDR Baseline Load may be provided to the customer prior to the event if available. Alternatively, at the mutual agreement of ARC and Company, the Midwest ISO default baseline for EDR resources or other specified baseline calculation acceptable to the MISO may be used. ARC may select either the Firm Demand Level (FDL) or Guaranteed Load Drop (GLD) curtailment compliance methods as specified in Rider MBDR.

K.      Demand Reduction Tolerance: The Demand Reduction Tolerance is defined as 95% * Midwest ISO EDR Dispatch Amount, as defined in Midwest ISO Schedule 30. The 95% value may change as Midwest ISO changes this value in Schedule 30.

L.      Generator Sourced Curtailment: If Customer plans to utilize a behind the meter generator ("BTMG") to accomplish load curtailment during an EDR Event, the Customer must affirm in writing to ARC that: (1) it holds all necessary permits; (2) it possesses the necessary rights to operate the unit; (3) the BTMG is not a Network Resource, as this term or its successor term is defined by MISO; and (4) if the resource(s) is historically operated during non-emergency conditions, that the energy available for participation under this Rider MBDR program is the increase in output that produces the demand reduction. By signing this agreement, ARC affirms these items.

M.      Settlement.

   a.  ARC will be eligible for compensation for load reduction for participating in an EDR Event when cleared and dispatched by MISO. If Customers reduce load greater than or equal to the Demand Reduction Tolerance, compensation will equal the greater of the applicable real time LMP revenue less the Marginal Foregone Retail Rate (MFRR) savings, as defined in (c) below of this Agreement, less applicable fees and charges, or EDR Production Costs less MFRR savings less applicable fees and charges. EDR Production Costs equal a) Shutdown Cost plus b) EDR Energy Offer

4

times minimum of i) verified load reduction amount or ii) Midwest ISO EDR Dispatch Amount.

b. Under no circumstance will ARC receive compensation for Customer load reduced and compensated for under another demand response program. For clarification purposes,
  i. Customer may not participate in the PowerShare® QuoteOption program while participating in PowerShare® DRR Type I.
  ii. Customer participation in PowerShare® CallOption will settle first,
  iii. Customer participation in PowerShare® DRR Type I will settle next,
  iv. Customer participation in PowerShare® EDR will settle last.

c. The MFRR savings is Customer's full marginal retail rate inclusive of trackers excluding any demand component effects multiplied by the amount of curtailment under this program. For aggregate groups of customers with different tariffs and service levels, ARC and Duke Energy Indiana must mutually agree on a weighted average MFRR prior to submission of offers to MISO under Rider MBDR.

d. If ARC does not reduce Customer load greater than or equal to the Demand Reduction Tolerance, compensation will be the applicable real time LMP revenue less MFRR savings less the non-compliance energy charges less applicable fees and charges. EDR Production Costs will not be considered.

e. Load reduction less than the Demand Reduction Tolerance will result in charges for the load not reduced, known as non-compliance energy charges. The Midwest ISO Real Time LMP at the Customer's associated CPNode will be applied to the Load Reduction Shortfall to determine the charges to be applied to ARC's settlement. The calculation of these non-compliance charges will be (Demand Reduction Tolerance – Demand Reduction Delivered) * Real Time LMP; not to be less than zero. This amount will be increased by 10% to cover related expenses of Company. The 10% increase will not exceed $500.

f. In addition, Company will reduce ARC compensation in the event where additional cost is incurred as a result of the EDR participation. In the event of such additional costs, Company shall provide supporting documentation to ARC upon request.

g. ARC will receive EDR Energy credits or debits as either an electronic wire transfer or a physical check issued to the ARC. Payment to the ARC will be issued 20 days after the end of the month in which the event occurs. Subsequent revisions, as needed, will be applied to future settlements.

h. Company will not provide incentives for any additional load reduction beyond the amount determined through the EDR Baseline Load, FDL and GLD.

i. EDR settlements are not provided for curtailments planned or unplanned for any reason other than notification by Company of a cleared EDR offer. ARC shall not receive an EDR credit for any EDR Event during which Customer's load is already reduced from their EDR Baseline Load due to planned or unplanned outage as a result of renovation, repair, refurbishment, force majeure, strike, or any event other than Customer's normal operating conditions.

j. In the event that ARC has a debit on its bill instead of a credit, if the ARC does not pay that debit by the due date indicated on the ARC settlement, the ARC shall be suspended from further participation until such time that the debit is paid.

k.  Company shall apply fees and charges monthly to ARC settlement as shown in Attachment B.  The offer clearing fee of 5% will be applied to the settlement amount less other applicable fees.  The offer clearing fee will not be less than $0.

N.    Power Interruption:  If power is interrupted to Customer during an EDR Event, then Company shall not be responsible for paying an EDR credit for energy reductions in excess of the minimum of the reduction based on Customer's EDR Baseline Load and FDL or GLD amount and the MISO dispatch amount.  If ARC does not wish to specify individual Customer GLD or FDL amounts, then impacted customers will be excluded from settlement calculations for the duration of the power interruption.  Examples of reasons that power may be interrupted include without limitation accidents, storm outages, equipment failures or malfunctions, and periods of involuntary load curtailment.

O.    Customer Maintenance.  ARC must inform Duke Energy Indiana of any plant maintenance that will significantly change the load level at the enrolled sites.  EDR offers are not permitted for curtailments planned or unplanned for any reason other than notification by Duke Energy Indiana of a cleared EDR offer.

P.    Daily Curtailment Event Limits.  ARC must specify the number of curtailment events permitted per day.

## III.  LIMITATION OF LIABILITIES

A.    Duke Energy Indiana shall not be liable to the ARC for any damages caused by Duke Energy Indiana's conduct in compliance with, or as permitted by, Rider MBDR or other tariffs, this Agreement and associated legal and regulatory requirements related to the Rider MBDR.

B.    Duke Energy Indiana's liability to ARC for any loss, cost, claim, injury, liability or expense, including reasonable attorneys' fees, relating to or arising from any act or omission in Duke Energy Indiana's performance of this Agreement shall be limited to the amount of direct damage actually incurred.  In no event shall Duke Energy Indiana be liable to ARC for any indirect, special, consequential or punitive damages of any kind whatsoever, whether in contract, tort or strict liability.

## IV.  PAYMENT

A.    Payment Terms.  During the term of this Agreement, Duke Energy Indiana shall make any payments due to ARC (after deducting any amounts due to Duke Energy Indiana) pursuant to the terms and conditions of Rider MBDR within sixty (20) calendar days following the end of each operating month by mailing an invoice and check payable, if applicable, to ARC to the following address or through electronic delivery:

Name:                   _____
Attention:              _____
Address 1:              _____
Address 2:              _____
City, State, Zip:       _____

6

B.    Late Payments.  Duke Energy Indiana's charges to ARC as provided in MBDR will be considered past due if it is not paid within 15 calendar days after transmittal of an invoice by Duke Energy Indiana.  If an ARC does not pay Duke Energy Indiana's invoice within such 15 calendar days, then:

a.    The ARC shall be suspended from further participation in Rider MBDR until such time that the invoice is paid.  If ARC's participation in Rider MBDR is terminated, the ARC remains responsible for all outstanding charges billed pursuant to Rider MBDR, even if such charges are identified after the termination becomes effective.

b.    If this Agreement is not terminated, the ARC will be unable to add Customers to its portfolio and Duke Energy Indiana will not submit offers until late payments are cured.

c.    Duke Energy Indiana may require full collateral in the form of cash, irrevocable standby letter of credit, security bond or any other security instrument deemed appropriate by Duke Energy Indiana if the ARC makes more than one late payment. If such collateral is requested and not provided by the ARC to Duke Energy Indiana, the ARC's participation will be subject to termination by Duke Energy Indiana.

## V.    **REPRESENTATIONS AND WARRANTIES**

A.    Each Party represents and warrants that it is and shall remain in compliance with all applicable laws.

B.    Each Party represents and warrants that (a) it has the full power and authority to execute and deliver this Agreement and to perform its terms and conditions; (b) the execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate or other action by such Party; and (c) this Agreement constitutes such Party's legal, valid and binding obligation, enforceable against such Party in accordance with its terms.

C.    Each Party shall exercise all reasonable care, diligence and good faith in the performance of its duties pursuant to this Agreement, and carry out its duties in accordance with applicable recognized professional standards in accordance with the requirements of this Agreement.

D.    With each submission of a "Notice to Add or Delete Customers Participating in Rider MBDR," and until such time as ARC submits such Notice for the removal of such Customer from ARC's representation, ARC represents and warrants that:

a.    Each Customer whom ARC represents is eligible to participate in Rider MBDR and has elected to participate in Rider MBDR through ARC;

b.    ARC has entered into the appropriate contractual or other arrangements with such Customer whereby such Customer has authorized ARC to receive payments from and to

7

pay penalty charges to Duke Energy Indiana on behalf of such Customer in connection with such Customer's participation in Rider MBDR.

c.      Duke Energy Indiana reserves the right to contact Customers directly to verify Customer participation.

## VI.    TERM

A.      Unless otherwise terminated, the term of this Agreement shall commence as of the Effective Date and shall continue in full force and effect for 15 months and shall automatically renew for subsequent month to month terms unless terminated by a Party after providing 60 days written notice. Notice may be given 60 days prior to the end of the initial term. Participation will immediately be suspended with no incentive payments upon Midwest ISO determination that the resource is not permitted to be a EDR resource for the purpose for which it is enrolled.

## VII.    TERMINATION

A.      Termination for Default. Duke Energy Indiana may immediately terminate this Agreement upon written notice to ARC if ARC breaches any material obligation under this Agreement and fails to cure such breach within fifteen (15) calendar days after receiving written notice of the breach. ARC must notify Duke Energy Indiana upon curing identified breach.

B.      Effect of Termination. Upon an issuance of a notice to terminate this Agreement, Duke Energy Indiana shall have the right to solicit the direct participation in Rider MBDR of Customers represented by ARC who are eligible to participate directly in Rider MBDR. All service agreements will be removed from the ARCs portfolio upon the effective date of termination.

## VIII.    INDEMNIFICATION

A.      Indemnification of Duke Energy Indiana. To the fullest extent permitted by law, ARC shall indemnify, defend and hold harmless Duke Energy Indiana, and its parent company, subsidiaries, affiliates and their respective shareholders, officers, directors, employees, agents, representatives, successors and assigns (collectively, the "Indemnified Parties"), from and against any and all claims, actions, suits, proceedings, losses, liabilities, penalties, fines, damages, costs or expenses, including without limitation reasonable attorneys' fees ("Claim"), resulting from (a) any breach of the representations, warranties, covenants and obligations of ARC under this Agreement, (b) any act or omission of ARC, whether based upon ARC's negligence, strict liability or otherwise, in connection with the performance of this Agreement, or (c) any third party claims of any kind, whether based upon negligence, strict liability or otherwise, arising out of or connected in any way to ARC's performance or nonperformance under this Agreement.

B.      Defense of Claim. If any Claim is brought against the Indemnified Parties, ARC shall assume the defense of such Claim, with counsel reasonably acceptable to the Indemnified Parties, unless in the opinion of counsel for the Indemnified Parties a conflict of interest between

8

the Indemnified Parties and ARC may exist with respect to such Claim. If a conflict precludes ARC from assuming the defense, then ARC shall reimburse the Indemnified Parties on a monthly basis for the Indemnified Parties' reasonable defense costs through separate counsel of the Indemnified Parties' choice. If ARC assumes the defense of the Indemnified Parties with acceptable counsel, the Indemnified Parties, at their sole option and expense, may participate in the defense with counsel of their own choice without relieving ARC of any of its obligations hereunder.

C.    Survival. ARC's obligation to indemnify the Indemnified Parties shall survive the expiration or termination of this Agreement.

## IX.    NOTICES

A.    Mailing Address. Except for payments, which shall be made pursuant to Section IV, any formal notice, request, or demand required or permitted under this Agreement shall be given in writing by Duke Energy Indiana and ARC, and shall be (a) mailed by first-class mail, (b) mailed by registered, certified, (c) mailed by overnight mail, (d) delivered by hand, or (e) faxed with confirmation as set forth below, to the other Party as indicated below, or to such other address as the parties may designate by written notice.

To ARC:

_____

_____

_____

Phone:        _____
Facsimile:    _____

To Duke Energy Indiana:

_____

_____

_____

Phone:        _____
Facsimile:    _____

B.    Notices. Notices delivered by hand shall be deemed received when delivered. Notices sent by facsimile shall be deemed received upon receipt but must be confirmed by mail within seventy-two (72) hours. Notices delivered by first class mail shall be deemed received forty-eight (48) hours (not including weekends and holidays) after deposit, postage prepaid, in the U.S. mail, or if certified, registered or overnight mailing is used, as acknowledged by the signed receipt of mailing.

9

## X.    **CONFIDENTIALITY**

A.    <u>Confidentiality.</u>  ARC shall not disclose any Confidential Information obtained pursuant to this Agreement to any third party, including any affiliates of ARC, without the express prior written consent of Duke Energy Indiana.  As used herein, the term "Confidential Information" means proprietary business, financial and commercial information pertaining to Duke Energy Indiana, Customer names and other information related to Customers, including energy usage data ("Customer Information"), any trade secrets and any other information of a similar nature, whether or not reduced to writing or other tangible form.  Confidential Information shall not include: (a) information known to ARC prior to obtaining the same from Duke Energy Indiana; (b) information in the public domain at the time of disclosure by ARC; (c) information obtained by ARC from a third party who did not receive the same, directly or indirectly, from Duke Energy Indiana; or (d) information approved for release by express prior written consent of an authorized representative of Duke Energy Indiana.

B.    <u>Use of Confidential Information.</u>  ARC hereby agrees that it shall use the Confidential Information solely for the purpose of performing under this Agreement.  ARC agrees to use at least the same degree of care ARC uses with respect to its own proprietary or confidential information, which in any event shall result in a reasonable standard of care to prevent unauthorized use or disclosure of the Confidential Information.

C.    <u>Authorized Disclosure.</u>  Notwithstanding any other provisions of this Section ARC may disclose any of the Confidential Information in the event, but only to the extent, that, based upon advice of counsel, ARC is required to do so by the disclosure requirements of any law, rule, regulation or any order, decree, subpoena or ruling or other similar process of any court, governmental agency or regulatory authority.  Prior to making or permitting any such disclosure, ARC shall provide Duke Energy Indiana with prompt written notice of any such requirement so that Duke Energy Indiana (with ARC's assistance if requested by Duke Energy Indiana) may seek a protective order or other appropriate remedy.

D.    <u>Term.</u>  The confidentiality provisions set forth in this Section shall remain in full force and effect with respect to any Confidential Information until the date that is five (5) years after the date of Duke Energy Indiana's disclosure of such Confidential Information to ARC pursuant to this Agreement; provided, further, that such confidentiality provisions shall remain in full force and effect with respect to any Customer Information in perpetuity.

E.    <u>Remedies.</u>  The Parties acknowledge that the Confidential Information is valuable and unique, and that damages would be an inadequate remedy for breach of this Section and the obligations of ARC are specifically enforceable.  Accordingly, the Parties agree that in the event of a breach or threatened breach of this Section by ARC, Duke Energy Indiana shall be entitled to seek an injunction preventing such breach, without the necessity of proving damages or posting any bond.  Any such relief shall be in addition to, and not in lieu of, monetary damages or any other legal or equitable remedy available to Duke Energy Indiana.

10

## IX.    MISCELLANEOUS

A.    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Indiana except for matters and disputes with respect to which the Commission is the proper venue for dispute resolution pursuant to applicable law or this Agreement, the federal and state courts located in Indianapolis, Indiana shall constitute the sole and proper venue for resolution of any matter or dispute hereunder.

B.    Entire Agreement. This Agreement contains the entire agreement between the Parties with respect to the subject matter herein and supersede and cancel any and all prior agreements and understandings, oral or written, between the Parties relating to the subject matter hereof.

C.    Amendment; Waiver. Neither this Agreement nor any provision hereof may be waived, amended or otherwise modified orally, but only by (in the case of a waiver) an instrument in writing signed by the Party against which the waiver is sought to be enforced and (in the case of an amendment or other modification) an agreement in writing signed by both Parties.

D.    Assignment. This Agreement shall not be transferred or assigned by ARC without the prior written consent of Duke Energy Indiana. Any violation of this Section shall be void.  .

E.    Severability. If any provision of this Agreement is held by a court of competent jurisdiction in a final, non-appealable judgment to be invalid, illegal or unenforceable, the remainder of the provisions shall remain in full force and effect and any invalid, illegal or unenforceable provision shall be replaced with a valid, legal or enforceable provision, the effect of which comes as close as possible to that of the invalid, illegal or unenforceable provision.

F.    Survival. Notwithstanding the expiration or termination of this Agreement, the Parties shall continue to be bound by the provisions of this Agreement, which, by their nature, survive completion or termination.

G.    Independent Contractor. ARC shall perform its obligations under this Agreement as an independent contractor, and no principal–agent or employer-employee relationship or joint venture or partnership shall be created with Duke Energy Indiana.

H.    Counterpart Execution. This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same instrument. Execution of this Agreement by facsimile signature shall have the same effect as execution by original signature.

IN WITNESS WHEREOF, the Parties hereto have entered into this Agreement as of the day and year hereinabove first written.

11

DUKE ENERGY INDIANA, INC.

By:_____

Name:_____

Title:_____


ARC

By:_____

Name:_____

Title:_____

**Program Participation Elections**

Number of Events Permitted per Day (Number / day)

_____

Specify Shutdown Amount ($ / shutdown)
$_____

Specify Notification Time Required (Hours)
(Note that this notification time must include 30 minutes for Duke Energy to provide notice to Customer from MISO)
_____ Hours

Specify Energy Offer ($ / MWH)
$_____

Demand Response Compliance Plan (Select Only One)
☐ Guaranteed Load Drop from Baseline Load* (GLD)
☐ Firm Demand Level* (FDL)

FDL or GLD MUST be the same for all hours in the offer period.

FDL  _____ kW
GLD  _____ kW

Specify Baseline Method (Select only one; Must be approved by Company and MISO)
☐ Company Regression Method
☐ MISO Default Method
☐ Other: describe below or attach document

_____

_____

_____

Description Attached

13

**Definitions**

| | |
|---|---|
| Real-Time LMP | The real-time locational marginal price for the appropriate Midwest ISO Load Zone CPNode as published by Midwest ISO. |
| EDR Event | A load curtailment event as dispatched by the Midwest ISO during a Midwest ISO declared emergency. |
| EDR Event Incentive | The credit or debit applied by Company to Customer for Customer's participation in an EDR Event, computed in accordance herewith. |
| Firm Load Level: | A consumption level selected by Customer to which Customer agrees to reduce its load during a declared EDR Event, as reflected on the Cover Sheet. |
| Guaranteed Load Drop: | Used when Customer will reduce load each hour during an event by a fixed amount, and is equal to the amount of load reduction from Customer's EDR Baseline Load level, as reflected on the Cover Sheet. |
| Load Zone CPNode | The commercial pricing node and such successor commercial pricing node as published by Midwest ISO. |
| Demand Reduction Tolerance | The Midwest ISO, based on information in the EDR Registration and daily offer, will provide the Midwest ISO EDR Dispatch Amount. The portion of this amount associated with Customer based on information provided in this agreement and through the PowerShare Web Site or in written notice to Company will be multiplied by 95% or the current tolerance band specified in Midwest ISO tariff Schedule 30. This is the minimum load reduction Customer must deliver during an EDR Event to avoid non-performance charges. |
| Midwest ISO | The Midwest Independent System Operator, Inc., which operates under an Open Access Transmission and Energy Markets Tariff filed with the Federal Energy Regulatory Commission. |
| Load Reduction Shortfall | This amount is the Demand Reduction Tolerance less the Demand Reduction Delivered but not to be less than 0. |
| PowerShare® Website | A Company-hosted Internet web site used to post EDR Events and related program information. |
| EDR Baseline Load | The EDR Baseline Load level is an estimate of the Customer's load during an EDR Event that would have occurred absent the Company exercising an event. |
| Demand Reduction Delivered | This amount is equal to the EDR Baseline Load less Customer's actual load level in each hour. |
| Customer Expected Load Reduction | Customer is expected to reduce load during EDR Events equal to the amount of EDR Baseline Load less the Firm Load Level or Guaranteed Load Drop amount, as specified by customer, result not to be less than zero. To avoid non- |

14

|  | compliance charges, customer must maintain a load level during all hours of EDR Event at or below the Firm Load Level or the EDR Baseline Load less the Guaranteed Load Drop. |
|---|---|
| NERC | North American Electric Reliability Council |
| Regional Emergency | A NERC level EEA2 Step 1 (Midwest ISO Maximum Generation Emergency Event) or higher emergency declared by Midwest ISO. |
| EDR Settlement | A calculation, after the EDR month, to determine the Customer's Demand Reduction Delivered for EDR Events. This value is used in the computation of the Customer's monthly credit. |

15

## STANDARD CONTRACT RIDER NO. 22
## POWERSHARE EDR PROGRAM

### Attachment B

### Company Fees & Charges

| | |
|---|---|
| Customer Registration with Company | $1,000 |
| Customer Modification to Registration with Company | $100 |
| EDR Offer Revisions(per offer revision) | $50 |

For offers cleared by Midwest ISO:  An offer clearing fee of 5% of the compensation defined in the Settlements section.  Offer clearing fee will not be less than $0.

16

## DRR TYPE I AGGREGATOR OF RETAIL CUSTOMERS SERVICE AGREEMENT FOR AGGREGATORS PARTICIPATING IN DUKE ENERGY INDIANA'S MARKET BASED DEMAND RESPONSE RIDER

This Service Agreement ("Agreement") for Aggregators of Retail Customers participating in Duke Energy Indiana's Market Based Demand Response Rider ("Rider MBDR") is entered into by and between Duke Energy Indiana, Inc. ("Duke Energy Indiana"), an Indiana corporation, and _____ (Aggregator of Retail Customers or "ARC") a _____. Duke Energy Indiana and ARC may sometimes be referred to herein as a "Party" and collectively as the "Parties."

WHEREAS, the Indiana Utility Regulatory Commission ("Commission"), through its July 28, 2010 Order in Cause No. 43566, has required all jurisdictional electric utilities in Indiana, including Duke Energy Indiana, to offer programs allowing customers to participate through their respective electric utilities in RTO demand response programs. Pursuant to the Commission Order in Cause No. 43566, Duke Energy Indiana has implemented Rider MBDR, as set forth in Duke Energy Indiana's Standard Contract Rider No. 22 ("Rider No. 22"), which is attached hereto as Attachment A and incorporated herein by this reference; and

WHEREAS, the Commission has authorized the participation of ARCs in Rider MBDR, and ARC desires to participate in Rider MBDR subject to the applicable Duke Energy Indiana tariff rules and rate schedules.

NOW, THEREFORE, in consideration of the mutual undertakings set forth below, the Parties agree as follows:

## I.    ARC'S OBLIGATIONS

A.    Status; Subject to Applicable Duke Energy Indiana Tariffs. ARC's status in Rider MBDR shall be as an "ARC" under Rider No. 22. ARC shall be subject to the terms and conditions of Duke Energy's Rates, Terms and Conditions for Electric Service, IURC No. 14 and any successor electric tariff, as filed with the Commission and as amended from time to time ("Tariff"), including without limitation Standard Contract Rider No. 22, Duke Energy Market Based Demand Response Rider, as may periodically be revised.

B.    Representation of Customers.  ARC shall represent those Customers in Duke Energy Indiana's electric service territory eligible to participate in Rider MBDR, who have elected to participate through ARC with respect to such Customer's service agreement(s), by having appropriate contractual or other arrangements with each such eligible Customer whereby such Customer authorizes ARC, as its representative, to receive payments and to pay penalty charges on behalf of such Customer in connection with the Customer's participation, through ARC, with Duke Energy Indiana, in Rider MBDR.  ARC shall be solely responsible for having the appropriate contractual or other arrangements with each Customer whom ARC represents in

1

Rider MBDR. Duke Energy Indiana shall not be responsible for monitoring, auditing, reviewing or enforcing such arrangements. ARC acknowledges and agrees that, in its representation of Duke Energy Indiana Customers for Rider MBDR, ARC is subject to the terms and conditions of Rider MBDR and this Agreement.

C.      ARC Service Establishment. Service under Rider MBDR shall commence upon the completion of (i) full execution of this Agreement, (ii) acceptance of the resource registration and the default DRR Type I offer by Midwest ISO, (iii) installation and operational readiness of required electric metering and dedicated communication links with applicable electric meters, and (iv) collection of the minimum amount of interval meter data required to calculate baseline load.

D.      Required Notice to Add or Delete Customers. Once ARC has entered into the appropriate contractual or other arrangements with each Customer whom ARC represents in the Rider MBDR, ARC shall deliver to Duke Energy Indiana a "Notice to Add or Delete Customers Participating in Rider MBDR" adding such Customer's service agreement(s) to ARC's portfolio. The Notice shall be executed by the ARC and each affected Customer and shall include the following information (i) Customer name; (ii) Customer address; (iii) Customer account number; and (iv) Customer's consent for ARC to receive Customer hourly electric consumption information from Duke Energy Indiana. ARC shall notify Duke Energy Indiana that it has dropped a Customer service agreement from its portfolio by delivering to Duke Energy Indiana a "Notice to Add or Delete Customers participating in Rider MBDR". Notice must be signed by Customer and ARC. ARC shall deliver such Notices to Duke Energy Indiana as specified in the Notice section. Changes to customer participation will not be effective until all required updates are completed with and approved by Midwest ISO and Duke Energy Indiana.

Duke Energy Indiana must approve each service agreement before the service agreement can be included in the ARC's portfolio. Additions to and deletions from the ARC's portfolio will be effective as specified in Rider MBDR and the Notice. Customers may not participate with multiple ARCs concurrently.

E.      Metering and Telemetry Requirements. ARC Customers who do not have an electric meter capable of providing the load metering frequency and telemetry required by the MISO in the applicable business practice manual (or "BPM") for each participating account must request and have installed by Duke Energy Indiana appropriate metering before participation may begin. The cost of incremental metering and communication equipment needed to fulfill MISO requirements will be paid by ARC. Duke Energy Indiana will provide an estimated cost of installation to ARC for all accounts applicable prior to installation.

F.      Timeliness and Due Diligence. ARC shall exercise due diligence in meeting its obligations and deadlines under Rider MBDR and this Agreement to facilitate Customer participation through ARC in Rider MBDR.

2

G.    Curtailment. Customer load curtailment enrolled with ARC under this Agreement must be solely committed to Duke Energy Indiana.

## II.    GENERAL TERMS

A.    Customer-Specific Usage or Meter Data. Upon the addition of a service agreement to an ARC's portfolio, Usage or meter data for the Service Agreement will become available on a going forward basis via the format available in Duke Energy Indiana's Rider MBDR Website; also known as Company's PowerShare® Website.

B.    Notice Method. Duke Energy Indiana will utilize phone and email to notify the ARC of events and to process ARC participation updates. ARC will be responsible for providing its own Internet access. ARC is responsible for notifying Duke Energy Indiana if their internet system cannot accept emails. In the event that the Internet system is temporarily unavailable from ARC or Company, Duke Energy Indiana will notify the ARC and process participation updates by phone. Duke Energy Indiana will provide written documentation and training on the process to be used by the ARC. ARC must provide and maintain 24-hour contact information.

C.    No Warranty. This Agreement shall not be construed as any promise or warranty by Duke Energy Indiana to provide continuous or uninterrupted power to the Customers participating with ARC.

D.    Testing. All participating Customers and ARC will be subject to the current testing and metering requirements of the Midwest ISO for DRR Type I resources, as this term or its successor term is defined by Midwest ISO, as specified in the appropriate Midwest ISO business practice manual.

E.    Event Notification. Duke Energy Indiana will notify ARCs within 30 minutes after receiving information on cleared offers and/or dispatch instructions from Midwest ISO regarding the DRR Type I offer. Duke Energy Indiana shall utilize phone and e-mail, or other means of communication as mutually agreed to apprise the ARC of a DRR Type I Event. ARCs may wish to incorporate notification time from Duke Energy Indiana in the Shut-Down Notification Time and/or the Shut-Down Time offer parameters. Duke Energy Indiana notification time to an ARC will not alter dispatch instructions from Midwest ISO and ARC is obligated to comply with MISO dispatch instructions as forwarded from Duke Energy Indiana. Duke Energy Indiana may notify day-ahead on Sundays and holidays for DRR Type I events for the following day when applicable.

F.    ARC Reduction Obligation. The ARC is obligated to reduce load from participating Customers as communicated by Duke Energy Indiana in accordance with the Midwest ISO dispatch instruction. Deviations in load reductions above or below the dispatch amount may

3

result in charges as described in the applicable Midwest ISO business practice manuals. These charges are the responsibility of the ARC.

G.    Energy Commitments and Other Changes to Offers. The ARC may update their Energy Commitment Status and other offer parameters daily through correspondence with Duke Energy Indiana as designated, subject to fees specified in Attachment B. Status updates must be received by 8 AM EST the day prior to the day the status or parameter change will be effective. All changes are subject to Midwest ISO limitations and will not permanently update the ARCs default offer unless specified by the ARC. Further, if the ARCs status changes and the Customers cannot provide load reduction as offered, the ARC must immediately notify Duke Energy Indiana. The ARC is responsible for meeting all offer obligations when the offer is cleared.

H.    ARC Offer Cost Parameters. The ARC may specify changes to their default offer parameters for the hourly Energy Offer ($/MWH), an Hourly Curtailment Offer ($/hour), and a Shut-down Offer ($) associated with demand reduction which may or may not include direct labor and equipment costs and/or opportunity costs. All costs are subject to Midwest ISO specified limits and Midwest ISO independent market monitor review. Duke Energy Indiana reserves the right to review daily offers and reject an ARCs proposed changes if offers contain errors or may create reliability concerns. All updates must be received by 8 AM EST the day prior to the day the status or parameter change will be effective. These updates will not permanently change the ARC's default offer unless specified by the ARC.

I.    Default Offer: ARC's default offer will be submitted to MISO daily unless updated by notifying Company by 8 AM EST the day prior to the day the update is to be effective.

J.    Measurement and Verification. Company will utilize the default Calculated Baseline method, as this term, or its successor term, is used in the applicable MISO business practice manual, specified by the Midwest ISO for DRR Type I resources providing energy to calculate the DRR Type I Baseline. As mutually agreed by ARC and Company, a Weather Sensitive Adjustment, as defined by Midwest ISO, may be incorporated. Alternatively, at the mutual agreement of ARC and Company, a custom baseline calculation acceptable to the Midwest ISO may be used to determine the DRR Type I Baseline. The DRR Type I Baseline will be calculated as data is available and provided to Midwest ISO and ARC within the guidelines specified by Midwest ISO in the applicable business practice manual. If available, the baseline load or an estimated baseline load will be delivered to ARC prior to the event. ARC may only use the Guaranteed Load Drop (GLD) curtailment compliance method as described in Rider MBDR.

4

K.    Settlement.

a.  ARC will be eligible for compensation for load reduction for participating in a DRR Type I event when cleared and dispatched by Midwest ISO. Company will request a settlement CPNode for the DRR Type I resource from Midwest ISO. The Midwest ISO settlement information will be used as the basis for ARC compensation. Company will reduce this settlement amount to account for the Marginal Foregone Retail Rate (MFRR) savings, as defined in this Agreement, and applicable fees and charges as set forth in Attachment B.

b.  Under no circumstance will ARC receive compensation for Customer load reduced and compensated for under another demand response program. For clarification purposes,

   i.   Customer may not participate in the PowerShare® QuoteOption program while participating in PowerShare® DRR Type I.

   ii.  Customer participation in PowerShare® CallOption will settle first,

   iii. Customer participation in PowerShare® DRR Type I will settle next,

   iv.  Customer participation in PowerShare® EDR will settle last.

c.  The MFRR savings is Customer's marginal retail rate inclusive of trackers excluding any demand component effects multiplied by the amount of curtailment under this program. For aggregate groups of customers with different tariffs and service levels, ARC and Duke Energy Indiana must mutually agree on a weighted average MFRR prior to submission of offers to MISO under Rider MBDR.

d.  All Midwest ISO charges for non-compliance will be ARC responsibility.

e.  In addition, Company will reduce ARC compensation in the event where additional cost is incurred as a result of the DRR Type I participation. In the event of such additional costs, Company shall provide supporting documentation to ARC upon request.

f.  In the event that ARC has a debit on its bill instead of a credit, if the ARC does not pay that debit by the due date indicated on the ARC settlement, the ARC shall be suspended from further participation until such time that the debit is paid.

g.  ARC will receive DRR Type I Event Incentive credits or debits as either an electronic wire transfer or a physical check issued to the ARC. Payment to the ARC will be issued 20 days after the end of the month in which the event occurs. Subsequent revisions, as needed, will be applied to future settlements.

h.  Company shall apply fees and charges monthly to ARC settlement as shown in Attachment B. The offer clearing fee of 5% will be applied to the MISO settlement amount less applicable fees. The offer clearing fee will not be less than $0.

i.  DRR Type I settlements are not provided for curtailments planned or unplanned for any reason other than notification by Company of a cleared DRR Type I offer. ARC shall not receive a DRR Type I credit for any DRR Type I Event during which applicable Customer's load is already reduced from their DRR Type I Baseline Load due to planned or unplanned outage as a result of renovation,

5

repair, refurbishment, force majeure, strike, or any event other than Customer's normal operating conditions.

L.    Power Interruption. If power is interrupted to Customers during a DRR Type I Event, then Duke Energy Indiana shall not be responsible for paying DRR Event Incentive Credit for energy reductions, to ARC, in excess of the estimated reduction based on the impacted Customer's GLD amount. If ARC does not wish to specify individual Customer GLD amounts, then impacted customers will be excluded from settlement calculations for the duration of the power interruption. ARC will not be exposed to any charges for excessive energy from Midwest ISO. Examples of reasons that power may be interrupted include without limitation accidents, storm outages, equipment failures or malfunctions, and periods of involuntary load curtailment.

M.    Customer Maintenance. ARC must inform Duke Energy Indiana of any plant maintenance that will significantly change the load level at the enrolled sites. DRR Type I offers are not permitted for curtailments planned or unplanned for any reason other than notification by Duke Energy Indiana of a cleared DRR Type I offer.

N.    Daily Curtailment Event Limits. If the ARC desires only one curtailment event to be permitted per day then the ARC should set offer parameters including Minimum Interruption Duration, Maximum Interruption Duration, and Minimum Non-Interruption Interval to appropriate values. Duke Energy Indiana will not restrict dispatch to only 1 curtailment per day.

## III.    LIMITATION OF LIABILITIES

A.    Duke Energy Indiana shall not be liable to the ARC for any damages caused by Duke Energy Indiana's conduct in compliance with, or as permitted by, Rider MBDR or other tariffs, this Agreement and associated legal and regulatory requirements related to the Rider MBDR.

B.    Duke Energy Indiana's liability to ARC for any loss, cost, claim, injury, liability or expense, including reasonable attorneys' fees, relating to or arising from any act or omission in Duke Energy Indiana's performance of this Agreement shall be limited to the amount of direct damage actually incurred. In no event shall Duke Energy Indiana be liable to ARC for any indirect, special, consequential or punitive damages of any kind whatsoever, whether in contract, tort or strict liability.

## IV.    PAYMENT

A.    Payment Terms. During the term of this Agreement, Duke Energy Indiana shall make any payments due to ARC (after deducting any amounts due to Duke Energy Indiana) pursuant to the terms and conditions of Rider MBDR within sixty (20) calendar days following the end of each operating month by mailing an invoice and check payable to ARC to the following address or through electronic delivery:

6

| Name: | _____ |
| Attention: | _____ |
| Address 1: | _____ |
| Address 2: | _____ |
| City, State, Zip: | _____ |

B.      Late Payments. Duke Energy Indiana's charges to ARC as provided in MBDR will be considered past due if it is not paid within 15 calendar days after transmittal of an invoice by Duke Energy Indiana. If an ARC does not pay Duke Energy Indiana's invoice within such 15 calendar days, then:

   a.      The ARC shall be suspended from further participation in Rider MBDR until such time that the invoice is paid. If ARC's participation in Rider MBDR is terminated, the ARC remains responsible for all outstanding charges billed pursuant to Rider MBDR, even if such charges are identified after the termination becomes effective.

   b.      If this Agreement is not terminated, the ARC will be unable to add Customers to its portfolio and Duke Energy Indiana will not submit offers until late payments are cured.

   c.      Duke Energy Indiana may require full collateral in the form of cash, irrevocable standby letter of credit, security bond or any other security instrument deemed appropriate by Duke Energy Indiana if the ARC makes more than one late payment. If such collateral is requested and not provided by the ARC to Duke Energy Indiana, the ARC's participation will be subject to termination by Duke Energy Indiana.

## V.    REPRESENTATIONS AND WARRANTIES

A.      Each Party represents and warrants that it is and shall remain in compliance with all applicable laws.

B.      Each Party represents and warrants that (a) it has the full power and authority to execute and deliver this Agreement and to perform its terms and conditions; (b) the execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate or other action by such Party; and (c) this Agreement constitutes such Party's legal, valid and binding obligation, enforceable against such Party in accordance with its terms.

C.      Each Party shall exercise all reasonable care, diligence and good faith in the performance of its duties pursuant to this Agreement, and carry out its duties in accordance with applicable recognized professional standards in accordance with the requirements of this Agreement.

7

D.     With each submission of a "Notice to Add or Delete Customers Participating in Rider MBDR," and until such time as ARC submits such Notice for the removal of such Customer from ARC's representation, ARC represents and warrants that:

    a.     Each Customer whom ARC represents is eligible to participate in Rider MBDR and has elected to participate in Rider MBDR through ARC;

    b.     ARC has entered into the appropriate contractual or other arrangements with such Customer whereby such Customer has authorized ARC to receive payments from and to pay penalty charges to Duke Energy Indiana on behalf of such Customer in connection with such Customer's participation in Rider MBDR.

## VI.     TERM

A.     Unless otherwise terminated, the term of this Agreement shall commence as of the Effective Date and shall continue in full force and effect for 15 months and shall automatically renew for subsequent month to month terms unless terminated by a Party after providing 60 days written notice. Such notice may be given 60 days prior to the end of the initial term. Participation will immediately be suspended with no incentive payments upon Midwest ISO determination that the resource is not permitted to be a DRR Type I resource for the purpose for which it is enrolled.

## VII.     TERMINATION

A.     Termination for Default. Duke Energy Indiana may immediately terminate this Agreement upon written notice to ARC if ARC breaches any material obligation under this Agreement and fails to cure such breach within fifteen (15) calendar days after receiving written notice of the breach. ARC must notify Duke Energy Indiana upon curing identified breach.

B.     Effect of Termination. Upon an issuance of a notice to terminate this Agreement, Duke Energy Indiana shall have the right to solicit the direct participation in Rider MBDR of Customers represented by ARC who are eligible to participate directly in Rider MBDR. All service agreements will be removed from the ARCs portfolio upon the effective date of termination.

## VIII.     INDEMNIFICATION

A.     Indemnification of Duke Energy Indiana. To the fullest extent permitted by law, ARC shall indemnify, defend and hold harmless Duke Energy Indiana, and its parent company, subsidiaries, affiliates and their respective shareholders, officers, directors, employees, agents, representatives, successors and assigns (collectively, the "Indemnified Parties"), from and against any and all claims, actions, suits, proceedings, losses, liabilities, penalties, fines, damages, costs or expenses, including without limitation reasonable attorneys' fees ("Claim"),

8

resulting from (a) any breach of the representations, warranties, covenants and obligations of ARC under this Agreement, (b) any act or omission of ARC, whether based upon ARC's negligence, strict liability or otherwise, in connection with the performance of this Agreement, or (c) any third party claims of any kind, whether based upon negligence, strict liability or otherwise, arising out of or connected in any way to ARC's performance or nonperformance under this Agreement.

B.      Defense of Claim.  If any Claim is brought against the Indemnified Parties, ARC shall assume the defense of such Claim, with counsel reasonably acceptable to the Indemnified Parties, unless in the opinion of counsel for the Indemnified Parties a conflict of interest between the Indemnified Parties and ARC may exist with respect to such Claim.  If a conflict precludes ARC from assuming the defense, then ARC shall reimburse the Indemnified Parties on a monthly basis for the Indemnified Parties' reasonable defense costs through separate counsel of the Indemnified Parties' choice.  If ARC assumes the defense of the Indemnified Parties with acceptable counsel, the Indemnified Parties, at their sole option and expense, may participate in the defense with counsel of their own choice without relieving ARC of any of its obligations hereunder.

C.      Survival.  ARC's obligation to indemnify the Indemnified Parties shall survive the expiration or termination of this Agreement.

## IX.    NOTICES

A.      Mailing Address.  Except for payments, which shall be made pursuant to Section IV, any formal notice, request, or demand required or permitted under this Agreement shall be given in writing by Duke Energy Indiana and ARC, and shall be (a) mailed by first-class mail, (b) mailed by registered, certified, (c) mailed by overnight mail, (d) delivered by hand, or (e) faxed with confirmation as set forth below, to the other Party as indicated below, or to such other address as the parties may designate by written notice.

To ARC:

_____

_____

Phone:        _____

Facsimile:    _____

To Duke Energy Indiana:

_____

_____

Phone:        _____

Facsimile:    _____

9

B.     Notices. Notices delivered by hand shall be deemed received when delivered. Notices sent by facsimile shall be deemed received upon receipt but must be confirmed by mail within seventy-two (72) hours. Notices delivered by first class mail shall be deemed received forty-eight (48) hours (not including weekends and holidays) after deposit, postage prepaid, in the U.S. mail, or if certified, registered or overnight mailing is used, as acknowledged by the signed receipt of mailing.

## X.     CONFIDENTIALITY

A.     Confidentiality. ARC shall not disclose any Confidential Information obtained pursuant to this Agreement to any third party, including any affiliates of ARC, without the express prior written consent of Duke Energy Indiana. As used herein, the term "Confidential Information" means proprietary business, financial and commercial information pertaining to Duke Energy Indiana, Customer names and other information related to Customers, including energy usage data ("Customer Information"), any trade secrets and any other information of a similar nature, whether or not reduced to writing or other tangible form. Confidential Information shall not include: (a) information known to ARC prior to obtaining the same from Duke Energy Indiana; (b) information in the public domain at the time of disclosure by ARC; (c) information obtained by ARC from a third party who did not receive the same, directly or indirectly, from Duke Energy Indiana; or (d) information approved for release by express prior written consent of an authorized representative of Duke Energy Indiana.

B.     Use of Confidential Information. ARC hereby agrees that it shall use the Confidential Information solely for the purpose of performing under this Agreement. ARC agrees to use at least the same degree of care ARC uses with respect to its own proprietary or confidential information, which in any event shall result in a reasonable standard of care to prevent unauthorized use or disclosure of the Confidential Information.

C.     Authorized Disclosure. Notwithstanding any other provisions of this Section ARC may disclose any of the Confidential Information in the event, but only to the extent, that, based upon advice of counsel, ARC is required to do so by the disclosure requirements of any law, rule, regulation or any order, decree, subpoena or ruling or other similar process of any court, governmental agency or regulatory authority. Prior to making or permitting any such disclosure, ARC shall provide Duke Energy Indiana with prompt written notice of any such requirement so that Duke Energy Indiana (with ARC's assistance if requested by Duke Energy Indiana) may seek a protective order or other appropriate remedy.

D.     Term. The confidentiality provisions set forth in this Section shall remain in full force and effect with respect to any Confidential Information until the date that is five (5) years after the date of Duke Energy Indiana's disclosure of such Confidential Information to ARC pursuant to this Agreement; provided, further, that such confidentiality provisions shall remain in full force and effect with respect to any Customer Information in perpetuity.

10

E.      Remedies. The Parties acknowledge that the Confidential Information is valuable and unique, and that damages would be an inadequate remedy for breach of this Section and the obligations of ARC are specifically enforceable. Accordingly, the Parties agree that in the event of a breach or threatened breach of this Section by ARC, Duke Energy Indiana shall be entitled to seek an injunction preventing such breach, without the necessity of proving damages or posting any bond. Any such relief shall be in addition to, and not in lieu of, monetary damages or any other legal or equitable remedy available to Duke Energy Indiana.

## IX.    MISCELLANEOUS

A.      Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Indiana except for matters and disputes with respect to which the Commission is the proper venue for dispute resolution pursuant to applicable law or this Agreement, the federal and state courts located in Indianapolis, Indiana shall constitute the sole and proper venue for resolution of any matter or dispute hereunder.

B.      Entire Agreement. This Agreement contains the entire agreement between the Parties with respect to the subject matter herein and supersede and cancel any and all prior agreements and understandings, oral or written, between the Parties relating to the subject matter hereof.

C.      Amendment; Waiver. Neither this Agreement nor any provision hereof may be waived, amended or otherwise modified orally, but only by (in the case of a waiver) an instrument in writing signed by the Party against which the waiver is sought to be enforced and (in the case of an amendment or other modification) an agreement in writing signed by both Parties.

D.      Assignment. This Agreement shall not be transferred or assigned by ARC without the prior written consent of Duke Energy Indiana. Any violation of this Section shall be void.   .

E.      Severability. If any provision of this Agreement is held by a court of competent jurisdiction in a final, non-appealable judgment to be invalid, illegal or unenforceable, the remainder of the provisions shall remain in full force and effect and any invalid, illegal or unenforceable provision shall be replaced with a valid, legal or enforceable provision, the effect of which comes as close as possible to that of the invalid, illegal or unenforceable provision.

F.      Survival. Notwithstanding the expiration or termination of this Agreement, the Parties shall continue to be bound by the provisions of this Agreement, which, by their nature, survive completion or termination.

G.      Independent Contractor. ARC shall perform its obligations under this Agreement as an independent contractor, and no principal–agent or employer-employee relationship or joint venture or partnership shall be created with Duke Energy Indiana.

H.      Counterpart Execution. This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same instrument.

11

Execution of this Agreement by facsimile signature shall have the same effect as execution by original signature.

IN WITNESS WHEREOF, the Parties hereto have entered into this Agreement as of the day and year hereinabove first written.

DUKE ENERGY INDIANA, INC.

By:_____

Name:_____

Title:_____

ARC

By:_____

Name:_____

Title:_____

12

**DRR Type I Default Offer Parameters**

DAY-Ahead Schedule Default Hourly Offer Parameters:

| Hour (EST) | Energy Offer ($/MWH) | Hourly Curtailment Offer ($/Hr) | Targeted Demand Reduction Level - GLD (MW) | Energy Commitment Status |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |

DAY-Ahead Schedule Default Daily Offer Parameters:

| | |
|---|---|
| **Shutdown Offer ($)** | |
| **Minimum Interruption Duration (hh:mm)** | |
| **Maximum Interruption Duration (hh:mm)** | |
| **Minimum Non-Interruption Interval (hh:mm)** | |
| **Shut-Down Time (hh:mm)** | |
| **Shut-Down Notification Time (hh:mm)** | |
| | |

13

Real-Time Schedule Default Hourly Offer Parameters:

| Hour (EST) | Energy Offer ($/MWH) | Hourly Curtailment Offer ($/Hr) | Targeted Demand Reduction Level - GLD (MW) | Energy Commitment Status |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |
| 13 | | | | |
| 14 | | | | |
| 15 | | | | |
| 16 | | | | |
| 17 | | | | |
| 18 | | | | |
| 19 | | | | |
| 20 | | | | |
| 21 | | | | |
| 22 | | | | |
| 23 | | | | |
| 24 | | | | |

Real-Time Schedule Default Daily Offer Parameters:

| | |
|---|---|
| **Shutdown Offer ($)** | |
| **Minimum Interruption Duration (hh:mm)** | |
| **Maximum Interruption Duration (hh:mm)** | |
| **Minimum Non-Interruption Interval (hh:mm)** | |
| **Shut-Down Time (hh:mm)** | |
| **Shut-Down Notification Time (hh:mm)** | |
| | |

14

**Definitions**

| | |
|---|---|
| Real-Time LMP | The real-time locational marginal price associated with the DRR Type I resource as determined by Midwest ISO. |
| DRR Type I Event | A load curtailment event as cleared and dispatched by the Midwest ISO. |
| DRR Type I Event Incentive Credit | The credit paid by Company to Customer for Customer's participation in a DRR Type I Event, computed in accordance herewith. |
| Firm Demand Level: | A consumption level selected by Customer to which Customer agrees to reduce its load during a DRR Type I Event.  This curtailment compliance plan is not available for this program. |
| Guaranteed Load Drop: | Used when Customer will reduce load each hour during an event by a fixed amount, and is equal to the amount of load reduction from Customer's DRR Baseline Load level. |
| Load Zone CPNode | A load zone commercial pricing node and such successor commercial pricing node as published by Midwest ISO. |
| Midwest ISO | The Midwest Independent Transmission System Operator, Inc., which operates under an Open Access Transmission and Energy Markets Tariff filed with the Federal Energy Regulatory Commission. |
| PowerShare® Website | A Company-hosted Internet web site used to post related program information. |
| DRR Type I Baseline Load | The DRR Type I Baseline Load level is an estimate of the Customer's load during a DRR Type I Energy Event that would have occurred absent the event. |
| Demand Reduction Delivered | This amount is equal to the DRR Type I Baseline Load less Customer's actual load level in each hour. |
| Customer Expected Load Reduction | Customer is expected to reduce load during DRR Type I Energy Events equal to the GLD, as specified by customer.  To avoid non-compliance charges, customer must maintain a load level during all hours of the DRR Type I Energy Event at or below the DRR Type I Baseline Load less the GLD. |
| Regional Emergency | A NERC level EEA2 Step 1 (Midwest ISO Maximum Generation Emergency Event) or higher emergency declared by Midwest ISO. |

15

STANDARD CONTRACT RIDER NO. 22
POWERSHARE DRR TYPE I ENERGY PROGRAM

**Attachment B**

**Company Fees and Charges**

Customer Registration with Company                                    $1,000
Customer Modification to Registration with Company        $100
DRR Type I Offer Revisions (per offer revision)                  $50

For offers cleared by Midwest ISO:  An offer clearing fee of 5% of the compensation defined in the Settlements section.  Offer clearing fee will not be less than $0.