# Exhibit 5

## STATE OF INDIANA

## INDIANA UTILITY REGULATORY COMMISSION

IN THE MATTER OF THE COMMISSION'S )
INVESTIGATION INTO ANY AND ALL )
MATTERS RELATED TO COMMISSION )
APPROVAL OF PARTICIPATION BY INDIANA )   **CAUSE NO. 43566 MISO 3**
END-USE CUSTOMERS IN DEMAND )
RESPONSE PROGRAMS OFFERED BY THE )   **APPROVED:**
MIDWEST ISO AND PJM INTERCONNECTION )   MAR 0 2 2011
                                     )
RESPONDENTS:    INDIANA   REGULATED )
ELECTRIC UTILITIES                   )

**BY THE COMMISSION:**
**Carolene R. Mays, Commissioner**
**Aaron A. Schmoll, Senior Administrative Law Judge**

On December 13, 2010, Respondent Duke Energy Indiana, Inc. ("Duke Energy Indiana" or "Company" or "Repondent") filed with the Indiana Utility Regulatory Commission ("Commission") its initial tariff compliance filing requesting approval of Duke Energy Indiana's proposed Market Based Demand Response Rider, Standard Contract Rider No. 22 ("Rider MBDR") as required by the Commission's July 28, 2010 Order in Cause No. 43566 (the "Generic DR Order").

On January 18, 2011, Energy Curtailment Specialists, Inc. ("ECS") filed its Comments in Response to Duke Energy Indiana's proposed Rider MBDR and associated service agreements. ECS filed a Petition to Intervene on January 28, 2011. The Indiana Office of Utility Consumer Counselor ("OUCC") filed the testimony of Ronald L. Keen on February 7, 2011. The Indiana Industrial Group ("Industrial Group") filed its Petition to Intervene and the Direct Testimony of James R. Dauphinais on February 9, 2011. Duke Energy Indiana filed the testimony of Bruce L. Sailers on February 16, 2011, which included a revised proposed tariff and service agreements.

Pursuant to notice given and published as required by law, proof of which was incorporated into the record of this Cause by reference and placed in the official files of the Commission, a public hearing was held on Tuesday, February 22, 2011 at 10:30 a.m. in Room 224, PNC Center, 101 W. Washington Street, Indianapolis, Indiana. Duke Energy Indiana, ECS, the Industrial Group and the OUCC participated in the hearing. No members of the general public appeared. At the hearing, the comments and testimony prepared by Duke Energy Indiana, ECS, the Industrial Group and the OUCC were admitted into evidence.

Based upon the evidence of record and the applicable law, the Commission now finds:

1.    **Commission Jurisdiction and Notice.** Due, legal and timely notice of the Evidentiary Hearing in this Cause was given as required by law. Duke Energy Indiana is a public utility within the meaning of Ind. Code § 8-1-2-1, as amended, and is subject to the

jurisdiction of this Commission in the manner and to the extent provided by the laws of the State of Indiana. The Commission has jurisdiction over Duke Energy Indiana and the subject matter of this Cause.

2.      **Background.** Demand response broadly refers to programs designed to motivate retail customers to reduce or shift their consumption of electric energy during high-price or high-demand periods. The Midwest Independent Transmission System Operator, Inc. ("MISO") market began allowing retail customers to participate in demand response programs in 2009.

Our Generic DR Order found that "Indiana end-use customers shall not be enrolled or otherwise participate in Regional Transmission Organization ("RTO") demand response programs directly or through curtailment service providers or other aggregators." Generic DR Order, 51. The Commission instead ordered Duke Energy Indiana and the other Indiana jurisdictional electric utilities (collectively the "Respondent Utilities") to file with the Commission for approval tariffs or riders authorizing the participation of their respective retail customers in RTO demand response programs through the Respondent Utilities. The Commission initiated two subdockets, one for MISO utilities and one for PJM utilities, to consider development of these tariffs. *Id.* at 51. To assist in establishing an appropriate framework for the development and filing of Respondent Utilities' tariff(s) or rider(s), we held a Prehearing and Technical Conference on September 7, 2010. The Respondent Utilities and interested parties participated in the Technical Conferences.

3.      **Relief Requested.** Through its initial tariff filing, Duke Energy Indiana requests approval of Rider MBDR providing its customers an option to participate in the MISO Ancillary Services Market ("ASM") as a demand response resource. Rider MBDR enables participation in MISO's Emergency Demand Response ("EDR") and Demand Response Resource Type 1 ("DRR-1") programs.

4.      **Comments on Duke Energy Indiana's Rider.** ECS, the Industrial Group and the OUCC filed comments on Rider MBDR. ECS commended the MISO utilities for allowing aggregator of retail customers ("ARCs") to coordinate with the MISO utilities to provide demand response. *ECS Verified Comments*, 2. ECS believes that ARCs are necessary to enroll smaller to mid-size customers that do not have the time or resources to independently participate in demand response programs. *ECS Verified Comments*, 2. ARCs provide support to their customers with demand response activations, program enrollment and facilitation of program rules, installation of additional energy monitoring equipment and shielding customers from non-performance penalties. *ECS Verified Comments*, 2-3. While ECS in general supported Rider MBDR, ECS believed that slight modifications to Rider MBDR were necessary to foster robust demand response programs. *ECS Verified Comments*, 3. Specifically, ECS advocated modifying Duke Energy Indiana's provision that required Company-installed metering infrastructure. ECS also indicated that the utilities' proposed fee structures be consistent. *ECS Verified Comments*, Attachment A. Specifically, ECS recommended a one time $1,000 fee, and a charge of $100 per entry above 15 per month. ECS contended that these revisions would provide consistency across the MISO utilities service territories and minimize customer confusion and transaction costs for ARCs. *ECS Verified Comments*, 3.

OUCC witness Ronald L. Keen testified that the OUCC is convinced well-designed and

robust demand response with the broadest possible participation is in the best interests of all customers and that energy markets work best when end-use customers can respond to supply. *Public's Exhibit 1*, 3-4.  He explained that demand response participation has the effect of contributing to grid stability and potentially lowering market prices.  Demand response provides customers one more tool in their financial and energy management strategies to increase revenues and reduce energy expenses. *Public's Exhibit 1*, 4.  Mr. Keen believed that ARCs may be able to contract with clients in multiple programs in more than one region, allowing customers to increase revenue potential.  He explained that the OUCC agreed with the Commission that ARCs may facilitate demand response participation by small and medium sized commercial and industrial customers that may be underserved by traditional utility demand response programs *Public's Exhibit 1*, 4-5.  Mr. Keen recommended that ARCs be allowed to help the Respondent Utilities offer specific end-use customer-targeted energy management services that provide the ability to help optimize generation and operations through strategic and tactical initiatives. *Public's Exhibit 1*, 5.

Like ECS, Mr. Keen indicated the OUCC supported Rider MBDR but recommended certain modifications.  The OUCC advocated the same changes outlined in ECS' Verified Comments. *Public's Exhibit 1*, 6.  He explained that the OUCC supported consistency across the MISO service territories to streamline implementation of the programs for ARCs and retail customers.  He agreed that CSPs should be able to install their own meters and software.  He expressed concern that dissimilar tariff offerings will only create confusion and other issues for customers with facilities in more than one MISO territory. *Public's Exhibit 1*, 5-6.

Mr. Dauphinais indicated that the Industrial Group was able to reach consensus on most issues with Duke Energy Indiana. *Dauphinais Direct,* 2.  He explained that the major area of disagreement with Duke Energy Indiana's proposed Rider MBDR was that it did not allow a customer on a Duke Energy Indiana interruptible tariff to also participate in MISO's demand response programs. *Dauphinais Direct,* 3.  Mr. Dauphinais acknowledged that only NIPSCO's tariff allowed such participation and only as long as participation is not inconsistent with NIPSCO's interruptible rates. *Dauphinais Direct,* 3.  He did not believe that a legitimate reason exists to prohibit an end user from taking advantage of a MISO program provided that the end user remains obligated first to meet its existing obligations to the utility. *Dauphinais Direct,* 3.

5.    **Duke Energy Indiana's Testimony**.  Bruce L. Sailers sponsored a revised Rider MBDR and service agreements for Duke Energy Indiana.  Mr. Sailers testified that Duke Energy Indiana sought input from customers and potential customers, including the OUCC, the Industrial Group, and parties that represent potential ARCs both before commencing drafting of its proposed Rider MBDR and throughout the process. *Respondent's Exh. A, 3.*  He stated that the rider and agreements filed in this proceeding reflect input from the parties and those discussions.

Mr. Sailers testified that Duke Energy Indiana already has other retail demand response options available to customers, and the new programs represent additional options to customers to manage energy costs and to provide benefits to the broader electric grid. *Respondent's Exh. A, 4.*  He indicated that providing options for customers related to energy-only products in the Midwest ISO markets provides an opportunity to gain experience from and make adjustments to these demand response products before offering other Midwest ISO demand response-related

3

options, such as operating reserves or capacity. Further, Mr. Sailers testified that Duke Energy Indiana is proposing to review Rider MBDR after two full summers of participation. This would allow Duke Energy Indiana to have sufficient experience in the financial and administrative aspects of the offerings and would allow sufficient time to make suggested changes prior to the third summer of the program.

Mr. Sailers next addressed comments by the OUCC and ECS that dissimilar tariff offerings will create confusion and cause other issues for customers with facilities in more than one MISO territory. He noted that while the Company generally agrees that basic consistency amongst the demand response tariff offerings between the utilities may be beneficial for some participants, the differences in each utility's proposed tariffs are minor. *Respondent's Exh. A, 7.* For example, Mr. Sailers indicated, the provisions in the Company's proposed Rider MBDR and associated service agreements are largely similar to the main provisions in NIPSCO's tariff offerings, while still allowing for some minor and appropriate differences. Mr. Sailers also testified that Duke Energy Indiana's proposed tariff review process provides an opportunity to assess any revisions appropriate after two summers of experience. As such, Mr. Sailers respectfully requested that the Commission not mandate any changes to Rider MBDR at this time. Mr. Sailers noted, however, that Duke Energy Indiana was willing to agree to the suggestion of the OUCC and ECS to allow customers or ARCs to install their own Company-approved metering, with the Company reserving the right to inspect the equipment and owning the equipment once it is installed. *Respondent's Exh. A, 6.*

Mr. Sailers also explained Duke Energy Indiana's opposition to allowing customers participating in its interruptible riders to also participate in Rider MBDR. First, Duke Energy Indiana does allow customers to participate in both the current programs offered under Standard Contract Rider No. 23, Peak Load Management ("Rider PLM"), and this new proposed Rider MBDR. Further, Mr. Sailers indicated that Duke Energy Indiana revised its proposed Rider MBDR to allow this participation after discussions with the Industrial Group. The sole restriction remaining in the Company's Rider MBDR is that customers cannot participate with the same interruptible load in both riders. *Respondent's Exh. A, 8.*

Second, Mr. Sailers testified, Duke Energy Indiana's Rider PLM already allows customers to participate in the Midwest ISO energy markets, although this participation is not structured the same as Rider MBDR. In Rider PLM, customers can elect to participate in economic-based events. When these events are called by Duke Energy Indiana, customers receive an energy incentive for reducing their load as specified based on the strike price of the program. Rider PLM participants receive greater capacity incentives for participating in economic based events. Further, the Company's Rider PLM is structured to capture certain benefits to both participating and non-participating customers. As an example, the Company receives capacity credits from the Midwest ISO towards its Planning Reserve Margin requirement, which reduces the Company's required supply-side resources. These benefits are shared by Rider PLM customers because they receive a capacity credit based on avoided cost and shared by all customers by reducing the Company's needed supply-side resources. As another example, Duke Energy Indiana can call on these resources outside of a Midwest ISO-declared emergency during high priced events to further help keep costs down for all customers, while still providing participating customers with event bill credits. Both of these examples result in a "win-win" for participating and non-participating customers achieved through the

structure of Rider PLM. *Respondent's Exh. A, 8-9.*

Finally, according to Mr. Sailers, the foundations of Rider PLM and Rider MBDR are not consistent. Rider PLM is based on an avoided cost of building a combustion turbine approach whereas Rider MBDR is a market-based approach. The Industrial Group suggests that the Company allow the same interruptible load the ability to receive both the capacity incentives provided by Rider PLM and the market-based incentives, including the potential for receiving scarcity pricing incentives, under Rider MBDR. Duke Energy Indiana believes the structure of these incentives is inconsistent and that any capacity incentive received under Rider MBDR should be a market-based capacity incentive. The participating customer should receive either the PLM avoided cost capacity incentive or a MBDR market-based capacity incentive, but not both. *Respondent's Exh. A, 9-10.*

Mr. Sailers testified that although Duke Energy Indiana believes there should not be crossover participation between Rider MBDR and Rider PLM with the same interruptible load at this time, the Company does understand that a capacity program under Rider MBDR is desirable to the Industrial Group and could encourage participation in Rider MBDR. Therefore, Duke Energy Indiana proposed to submit a new program under Rider MBDR that will incorporate capacity credit for participation in the MISO 2012-2013 delivery year. *Respondent's Exh. A, 10.*

6. **Discussion and Findings.** In the "Generic DR Order, we required the filing of "tariffs or riders authorizing the participation of [its] retail customers in Midwest ISO demand response programs through the Respondent Utility[.]" Generic DR Order at 51. We find that Duke Energy Indiana has not only complied with that requirement through the proposed Rider MBDR submitted in this proceeding, it has taken additional steps toward implementation of customer access to these programs through the development and submission of proposed standard agreements for both customers and ARCs. We also recognized that "each utility is different with unique load characteristics, cost structures and tariffs." Generic DR Order at 48. We believe that allowing differences in the tariffs also permits experimentation with the methodologies that can lead to adoption of best practices when the tariffs are revisited in 2 years.

It is evident that there was a significant degree of engagement and cooperation by the parties involved in this subdocket to develop a program that attempts to address a majority of the needs of potential participants while allowing Duke Energy Indiana the opportunity to learn more about demand response programs and customer interest before offering additional products. While parties suggested changes to the proposed rider, no party argued for wholesale rejection of the proposed Rider MBDR. As noted above, we believe that the best approach is a conservative one that allows the utilities to implement their proposed demand response tariffs and report on their respective experience over the next two years before considering whether changes are appropriate. We find that the riders and service agreements proposed by Duke Energy Indiana are supported by the evidence of record, consistent with our findings in Cause No. 43566 and should be approved.

Finally, in order to provide the Commission additional data concerning the distinctions among the demand response tariffs offered by the various Respondents, on or before October 31, 2012, Respondent shall file a report with the Commission, under this Cause, describing its

experience with the rider and outlining the costs and expenses associated with the rider and the administrative charges collected. Respondent shall also provide discussion on the following issues, in addition to any other issues the utility finds appropriate:

1) how often the participants exceeded 10 or 15 offer changes per month;
2) how often the economic offers were accepted in the MISO markets;
3) how often the reliability offers were called on;
4) how the load reductions were measured or documented, and issues with customers meeting their commitments and whether this improved as customers gained experience;
5) the number of aggregators, the number of customers being served by the aggregators, the types of customers being served by aggregators, and how this compares to those customers participating directly with the utility.

Within 30 days of filling its report, the OUCC and intervenors may file comments on the report and addressing other issues with the rider.

**IT IS THEREFORE ORDERED BY THE INDIANA UTILITY REGULATORY COMMISSION that:**

1.      Duke Energy Indiana's Proposed Rider MBDR filed as Respondent's Exhibit A-1 shall be and hereby is approved.

2.      Duke Energy Indiana's proposed service agreements filed as Respondent's Exhibits A-2 through A-5 shall be and hereby are approved.

3.      Within two (2) business days of the effective date of this Order, Duke Energy Indiana shall file Rider MBDR as approved herein with the Electricity Division of the Commission prior to placing it into effect.

4.      Duke Energy Indiana shall file its report, under this Cause and as addressed herein, with the Commission on or before October 31, 2012.

5.      This Order shall be effective on and after the date of its approval.

**ATTERHOLT, LANDIS, MAYS AND ZIEGNER CONCUR; BENNETT ABSENT:**
**APPROVED:**  MAR 0 2 2011

**I hereby certify that the above is a true**
**and correct copy of the Order as approved.**

*Brenda A. Howe*
**Brenda A. Howe**
**Secretary to the Commission**

6