# Exhibit 6

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 2 of 26

# PROPOSED DRR-1 TARIFF

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 3 of 26

## RIDER NO. 849
## DEMAND RESPONSE RESOURCE TYPE 1 (DRR 1) – ENERGY ONLY

(Applicable to Rates 823, 824, 825, 826, 832, 833, 834, 835, 836 and 845)

AVAILABILITY

Available to a Customer on Rate 823, 824, 825, 826, 832, 833, 834, 835, 836 and/or 845or their successor rates who has a sustainable ability to reduce its energy requirements through indirect participation in the Midwest Independent Transmission System Operator, Inc. ("Midwest ISO") wholesale energy market by managing its electric usage as described by the Midwest ISO.  The Customer or Aggregator of Retail Load ("ARC") shall enter into a written Standard Service Agreement ("Service Agreement") to curtail a portion of its electric load for single or multiple meters through participation with the Company acting as the Market Participant ("MP") for the Customer/ARC.  This rider is available to any load that is participating in the Company's other interruptible or curtailment riders, unless Midwest ISO rules change and do not permit load used by the Company as a load modifying resource ("LMR") to also participate as a DRR; provided, however, load may not participate as a DRR if such participation would be inconsistent with the provisions of Company's interruptible or curtailment riders.  Such a Customer may, however, participate as a DRR with any load at any site that is not committed as interruptible.  A Customer/ARC taking service under this Rider is prohibited from taking power under the temporary, surplus power and back up and maintenance Riders during an event under this Rider.

DEFINITIONS

| | |
|---|---|
| ARC: | Aggregator of Retail Customers.  A third party that consolidates the applicable load of NIPSCO customers to NIPSCO in order to meet the minimum requirements under this Rider.  A Customer either aggregating its load from different meters or serving as an ARC for other Customers is considered a third party ARC for purposes of this Rider.  An ARC may only aggregate for purposes of curtailment on this Rider. Although a Customer may serve as an ARC, for purposes of this Rider, an ARC is not a NIPSCO Customer. |
| ASM: | Ancillary Services Market which includes the market for Demand Response Resources. |
| BPM: | Business Practices Manual currently in effect at Midwest ISO. |

1

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 4 of 26

| | |
|---|---|
| Consumption Baseline: | The default calculation of the Consumption Baseline ("CBL") shall be calculated pursuant to the relevant BPM or Midwest ISO tariff currently in effect at Midwest ISO. In cases where the default calculation does not provide a reasonable representation of normal load conditions, the Company and the customer may develop an alternative CBL calculation that more accurately reflects the customer's normal consumption pattern. |
| Curtailment Amount: | The amount of load the Customer/ARC reduces from its Consumption Baseline. |
| DRR 1-Energy Only: | Demand Response Resource Type 1-Energy Only, an energy-only resource that is capable of supplying a specific quantity of energy to the energy market of the ASM through the Company as Market Participant through physical Load reduction. |
| MFRR: | Marginal Foregone Retail Rate, exclusive of any demand component effects, which is further defined as the full marginal retail rate inclusive of trackers (excluding the Fuel Adjustment Clause) and approved by the Commission. |
| Midwest ISO: | Midwest Independent Transmission System Operator, Inc. |

MINIMUM CURTAILMENT AMOUNT

Customer/ARC shall provide at least 1 MW Curtailment Amount. ARCs may aggregate to meet the 1 MW Curtailment Amount minimum.

LOAD CURTAILMENT AMOUNT

Customer/ARC shall elect to participate in this Rider by choosing to reduce energy usage below a specified Consumption Baseline by a fixed reduction amount. Customer/ARC and Company shall enter into a Service Agreement (Attached as Attachment B) under this Rider which will specify the terms and conditions under which Customer/ARC

2

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 5 of 26

agrees to reduce usage. Company and Customer/ARC shall agree to the baseline method. The Midwest ISO default baseline shall be available as a choice for Customer/ARC.

Midwest ISO will request implementation of this program at applicable times through its dispatch process.  On such a Midwest ISO request, as relayed by Company, Customers or customers of ARCs electing this option agree to reduce energy usage below their Consumption Baseline level by the Customer specified amount. The method to compute the amount of the demand reduction will be specified in the Service Agreement under the Measurement and Verification section.  If an offer is accepted, no buy-through energy will be available.

COMMUNICATIONS AND METERING REQUIREMENTS

The Company shall specify a communications plan, which may include software.  It is the Customer's or ARC's responsibility to comply with that plan.  Customer/ARC will pay for the installed cost of additional metering and telemetry that may be required to facilitate service under this Rider.  All such metering shall be compliant with any applicable Midwest ISO and/or Commission requirements.  Customer shall provide Company an electronic interconnection to the meter or aggregate meter data upon request. Customer/ARC may elect to install its own metering, with the Company reserving the right to inspect the equipment and owning the equipment once it is installed.  At the Customer's/ARC's request, metering may be installed by the Company and invoiced at the installed cost to the Customer/ARC.  Estimated costs of metering and equipment shall be provided prior to installation by the Company, but the Customer/ARC shall be responsible for the actual costs of the equipment and installation.

APPLICATION, SERVICE AGREEMENT AND TESTING

Customer/ARC participation in this Rider shall be subject to the approval of an application by the Company on a non-discriminatory basis.  For non-Customer ARCs, this process may include a review of the ARC's creditworthiness and an evaluation for need for appropriate financial assurance prior to participation.  This financial assurance may include full collateral in the form of cash or other security instrument deemed appropriate by the Company.   The Customer/ARC must assist the Company in completing any Midwest ISO registration requirements.  Once approved for participation, the Customer/ARC must enter into the Company provided Service Agreement, which shall be no more than one-year in duration.  This Service Agreement shall be renewed for up to two additional one-year terms subject to the right of either party to provide notice of termination 60-days prior to the expiration of the initial or any subsequent term.

In accordance with Midwest ISO's requirements, the Company shall have the right to perform a measurement and verification test prior to participation in this tariff to ensure that the selected Curtailment Amount option is viable and that the test results can be accurately measured and verified by all parties for settlement purposes.  The testing will not require the actual curtailment of Customer load except to the extent such actual curtailment of Customer load is required under the Midwest ISO Tariff and/or BPMs.  As

3

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 6 of 26

the MP, NIPSCO shall have the final decision on the viability of the Customer's or ARC's measurement and verification.

## THIRD-PARTY AGGREGATORS

Aggregation will be permitted under this tariff subject to (a) measurement and verification of Customer response in a manner satisfactory to the Company sufficient to allow Company to comply with any and all Midwest ISO requirements, and (b) subject to satisfaction of reasonable and appropriate qualifications for any participating Aggregator. An ARC shall be subject to the terms of the ARC Service Agreement and pursuant to the terms of this Rider.   An ARC shall provide a list of all individual Customers who are participating with the ARC.  A Customer may serve as an ARC for other Customers in the service territory, but shall be subject to the requirements set forth in this Rider for ARCs.  NIPSCO shall have final approval over final integration of business processes of all participating ARCs.

## OFFERS

A Customer/ARC shall have the option of participating or not on any particular day, as applicable, as long as it notifies the Company prior to 8:30 A.M. Central Standard Time on the day before the day it does not wish to provide an energy offer.  If the total load Curtailment Amount available for any particular offer from the applicable participant for a given day within a given hour is less than 1 MW no offer will be made for that hour.

When first registered, a default offer will be established which will remain valid until updated or declared unavailable by the Customer/ARC. All offers are applicable to every day noted in the offer. Default offers can only be made after the resource has been certified by Midwest ISO. The annual registration fee shown on Attachment A must be paid to the Company with submittal of the registration information.

The Customer/ARC shall submit the required information in the prescribed electronic format to the Company's designee no later than 8:30 A.M. Central Standard Time for submittal to Midwest ISO by the Company.  This time may be later at the Company's sole discretion.  Up to fifteen offer changes per month shall be entered at no charge to the Customer/ARC.  Attachment A outlines the charges for subsequent offer changes.

## MIDWEST ISO PERFORMANCE REQUIREMENTS

Performance requirements are stated in the BPM and the Midwest ISO Open Access Transmission, Energy and Operating Reserve Markets Tariff.  It shall be the Customer's or ARC's responsibility to comply with all of the minimum performance criteria specified by Midwest ISO in effect and as may be amended from time-to-time. Participating Customers or ARCs must be able to accept dispatch instructions via an electronic interface.

## PROCEDURES

Registration requirements, notifications, performance, metering requirements and other operating procedures are contained in the Service Agreement (Attached as Attachment B). Customer/ARC shall be responsible for acting upon a curtailment notification.

4

MARKET PARTICIPANT
The Company shall be the MP to Midwest ISO for those facilities operated by the Customer or aggregated by an ARC within the Company's service territory.

ADMINISTRATIVE FEES
The Company shall bill Customer/ARC for administrative fees shown on Attachment A which may be amended from time to time with approval by the Commission utilizing the 30-day Administrative Filing Procedures to the extent such amendment would otherwise qualify under said provisions.

PENALTY FOR FAILURE TO PERFORM
If the Customer/ARC does not reduce load in accordance with the Service Agreement, Midwest ISO may charge the Company a penalty for failure to perform. Such penalty will be imposed on the Customer/ARC. The Company shall take its fee for offers cleared as indicated in Attachment A and subtract the Midwest ISO penalty or fee from the net of that amount.

If the Customer/ARC fails to comply with the provisions of the Curtailment Amount under this Rider, the Company and the Customer/ARC will discuss methods to comply during future events. If the Midwest ISO terminates the Customer's/ARC's participation, the Company shall immediately terminate the Customer's/ARC's participation. If there are system reliability issues created by the Customer's/ARC's failure to perform the Company reserves the right to suspend participation of the Customer/ARC under this Rider for 90 days or to terminate the Customer/ARC's participation. The Customer has the right to ask the Commission to review any decision made by the Company.

In addition, in the event that a Customer or ARC has a debit on its bill or invoice due to failure to perform, if the Customer/ARC does not pay the undisputed portion of that debit by the due date indicated on the Customer's bill or ARC's invoice, the Customer/ARC shall be suspended from further participation until such time that the debit is paid.

SETTLEMENTS
Company shall establish a bill credit to be given to Customer. The Company shall provide bill credits for the amount of the demand reduction as specified in the Service Agreement. The initial bill credit will reflect settlements between the Company and Midwest ISO through the most recent weekly net settlement invoice prior to the regular monthly bill. A true-up shall take place on the bill following any additional settlement from Midwest ISO. The Company shall pay the ARC for the amount of the demand reduction as specified in the Service Agreement. The initial payment to ARCs shall take place 10 days following the end of the calendar month and shall include the weekly net settlement invoices between the Company and Midwest ISO for the calendar month. A true-up shall take place with the ARC following any additional settlement from Midwest ISO as reflected in the Service Agreement.

5

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 8 of 26

TERMS AND CONDITIONS

Except as provided in this Rider, all terms, conditions, rates, and charges outlined in the applicable rate schedule will apply.

Any interruptions or reductions in electric service caused by outages of Company's facilities and, therefore, not compensated by Midwest ISO, other than as provided under this Rider, will not be compensated under this Rider.  Agreements under this Rider will in no way affect Customer's or Company's respective obligations regarding the rendering of and payment for electric service under the applicable electric tariff and its applicable rate schedules. It will be Customer's or ARC's responsibility to monitor and control its demand and energy usage before, during, and after a notice period under this Rider.

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 9 of 26

RIDER NO. _____
DEMAND RESPONSE RESOURCE TYPE 1 (DRR1) – ENERGY ONLY

(Applicable to Rates 823, 824, 825, 826, 832, 833, 834, 835, 836 and 845)

## Attachment A

## Administrative Fees

**DRR 1**

| | |
|---|---|
| Annual Registration with NIPSCO | $1, 000 |
| Additional Day Ahead Offer (Over 15 per calendar month) Entry Changes (per entry) | $100 |
| For offers cleared by Midwest ISO: | MFRR + 5% of customer settlement |

7

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 10 of 26

# PROPOSED DRR-1 SERVICE AGREEMENT FOR PARTICIPATING CUSTOMERS

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 11 of 26

## DRR Type I Energy Service Agreement

This DRR Type I Energy Service Agreement ("Agreement") is entered into this _____ day of _____ 20 __ ("Effective Date") and is between the customer receiving service from Northern Indiana Public Service Company ("NIPSCO" or "Company") as identified on the customer information page ("Customer") and NIPSCO (collectively the "Parties").

## General Terms and Conditions

1. This Agreement is subject to the terms and conditions of NIPSCO Rider _____ ("Rider _____") and the General Rules and Regulations for Electric Service ("Tariff") and any successor electric tariff, as approved by the Indiana Utility Regulatory Commission and as amended from time to time.  Definitions contained in Rider _____ and the Tariff are incorporated herein by reference.

2. Service under Rider _____ shall commence upon the later of (i) full execution of this Service Agreement, (ii) acceptance of the resource registration and the DRR Type I offer by Midwest ISO, (iii) installation and operational readiness of required electric metering and dedicated communication links with applicable electric meters, (iv) collected minimum amount of interval meter data to calculate Baseline Load.

3. This Agreement supersedes and replaces any and all other DRR agreements between Customer and NIPSCO.

4. NIPSCO will utilize both telephone and electronic communication as the primary means to notify Customer of events and to process Customer participation updates.  This mechanism for communication may be altered with consent of both parties.  Customers will be responsible for providing their own Internet access and a phone number to be used by NIPSCO.  In the event that the Internet system is temporarily unavailable, NIPSCO will notify Customer of an alternative participation update process.  NIPSCO will provide written documentation and training on the process to be used by Customer.

5. This Agreement shall not be construed as any promise or warranty by NIPSCO to provide continuous or uninterrupted power to Customer.

6. Customer shall be subject to testing and metering requirements of the Midwest ISO for DRR Type I resources, as this term is defined by Midwest ISO, as specified in all applicable Midwest ISO Business Practice Manuals ("BPMs").

7. Customer load curtailment enrolled under this Agreement must be solely committed to NIPSCO.

1

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 12 of 26

**DRR Type I Energy Terms and Conditions**

1. EVENT NOTIFICATION:  NIPSCO will notify Customer within 30 minutes after receiving information on cleared offers and/or dispatch instructions from Midwest ISO regarding Customer's DRR Type I offer submitted through NIPSCO.  NIPSCO shall provide such notice in the manner outlined above.

2. CUSTOMER REDUCTION OBLIGATION:  Customer is obligated to reduce load as communicated by NIPSCO in accordance with the Midwest ISO dispatch instruction. Deviations in load reductions above or below the dispatch amount may result in charges as described in the applicable BPM(s).

3. ENERGY COMMITMENT STATUS AND OTHER DAILY CHANGES TO OFFERS:  Customer may update their Energy Commitment Status ("Participating" or "Not Participating") daily through correspondence with NIPSCO as updated.  Status updates must be received by 8:30 AM Central Standard Time.  Energy Commitment Status may be changed daily with no additional charge to the Customer.   Customers must specify a "Not Participating" status if load reduction is unavailable due to a forced or planned outage/shutdown or other physical operating restriction.  Other offer parameters, including Cost Parameters, may be updated daily through correspondence with NIPSCO as designated.  Status updates must be received by 8:30 AM Central Standard Time the day prior to the day the status or parameter change will be effective.  Customer shall be entitled to fifteen (15) offer entry changes per calendar month at no additional charge to the Customer. Customer shall pay $100 for each additional change, which shall be included on the Customer's monthly bill and will first be netted against any settlement due to Customer as a result of a DRR Type I event.  Each offer entry change may cover any number of hourly offers/parameters in a given month, and such an offer entry change shall constitute one change.  All changes are subject to Midwest ISO limitations and will not permanently update the Customer's default offer unless specified by Customer.  Further, if Customer's status changes and Customer cannot provide load reduction as offered, Customer must immediately notify NIPSCO.  Customer is responsible for meeting all offer obligations when the offer is cleared.

4. CUSTOMER OFFER COST PARAMETERS:  Customer may specify changes to its default offer parameters for each hour as specified in the relevant Midwest ISO BPM(s).   All costs are subject to Midwest ISO specified limits and Midwest ISO independent market monitor review.  NIPSCO reserves the right to review daily offers and reject Customer proposed changes if offers contain errors or may create reliability concerns.  All updates must be received by 8:30 AM Central Standard Time the day prior to the day the status or parameter change will be effective.  These updates will not permanently change the Customer's default offers unless specified by Customer.

5. MEASUREMENT and VERIFICATION:  Upon registration by the Customer, NIPSCO shall request a settlement CP Node from Midwest ISO for the DRR Type I resource.

2

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 13 of 26

NIPSCO will utilize the baseline method as spelled out Rider_____  The Baseline Load will be provided to the Customer by 4:30 PM CST following the DRR Type I Event.  Customer may curtail by the fixed reduction amount.

    6.  ENERGY SETTLEMENT:

        a.  Customer will be eligible for compensation for load reduction for participating in a DRR Type I Event when cleared and dispatched.  The Midwest ISO settlement information will be used as the basis for Customer event compensation.  NIPSCO will reduce this settlement amount to account for the Marginal Foregone Retail Rate ("MFRR")  and any applicable fees as defined in NIPSCO's tariff.

        b.  In addition, NIPSCO will reduce Customer compensation in the event where additional Midwest ISO imposed cost is incurred as a result of the DRR Type I participation.  In the event of such additional costs, NIPSCO shall provide supporting documentation to Customer upon request.

        c.  All Midwest ISO charges for non-compliance will be Customer responsibility.  This will include subtracting from the amount received from Midwest ISO the sum of 5% of the total Cleared Offer for the part of the load that was non-compliant.  The remainder shall be remitted on a monthly basis to the Customer through a bill credit as specified in Rider_____.

        d.  In the event that the amount specified in 5 (c) for the month is greater than the amount due to the Customer for the month in 5 (a) less any reductions as a result of 5 (b), a DRR Type I Debit ("Debit") for the appropriate amount shall appear on the Customer's bill as specified in Rider _____.

        e.  In the event that a Customer has a Debit on its bill as described in 5 (d), if the Customer does not pay the undisputed portion of that Debit by the Due Date indicated on the Customer's bill, the Customer shall be suspended from further participation until such time that the Debit is paid.

        f.  Customer will receive DRR Type I Event Credits or Debits on its NIPSCO-issued electric bill.  Depending on the Customer's billing cycle and when DRR Type I Event Credits ("Credits") or Debits are issued, posting of the Credits or Debits to the Customer's bill may be delayed.  Customer will notify NIPSCO if Customer disputes any payments and/or charges reflected on the NIPSCO-issued electric bill.  The Parties will attempt to resolve any dispute in accordance with Paragraph 14.

        g.  The process for determination of the Credits or Debits for each electric bill is established in Rider _____.

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 14 of 26

7.  POWER INTERRUPTION:  If power is interrupted to Customer during a DRR Type I Event, then NIPSCO shall not be responsible for paying DRR Type I Event Credit for energy reductions in excess of the amount received by NIPSCO from Midwest ISO.  In addition, Customer will not be exposed to any charges for excessive energy from Midwest ISO.  Examples of reasons that power may be interrupted include without limitation accidents, storm outages, equipment failures or malfunctions, and periods of involuntary load curtailment.  Additionally, Customer shall not receive any DRR Type I Event Credit for any DRR Event excluded pursuant to the Midwest ISO Tariff or BPMs.

8.  CUSTOMER MAINTENANCE:  Midwest ISO rules apply.

9.  DAILY CURTAILMENT EVENT LIMITS:  If Customer desires only one curtailment event to be permitted per day then Customer should set offer parameters including Minimum Interruption Duration, Maximum Interruption Duration, and Minimum Non-Interruption Interval to appropriate values.  NIPSCO will not restrict dispatch to only one curtailment per day.

10. METERING and TELEMETRY REQUIREMENTS:  If a Customer does not have an electric meter capable of providing the load metering frequency and telemetry required by the Midwest ISO in the applicable BPM for each participating account or a more frequent interval, the Customer must install or have installed by NIPSCO, at the Customer's expense, appropriate metering before participation may begin.  NIPSCO shall provide, upon request, the current Midwest ISO requirements. The cost of incremental metering and communication equipment needed to fulfill Midwest ISO requirements will be paid by Customer and NIPSCO shall be the owner of the metering equipment once it is installed.

11.  ANNUAL TESTING:  Customer must demonstrate load reduction capability annually as specified by the Midwest ISO.

12.  ASSIGNMENT:  Neither Party shall assign this Agreement or any portion thereof without the prior written consent of the other Party, which consent shall not be unreasonably withheld, and any attempted assignment or transfer without such written consent shall be of no force or effect.  As to any permitted assignment: (a) reasonable prior notice of any such assignment shall be given to the other Party; and (b) any assignee shall expressly assume the assignor's obligations hereunder, unless otherwise agreed to by the other Party in writing.

13.  FORCE MAJEURE: For purposes of this Agreement, the term "Force Majeure" means any cause or event not reasonably within the control of the Party claiming Force Majeure, including, but not limited to, the following: acts of God, strikes, lockouts, or other industrial disturbances; acts of public enemies; orders or permits or the absence of the necessary orders or permits of any kind which have been properly applied for from the government of the United States, the State of Indiana, any political subdivision or municipal subdivision or any of their departments, agencies or officials, or any civil or military authority; unavailability of a fuel or resource used in connection with the generation of electricity; extraordinary delay in transportation; unforeseen soil conditions; equipment, material, supplies, labor or machinery shortages; epidemics; landslides; lightning; earthquakes; fires; hurricanes; tornadoes; storms; floods; washouts; drought; arrest; war; civil disturbances; explosions; breakage or accident to

4

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 15 of 26

machinery, transmission lines, pipes or canals; partial or entire failure of utilities; breach of contract by any supplier, contractor, subcontractor, laborer or materialman; sabotage; injunction; blight; famine; blockade; or quarantine.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure, both Parties shall be excused from whatever obligations under this Agreement are affected by the Force Majeure (other than the obligation to pay money) and shall not be liable or responsible for any delay in the performance of, or the inability to perform, any such obligations for so long as the Force Majeure continues. The Party suffering an occurrence of Force Majeure shall, as soon as is reasonably possible after such occurrence, give the other Party written notice describing the particulars of the occurrence and shall use commercially reasonable efforts to remedy its inability to perform; provided, however, that the settlement of any strike, walkout, lockout or other labor dispute shall be entirely within the discretion of the Party involved in such labor dispute.

14. DISPUTES: In the event of a dispute between the Parties arising out of or relating to this Agreement, the Parties shall agree to seek informal dispute resolution or settlement prior to the institution of any other dispute resolution process. Should the informal dispute resolution process described herein be unsuccessful, the Parties agree that no written or oral representations made during the course of the attempted dispute resolution shall constitute a Party admission or waiver and that each Party may pursue any other legal or equitable remedy it may have available to it. The Parties agree that the existence of any dispute or the institution of any dispute resolution process (either formal or informal) shall not delay the performance of each Party's undisputed responsibilities under this Agreement.

15. NOTICE: Except as otherwise provided in this Agreement, any notice, request, consent, demand, or statement which is contemplated to be made upon either Party hereto by the other Party hereto under any of the provisions of this Agreement, shall be in writing and sent by certified mail with a return receipt requested or via overnight courier with tracking capability to the address set forth below:

If notice or other transmittal (other than payment of invoices) is to Company:

With a copy to:

If notice or other transmittal is to Participant:

Attention:

5

With a copy to:

_____

_____

_____

Attention:   _____

16.  TERM OF CONTRACT and TERMINATION:  The initial term of this contract will be one (1) year from the commencement of Customer participation, as defined above.  This Service Agreement shall be renewed for up to two additional one-year terms subject to the right of either party to provide notice of termination 60-days prior to the expiration of the initial or any subsequent term.   If the Customer/ARC fails to comply with the provisions of the Curtailment Amount under Rider_____, the Company and the Customer/ARC will discuss methods to comply during future events. If the Midwest ISO terminates the Customer's/ARC's participation, the Company shall immediately terminate the Customer's/ARC's participation. If there are system reliability issues created by the Customer's/ARC's failure to perform the Company reserves the right to suspend participation of the Customer/ARC under this Rider for 90 days or to terminate the Customer/ARC's participation.  The Customer has the right to ask the Commission to review any decision made by the Company.

17.  LIMITATION OF LIABILITY:  To the fullest extent permitted by law, Customer and NIPSCO shall indemnify, defend and hold harmless the other party and its parent company, subsidiaries, affiliates and their respective shareholders, officers, directors, employees, agents, representatives, successors and assigns (collectively,  the "Indemnified Parties"), from and against any and all claims, actions, suits, proceedings, losses, liabilities, penalties, fines, damages, costs or expenses, including without limitation reasonable attorneys' fees (Claim), resulting from (a) any breach of the representations, warranties, covenants and obligations of Customer/NIPSCO under this Agreement, (b) any act or omission of Customer/NIPSCO, whether based upon Customer's/NIPSCO's negligence, strict liability or otherwise, in connection with the performance of this Agreement, or (c) any third party claims of any kind, whether based upon negligence, strict liability or otherwise, arising out of or connected in any way to Customer's/NIPSCO's performance or nonperformance under this Agreement.  Neither Party to this Agreement shall be liable for consequential damages of any kind related to performance or non-performance under this Agreement.

| For Customer | For NIPSCO |
|---|---|
|  |  |
| Printed | Printed |
|  |  |
| Date | Date |

6

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 17 of 26

## Definitions

| | |
|---|---|
| Baseline Load | The amount of load after calculating the Consumption Baseline as further defined in Rider_____. |
| Cleared Offer | An offer accepted by  and called upon by Midwest ISO. |
| Curtailment Amount | The amount of load reduced from the Consumption Baseline. |
| DRR Event | When an offer is cleared by Midwest ISO and the ARC is eligible for Credits or Debits based on its compliance or non-compliance. |
| DRR Event Credit | Money due to the ARC for compliance in a DRR Type I Event |
| DRR Event Debit | Money due from the ARC for non-compliance in a DRR Type I Event |
| Energy Commitment Status | Indication from the ARC if its load is eligible for participation on a given day. |
| Marginal Foregone Retail Rate | The amount forgone by the Company because of the lack of energy sales, exclusive of any demand component effects, which if further defined as the full marginal retail rate inclusive of trackers (excluding the Fuel Adjustment Clause) and approved by the Commission. |

7

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 18 of 26

# PROPOSED DRR-1 SERVICE AGREEMENT FOR PARTICIPATING CUSTOMERS

**Aggregator of Retail Services**
**Emergency Demand Response Energy Service Agreement**

This Emergency Demand Response -Energy  ("EDR") Service Agreement ("Agreement") is entered into this _____ day of _____ 20 __ ("Effective Date") and is between _____ serving as an Aggregator of Retail Services ("ARC") for customers  receiving service from the Northern Indiana Public Service Company ("NIPSCO" or "Company") as identified on the ARC information page (hereafter the "ARC") and NIPSCO (collectively, the "Parties").

**General Terms and Conditions**

1.      This Agreement is subject to the terms and conditions of NIPSCO Rider _____ ("Rider _____") and the General Rules and Regulations for Electric Service ("Tariff") and any successor electric tariff, as approved by the Indiana Utility Regulatory Commission and as amended from time to time.  Definitions contained in Rider _____ and the Tariff are incorporated herein by reference.

2.      Service under Rider _____ shall commence upon the later of (i) full execution of this Service Agreement, (ii) acceptance of the resource registration and the EDR offer by Midwest ISO, (iii) installation and operational readiness of required electric metering and dedicated communication links with applicable electric meters, (iv) collected minimum amount of interval meter data to calculate baseline load.  The baseline load shall be the sum of all of the baseline loads for Customers whose load is being aggregated by the ARC.

3.      This Agreement supersedes and replaces any and all other EDR  agreements between the ARC and NIPSCO.

4.      NIPSCO will utilize telephone and electronic communication as the primary means to notify the ARC of events and to process ARC participation updates.  This mechanism for communication may be altered with consent of both Parties. The ARC will be responsible for communicating with individual Customers and providing their own Internet access and a phone number to be used by NIPSCO.  In the event that the Internet system is temporarily unavailable, NIPSCO will notify the ARC of an alternative participation update process.  NIPSCO will provide written documentation and training on the process to be used by the ARC.

5.      This Agreement shall not be construed as any promise or warranty by NIPSCO to provide continuous or uninterrupted power to any Customer.

6.      The ARC shall be subject to testing and metering requirements of the Midwest ISO for EDR resources, as this term is defined by Midwest ISO, as specified in the all applicable Midwest ISO Business Practice Manuals ("BPMs").

**7.**      Customer load curtailment enrolled under this Agreement must be solely committed to NIPSCO and may not participate in any other EDR or Demand Response Resource Type I-Energy Service Agreement either on its own or with another ARC.

1

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 20 of 26

## ARC EDR Energy Terms and Conditions

1. EVENT NOTIFICATION:  NIPSCO will notify the ARC within 30 minutes after receiving information on cleared offers and/or dispatch instructions from Midwest ISO regarding the ARC's  EDR offer submitted through NIPSCO.  NIPSCO shall provide such notice in the manner outlined above.

2. ARC REDUCTION OBLIGATION:  The ARC is obligated to reduce load as communicated by NIPSCO in accordance with the Midwest ISO dispatch instruction.  Deviations in load reductions above or below the dispatch amount may result in charges as described in the applicable BPM(s).  Any charges will be assessed to the ARC and it shall be the ARC's responsibility to determine how to assess those charges to individual customers.

3. ENERGY COMMITMENT STATUS AND OTHER DAILY CHANGES TO OFFERS:  The ARC may update its Energy Commitment Status ("Participating" or "Not Participating") daily through correspondence with NIPSCO.  Status updates must be received by 8:30 AM Central Standard Time.  Energy Commitment Status may be changed daily with no additional charge to the ARC.   The ARC must specify a "Not Participating" status if load reduction is unavailable due to a forced or planned outage/shutdown or other physical operating restriction.  Other offer parameters, including cost parameters, may be updated daily through correspondence with NIPSCO as designated.  Status updates must be received by 8:30 AM Central Standard Time the day prior to the day the status or parameter change will be effective.  The shall be entitled to fifteen (15) offer entry changes per calendar month at no additional charge to the Customer. The ARC shall pay $100 for each additional change, which shall invoiced to the ARC monthly and will first be netted against any settlement due to the ARC as a result of a EDR event.  Each offer entry change may cover any number of hourly offers/parameters in a given month, and such an offer entry change shall constitute one change.  All changes are subject to Midwest ISO limitations and will not permanently update the ARC's default offer unless specified by the ARC.  Further, if the ARC's status changes and the ARC cannot provide load reduction as offered, the ARC must immediately notify NIPSCO.  The ARC is responsible for meeting all offer obligations when the offer is cleared.

4. ARC OFFER COST PARAMETERS:  Customer may specify changes to its default offer parameters for each hour as specified in the relevant Midwest ISO BPM(s).  All costs are subject to Midwest ISO specified limits and Midwest ISO independent market monitor review.  NIPSCO reserves the right to review daily offers and reject Customer proposed changes if offers contain errors or may create reliability concerns.  All updates must be received by 8:30 AM Central Standard Time the day prior to the day the status or parameter change will be effective.  These updates will not permanently change the ARC's default offers unless specified by the ARC.

5. MEASUREMENT and VERIFICATION:  Upon registration by the Customer, NIPSCO shall request a settlement CP Node from Midwest ISO for the EDR resource.

2

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 21 of 26

NIPSCO will utilize the baseline method as spelled out Rider_____  The Baseline Load will be provided to Customer by 4:30 PM CST following the EDR Event.

      a.  Firm Demand Level: To determine the amount of demand reduction for the ARC electing to drop load to a firm demand level, the demand level at the time of event will be utilized.  If the ARC does not reduce load to that demand level, the ARC will be considered to not be in compliance.

      b.  Fixed Reduction Amount:  To determine the amount of demand reduction for an ARC electing to reduce load by a fixed amount, the difference between the Baseline Load and the load at the time of the event will be utilized.  If the ARC does not reduce load by the fixed amount, the ARC will be considered to not be in compliance.

6. ENERGY SETTLEMENT:

      a.  The ARC will be eligible for compensation for load reduction for participating in a EDR event when cleared and dispatched.  The Midwest ISO settlement information will be used as the basis for EDR event compensation.  NIPSCO will reduce this settlement amount to account for the Marginal Foregone Retail Rate ("MFRR") and any applicable fees as defined in NIPSCO's tariff.

      b.  In addition, NIPSCO will reduce the ARC's compensation in the event where additional Midwest ISO costs are incurred as a result of the EDR participation.  In the event of such additional costs, NIPSCO shall provide documentation to the ARC upon request.

      c.  All Midwest ISO charges for non-compliance shall be the ARC's responsibility.  NIPSCO shall not be responsible for determining the individual Customer(s) responsible for non-compliance, nor shall the Company be responsible for assessing fees to the individual Customer(s).  This will be determined by subtracting 5% of the total Cleared Offer for the part of the load that was non-compliant.  The remainder shall be remitted on a monthly basis to the Customer through an EDR Event Credit ("Credit") as specified in Rider _____.

      d.  In the event that the amount specified in 5 (c) for the month is greater than the amount due to the ARC for the month in 5 (a) less any reductions as a result of 5 (b) , an EDR Event  ("Debit") for the appropriate amount shall appear on the ARC's invoice as specified in Rider _____.

      e.  In the event that the ARC has a Debit on its invoice as described in 5(d), if the ARC does not pay the undisputed portion of that Debit by the due date indicated on the invoice, the ARC shall be suspended from participation until such time the Debit is paid.

      f.  The ARC shall receive payment from NIPSCO and/or an invoice from NIPSCO for EDR Event Credits or Debits as specified in Rider_____.  Depending on

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 22 of 26

the time of the month when the EDR Event Credits or Debits are issued, posting of the Credits or Debits to the ARC's account may be delayed.  ARC will notify NIPSCO if Customer disputes any payments and/or charges reflected on the NIPSCO-issued bill.  The Parties will attempt to resolve any dispute in accordance with Paragraph 16.

g.  Payments and invoicing shall take place to the ARC once a month according to the schedule and process set forth in Rider_____.

7.  POWER INTERRUPTION:  If power is interrupted to individual Customer(s) during a EDR Event, then NIPSCO shall not be responsible for paying the ARC for energy reductions in excess of the amount received by NIPSCO from Midwest ISO.  In addition, neither the Customer nor the ARC shall be exposed to any charges for excessive energy from Midwest ISO.  Examples of reasons that power may be interrupted include without limitation accidents, storm outages, equipment failures or malfunctions, and periods of involuntary load curtailment.  Additionally, the ARC shall not receive any Credit for any EDR Event excluded pursuant to the Midwest ISO Tariff or BPMs.

8.  CUSTOMER MAINTENANCE:  Midwest ISO rules apply.

9.  DAILY CURTAILMENT EVENT LIMITS:  If ARC desires only one curtailment event to be permitted per day then ARC should set offer parameters including Minimum Interruption Duration, Maximum Interruption Duration, and Minimum Non-Interruption Interval to appropriate values.  NIPSCO will not restrict dispatch to only one curtailment per day.

10.  METERING and TELEMETRY REQUIREMENTS:  If an individual Customer does not have an electric meter capable of providing the load metering frequency and telemetry required by the Midwest ISO in the applicable BPM for each participating account or a more frequent interval, the ARC shall be responsible for assuring the Customer installs or has installed by NIPSCO, at the Customer's expense, appropriate metering before participation may begin.  NIPSCO shall provide, upon request, the current Midwest ISO requirements. The cost of incremental metering and communication equipment needed to fulfill Midwest ISO requirements will be paid by Customer or ARC and NIPSCO shall be the owner of the metering equipment once it is installed.

11.  REQUIRED NOTICE TO ADD OR DELETE CUSTOMERS:  Once an ARC has entered into the appropriate contractual or other arrangements with each customer whom the ARC represents, the ARC shall deliver to NIPSCO a "Notice to Add or Delete Customers Participating in the EDR Program" signed by the Customer and ARC.  The ARC shall notify NIPSCO that it has dropped a customer service agreement from its portfolio by delivering to NIPSCO a "Notice to Add or Delete Customers Participating in the EDR Program" signed by the Customer and ARC.  With each submission of a "Notice to Add or Delete Customers Participating in the EDR Program," and until such time as ARC submits such Notice for the removal of such Customer from the ARC's representation, ARC represents and warrants that:

4

    a.  Each Customer whom ARC represents is eligible to participate in the EDR program and has elected to participate through the ARC;

    b.  The ARC has entered into the appropriate contractual or other arrangements with such customer whereby such Customer has authorized the ARC to receive payments from and to pay any fees to NIPSCO on behalf of such Customer in connection with such Customer's participation in the program.  The ARC shall make such agreements available to the Company upon request.

12.  ANNUAL TESTING:  The ARC must demonstrate load reduction capability annually as specified by NIPSCO and Midwest ISO.

13.  CONFIDENTIALITY:  The ARC shall not disclose any Confidential Information obtained pursuant to this Agreement to any third party, including affiliates of the ARC, without the express prior written consent of the Company.  As used herein, the term "Confidential Information" means proprietary business, financial and commercial information pertaining to NIPSCO, Customer names and other information related to Customers, including energy usage data, any trade secrets, and any other information of a similar natures, whether or not reduced to writing or other tangible form.  Confidential Information shall not include (a) information known to ARC prior to obtaining the same from the Company; (b) information in the public domain at the time of disclosure by the ARC; (c) information obtained by ARC from a third party who did not receive the same, directly or indirectly, from the Company; or (d) information approved for release by express prior written consent of an authorized representative of the Company.

14. ASSIGNMENT:  Neither Party shall assign this Agreement or any portion thereof without the prior written consent of the other Party, which consent shall not be unreasonably withheld, and any attempted assignment or transfer without such written consent shall be of no force or effect.  As to any permitted assignment: (a) reasonable prior notice of any such assignment shall be given to the other Party; and (b) any assignee shall expressly assume the assignor's obligations hereunder, unless otherwise agreed to by the other Party in writing.

15.  FORCE MAJEURE: For purposes of this Agreement, the term "Force Majeure" means any cause or event not reasonably within the control of the Party claiming Force Majeure, including, but not limited to, the following: acts of God, strikes, lockouts, or other industrial disturbances; acts of public enemies; orders or permits or the absence of the necessary orders or permits of any kind which have been properly applied for from the government of the United States, the State of Indiana, any political subdivision or municipal subdivision or any of their departments, agencies or officials, or any civil or military authority; unavailability of a fuel or resource used in connection with the generation of electricity; extraordinary delay in transportation; unforeseen soil conditions; equipment, material, supplies, labor or machinery shortages; epidemics; landslides; lightning; earthquakes; fires; hurricanes; tornadoes; storms; floods; washouts; drought; arrest; war; civil disturbances; explosions; breakage or accident to machinery, transmission lines, pipes or canals; partial or entire failure of utilities; breach of contract by any supplier, contractor, subcontractor, laborer or materialman; sabotage; injunction; blight; famine; blockade; or quarantine.

5

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 24 of 26

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure, both Parties shall be excused from whatever obligations under this Agreement are affected by the Force Majeure (other than the obligation to pay money) and shall not be liable or responsible for any delay in the performance of, or the inability to perform, any such obligations for so long as the Force Majeure continues.  The Party suffering an occurrence of Force Majeure shall, as soon as is reasonably possible after such occurrence, give the other Party written notice describing the particulars of the occurrence and shall use commercially reasonable efforts to remedy its inability to perform; provided, however, that the settlement of any strike, walkout, lockout or other labor dispute shall be entirely within the discretion of the Party involved in such labor dispute.

16.  DISPUTES:  In the event of a dispute between the Parties arising out of or relating to this Agreement, the Parties shall agree to seek informal dispute resolution or settlement prior to the institution of any other dispute resolution process.  Should the informal dispute resolution process described herein be unsuccessful, the Parties agree that no written or oral representations made during the course of the attempted dispute resolution shall constitute a Party admission or waiver and that each Party may pursue any other legal or equitable remedy it may have available to it.  The Parties agree that the existence of any dispute or the institution of any dispute resolution process (either formal or informal) shall not delay the performance of each Party's undisputed responsibilities under this Agreement.

17.  NOTICE:  Except as otherwise provided in this Agreement, any notice, request, consent, demand, or statement which is contemplated to be made upon either Party hereto by the other Party hereto under any of the provisions of this Agreement, shall be in writing and sent by certified mail with a return receipt requested or via overnight courier with tracking capability to the address set forth below:

If notice or other transmittal (other than payment of invoices) is to Company:

_____
_____
_____

Attention:       _____

With a copy to:

_____
_____
_____

Attention:       _____

If notice or other transmittal is to Participant:

_____
_____
_____

Attention:       _____

6

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 25 of 26

With a copy to:

                 _____

                 _____

                 _____

Attention:     _____

18.  TERM OF CONTRACT and TERMINATION:  The initial term of this contract will be one (1) year from the commencement of Customer participation, as defined above.  This Service Agreement shall be renewed for up to two additional one-year terms subject to the right of either party to provide notice of termination 60-days prior to the expiration of the initial or any subsequent term.   If the Customer/ARC fails to comply with the provisions of the Curtailment Amount under Rider_____, the Company and the Customer/ARC will discuss methods to comply during future events. If the Midwest ISO terminates the Customer's/ARC's participation, the Company shall immediately terminate the Customer's/ARC's participation. If there are system reliability issues created by the Customer's/ARC's failure to perform the Company reserves the right to suspend participation of the Customer/ARC under this Rider for 90 days or to terminate the Customer/ARC's participation.  The Customer has the right to ask the Commission to review any decision made by the Company.

19.  LIMITATION OF LIABILITY:  To the fullest extent permitted by law, Customer shall indemnify, defend and hold harmless NIPSCO and its parent company, subsidiaries, affiliates and their respective shareholders, officers, directors, employees, agents, representatives, successors and assigns (collectively,  the "Indemnified Parties"), from and against any and all claims, actions, suits, proceedings, losses, liabilities, penalties, fines, damages, costs or expenses, including without limitation reasonable attorneys' fees (Claim), resulting from (a) any breach of the representations, warranties, covenants and obligations of Customer under this Agreement, (b) any act or omission of Customer, whether based upon Customer's negligence, strict liability or otherwise, in connection with the performance of this Agreement, or (c) any third party claims of any kind, whether based upon negligence, strict liability or otherwise, arising out of or connected in any way to Customer's performance or nonperformance under this Agreement.  Neither Party to this Agreement shall be liable for consequential damages of any kind related to performance or non-performance under this Agreement.

| For Customer | For NIPSCO |
|---|---|
|  |  |
| Printed | Printed |
|  |  |
| Date | Date |

7

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 26 of 26

## Definitions

**Baseline Load** — The amount of load after calculating the Consumption Baseline as further defined in Rider_____.

**Cleared Offer** — An offer accepted by  and called upon by Midwest ISO.

**Curtailment Amount** — The amount of load reduced from the Consumption Baseline.

**Customer** — An entity receiving service from the Company as further defined in the Company's Tariff.

**EDR Type I Event** — When an offer is cleared by Midwest ISO and the ARC is eligible for Credits or Debits based on its compliance or non-compliance.

**EDR Type I Event Credit** — Money due to the ARC for compliance in a DRR Type I Event

**EDR Type I Event Debit** — Money due from the ARC for non-compliance in a DRR Type I Event

**Energy Commitment Status** — Indication from the ARC if its load is eligible for participation on a given day.

**Marginal Foregone Retail Rate** — The amount forgone by the Company because of the lack of energy sales, exclusive of any demand component effects, which if further defined as the full marginal retail rate inclusive of trackers (excluding the Fuel Adjustment Clause) and approved by the Commission.

8

<u>**Petitioner's Exhibit No. TRC-3**</u>

**NORTHERN INDIANA PUBLIC SERVICE COMPANY**

**IURC CAUSE NO. 43566-MISO 1**

<u>REVISED Exhibit B</u>

Proposed EDR Tariff
Proposed EDR Service Agreement for Participating Customers
Proposed EDR Service Agreement for ARCs

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 2 of 27

# PROPOSED EDR TARIFF

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 3 of 27

RIDER NO. 849.1
EMERGENCY DEMAND RESPONSE RESOURCE (EDR) – ENERGY
ONLY

(Applicable to Rates 823, 824, 825, 826, 832, 833, 834, 835, 836 and 845)

AVAILABILITY

Available to a Customer on Rate 823, 824, 825, 826, 832, 833, 834, 835, 836 and/or 845or their successor rates who has a sustainable ability to reduce its energy requirements through indirect participation in the Midwest Independent Transmission System Operator, Inc. ("Midwest ISO") wholesale energy market by managing its electric usage as described by the Midwest ISO.  The Customer or Aggregator of Retail Load ("ARC") shall enter into a written Standard Service Agreement ("Service Agreement") to curtail a portion of its electric load for single or multiple meters through participation with the Company acting as the Market Participant ("MP") for the Customer/ARC.  Load that is participating in the Company's other interruptible or curtailment riders may only participate as an EDR and as a load modifying resource ("LMR") if it meets the LMR requirements as set forth by Midwest ISO and is consistent with the provisions of Company's interruptible or curtailment riders.  Such a customer who does not qualify as an LMR may, however, participate as an EDR with any load.  A Customer/ARC taking service under this Rider is prohibited from taking power under the temporary, surplus power and back up and maintenance Riders during an event under this Rider.

DEFINITIONS

| | |
|---|---|
| ARC: | Aggregator of Retail Customers.  A third party that consolidates the applicable load of NIPSCO customers to NIPSCO in order to meet the minimum requirements under this Rider.  A Customer either aggregating its load from different meters or serving as an ARC for other Customers is considered a third party ARC for purposes of this Rider.  An ARC may only aggregate for purposes of curtailment on this Rider. Although a Customer may serve as an ARC, for purposes of this Rider, an ARC is not a NIPSCO Customer. |
| BPM: | Business Practices Manual currently in effect at Midwest ISO. |
| Consumption Baseline: | The default calculation of the Consumption Baseline ("CBL") shall be calculated pursuant to the relevant BPM or Midwest ISO tariff currently in |

1

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 4 of 27

effect at Midwest ISO. In cases where the default calculation does not provide a reasonable representation of normal load conditions, the Company and the customer may develop an alternative CBL calculation that more accurately reflects the customer's normal consumption pattern.

| | |
|---|---|
| Curtailment Amount: | The amount of load the Customer/ARC reduces from its Consumption Baseline. |
| EDR | Emergency Demand Response, an energy-only type of demand response resource as defined by Midwest ISO. |
| MFRR: | Marginal Foregone Retail Rate, exclusive of any demand component effects, which is further defined as the full marginal retail rate inclusive of trackers (excluding the Fuel Adjustment Clause) and approved by the Commission. |
| Midwest ISO: | Midwest Independent Transmission System Operator, Inc. |

MINIMUM CURTAILMENT AMOUNT
Customer/ARC shall provide at least 1 MW Curtailment Amount. ARCs may aggregate to meet the 1 MW Curtailment Amount minimum.

LOAD CURTAILMENT AMOUNT
Customer/ARC shall elect to participate in this Rider by choosing to reduce energy usage below a specified Consumption Baseline to a firm demand level or by a fixed reduction amount. Customer/ARC and Company shall enter into a Service Agreement (Attached as Attachment B) under this Rider which will specify the terms and conditions under which Customer/ARC agrees to reduce usage. Company and Customer/ARC shall agree to the baseline method.  The Midwest ISO default baseline shall be available as a choice for Customer/ARC.

**Firm Demand Level (FDL)**
Customers electing this option agree, upon notification by Company, to limit their demand to a firm load level. The method to compute the amount of the demand reduction will be specified in the service agreement under the Measurement and Verification section.  All usage above the Firm Demand Level will be charged to Customer or ARC, as applicable, consistent with the non-compliance provisions in the applicable Midwest ISO Business Practice Manuals ("BPMs") and the Company's tariff.

2

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 5 of 27

Midwest ISO will request implementation of this program at applicable times through its dispatch process.  On such a Midwest ISO request, as relayed by Company, Customers or customers of ARCs electing this option agree to reduce to the FDL as specified in the Service Agreement under the Measurement and Verification section.  If an offer is accepted, no buy-through energy will be available.

**Fixed Reduction Amount**
Customers electing this option agree, upon notification by Company, to reduce energy usage below their Consumption Baseline level by the Customer specified amount. The method to compute the amount of the demand reduction will be specified in the service agreement under the Measurement and Verification section.  .

Midwest ISO will request implementation of this program at applicable times through its dispatch process.  On such a Midwest ISO request, as relayed by Company, Customers or customers of ARCs electing this option agree to reduce by the fixed reduction amount as specified in the Service Agreement under the Measurement and Verification section.  If an offer is accepted, no buy-through energy will be available.

COMMUNICATIONS AND METERING REQUIREMENTS
The Company shall specify a communications plan, which may include software.  It is the Customer's or ARC's responsibility to comply with that plan.  Customer/ARC will pay for the installed cost of additional metering and telemetry that may be required to facilitate service under this Rider.  All such metering shall be compliant with any applicable Midwest ISO and/or Commission requirements.  Customer shall provide Company an electronic interconnection to the meter or aggregate meter data upon request. Customer/ARC may elect to install its own metering, with the Company reserving the right to inspect the equipment and owning the equipment once it is installed.  At the Customer's/ARC's request, metering may be installed by the Company and invoiced at the installed cost to the Customer/ARC.  Estimated costs of metering and equipment shall be provided prior to installation by the Company, but the Customer/ARC shall be responsible for the actual costs of the equipment and installation.

APPLICATION, SERVICE AGREEMENT AND TESTING
Customer/ARC participation in this Rider shall be subject to the approval of an application by the Company on a non-discriminatory basis.  For non-Customer ARCs, this process may include a review of the ARC's creditworthiness and an evaluation for need for appropriate financial assurance prior to participation.  This financial assurance may include full collateral in the form of cash or other security instrument deemed appropriate by the Company.   The Customer/ARC must assist the Company in completing any Midwest ISO registration requirements.  Once approved for participation, the Customer/ARC must enter into the Company provided Service Agreement, which shall be no more than one-year in duration.  This Service Agreement shall be renewed for up to two additional one-year terms subject to the right of either party to provide notice of termination 60-days prior to the expiration of the initial or any subsequent term.

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 6 of 27

In accordance with Midwest ISO's requirements, the Company shall have the right to perform a measurement and verification test prior to participation in this tariff to ensure that the selected Curtailment Amount option is viable and that the test results can be accurately measured and verified by all parties for settlement purposes.  The testing will not require the actual curtailment of Customer load except to the extent such actual curtailment of Customer load is required under the Midwest ISO Tariff and/or BPMs.  As the MP, NIPSCO shall have the final decision on the viability of the Customer's or ARC's measurement and verification.

THIRD-PARTY AGGREGATORS
Aggregation will be permitted under this tariff subject to (a) measurement and verification of Customer response in a manner satisfactory to the Company sufficient to allow Company to comply with any and all Midwest ISO requirements, and (b) subject to satisfaction of reasonable and appropriate qualifications for any participating Aggregator. An ARC shall be subject to the terms of the ARC Service Agreement and pursuant to the terms of this Rider.   An ARC shall provide a list of all individual Customers who are participating with the ARC.  A Customer may serve as an ARC for other Customers in the service territory, but shall be subject to the requirements set forth in this Rider for ARCs.  NIPSCO shall have final approval over final integration of business processes of all participating ARCs.

OFFERS
A Customer/ARC shall have the option of participating or not on any particular day, as applicable, as long as it notifies the Company prior to 8:30 A.M. Central Standard Time on the day before the day it does not wish to provide an energy offer.  If the total load Curtailment Amount available for any particular offer from the applicable participant for a given day within a given hour is less than 1 MW no offer will be made for that hour.

If the resource is a Behind the Meter Generator ("BTMG"), the Customer must affirm in writing that: (1) it holds all necessary permits; (2) it possesses the necessary rights to operate the unit; and (3) the BTMG is not a Network Resource. If the generation resource designated under this tariff is historically not operated during non-Emergency conditions, the energy that can be offered is the increase in output from a BTMG resource to enable a net Demand reduction in response to receiving an EDR dispatch instruction from the Company.

When first registered, a default offer will be established which will remain valid until updated or declared unavailable by the Customer/ARC. All offers are applicable to every day noted in the offer. Default offers can only be made after the resource has been certified by Midwest ISO. The annual registration fee shown on Attachment A must be paid to the Company with submittal of the registration information.

The Customer/ARC shall submit the required information in the prescribed electronic format to the Company's designee no later than 8:30 A.M. Central Standard Time for submittal to Midwest ISO by the Company.  This time may be later at the Company's

4

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 7 of 27

sole discretion.  Up to fifteen offer changes per month shall be entered at no charge to the Customer/ARC.  Attachment A outlines the charges for subsequent offer changes.

## MIDWEST ISO PERFORMANCE REQUIREMENTS

Performance requirements are stated in the BPM and the Midwest ISO Open Access Transmission, Energy and Operating Reserve Markets Tariff.  It shall be the Customer's or ARC's responsibility to comply with all of the minimum performance criteria specified by Midwest ISO in effect and as may be amended from time-to-time.  Participating Customers or ARCs must be able to accept dispatch instructions via an electronic interface.

## PROCEDURES

Registration requirements, notifications, performance, metering requirements and other operating procedures are contained in the Service Agreement (Attached as Attachment B).  Customer/ARC shall be responsible for acting upon a curtailment notification.

## MARKET PARTICIPANT

The Company shall be the MP to Midwest ISO for those facilities operated by the Customer or aggregated by an ARC within the Company's service territory.

## ADMINISTRATIVE FEES

The Company shall bill Customer/ARC for administrative fees shown on Attachment A which may be amended from time to time with approval by the Commission utilizing the 30-day Administrative Filing Procedures to the extent such amendment would otherwise qualify under said provisions.

## PENALTY FOR FAILURE TO PERFORM

If the Customer/ARC does not reduce load in accordance with the Service Agreement, Midwest ISO may charge the Company a penalty for failure to perform.  Such penalty will be imposed on the Customer/ARC.  The Company shall take its fee for offers cleared as indicated in Attachment A and subtract the Midwest ISO penalty or fee from the net of that amount.

If the Customer/ARC fails to comply with the provisions of the Curtailment Amount under this Rider, the Company and the Customer/ARC will discuss methods to comply during future events. If the Midwest ISO terminates the Customer's/ARC's participation, the Company shall immediately terminate the Customer's/ARC's participation. If there are system reliability issues created by the Customer's/ARC's failure to perform the Company reserves the right to suspend participation of the Customer/ARC under this Rider for 90 days or to terminate the Customer/ARC's participation.  The Customer has the right to ask the Commission to review any decision made by the Company.

In addition, in the event that a Customer or ARC has a debit on its bill or invoice due to failure to perform, if the Customer/ARC does not pay the undisputed portion of that debit by the due date indicated on the Customer's bill or ARC's invoice, the Customer/ARC shall be suspended from further participation until such time that the debit is paid.

5

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 8 of 27

<u>SETTLEMENTS</u>
Company shall establish a bill credit to be given to Customer. The Company shall provide bill credits for the amount of the demand reduction as specified in the Service Agreement.  The initial bill credit will reflect settlements between the Company and Midwest ISO through the most recent weekly net settlement invoice prior to the regular monthly bill. A true-up shall take place on the bill following any additional settlement from Midwest ISO. The Company shall pay the ARC for the amount of the demand reduction as specified in the Service Agreement.  The initial payment to ARCs shall take place 10 days following the end of the calendar month and shall include the weekly net settlement invoices between the Company and Midwest ISO for the calendar month.  A true-up shall take place with the ARC following any additional settlement from Midwest ISO as reflected in the Service Agreement.

<u>TERMS AND CONDITIONS</u>
Except as provided in this Rider, all terms, conditions, rates, and charges outlined in the applicable rate schedule will apply.

Any interruptions or reductions in electric service caused by outages of Company's facilities and, therefore, not compensated by Midwest ISO, other than as provided under this Rider, will not be compensated under this Rider.  Agreements under this Rider will in no way affect Customer's or Company's respective obligations regarding the rendering of and payment for electric service under the applicable electric tariff and its applicable rate schedules. It will be Customer's or ARC's responsibility to monitor and control its demand and energy usage before, during, and after a notice period under this Rider.

6

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 9 of 27

RIDER NO. _____
EMERGENCY DEMAND RESPONSE (EDR) – ENERGY ONLY

(Applicable to Rates 823, 824, 825, 826, 832, 833, 834, 835, 836 and 845)

## Attachment A

## Administrative  Fees

### DRR 1

| | |
|---|---|
| Annual Registration with NIPSCO | $1, 000 |
| Additional Day Ahead Offer (Over 15 per calendar month) Entry Changes (per entry) | $100 |

| | |
|---|---|
| For offers cleared by Midwest ISO: | MFRR + 5% of customer settlement |

7

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 10 of 27

# PROPOSED EDR SERVICE AGREEMENT FOR PARTICIPATING CUSTOMERS

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 11 of 27

## EDR Energy Service Agreement

This Emergency Demand Response ("EDR") Energy Service Agreement ("Agreement") is entered into this _____ day of _____ 20 __ ("Effective Date") and is between the customer receiving service from the Northern Indiana Public Service Company ("NIPSCO" or "Company") as identified on the customer information page ("Customer") and NIPSCO (collectively the "Parties").

## General Terms and Conditions

1.      This Agreement is subject to the terms and conditions of NIPSCO Rider _____ ("Rider _____") and the General Rules and Regulations for Electric Service ("Tariff") and any successor electric tariff, as approved by the Indiana Utility Regulatory Commission and as amended from time to time.  Definitions contained in Rider _____ and the Tariff are incorporated herein by reference.

2.      Service under Rider _____ shall commence upon the later of (i) full execution of this Service Agreement, (ii) acceptance of the resource registration and the EDR offer by Midwest ISO, (iii) installation and operational readiness of required electric metering and dedicated communication links with applicable electric meters, (iv) collected minimum amount of interval meter data to calculate baseline load.

3.      This Agreement supersedes and replaces any and all other EDR agreements between Customer and NIPSCO.

4.      NIPSCO will utilize both telephone and electronic communication as the primary means to notify Customer of events and to process Customer participation updates.  This mechanism for communicating may be altered with the consent of both Parties.  Customers will be responsible for providing their own Internet access and a telephone number to be used by NIPSCO.  In the event that the Internet system is temporarily unavailable, NIPSCO will notify Customer of an alternative participation update process.  NIPSCO will provide written documentation and training on the process to be used by Customer.

5.      This Agreement shall not be construed as any promise or warranty by NIPSCO to provide continuous or uninterrupted power to Customer.

6.      Customer shall be subject to testing and metering requirements of the Midwest ISO for EDR resources, as this term is defined by Midwest ISO, as specified in the all applicable Midwest ISO Business Practice Manuals ("BPMs") and Schedule 30 of the Midwest ISO tariff.

**7.**      Customer load curtailment enrolled under this Agreement must be solely committed to NIPSCO.

1

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 12 of 27

**EDR Energy Terms and Conditions**

1.  EVENT NOTIFICATION:  NIPSCO will notify Customer within 30 minutes after receiving information on cleared offers and/or dispatch instructions from Midwest ISO regarding Customer's EDR offer submitted through NIPSCO.  NIPSCO shall provide such notice in the manner outlined above.

2.  CUSTOMER REDUCTION OBLIGATION:  Customer is obligated to reduce load as communicated by NIPSCO in accordance with the Midwest ISO dispatch instruction. Deviations in load reductions above or below the dispatch amount may result in charges as described in the applicable BPM(s). Customer may curtail a) to a firm demand level or b) by a fixed reduction amount.

   a.  A Customer electing to curtail to a firm demand level agrees, upon notification by Company, to limit its demand to a firm load level.
   b.  A Customer electing to curtail by a fixed reduction amount agrees, upon notification by Company, to reduce energy usage below its Consumption Baseline level by the Customer specified amount.

3.  ENERGY COMMITMENT STATUS AND OTHER DAILY CHANGES TO OFFERS:  Customer may update their Energy Commitment Status ("Participating" or "Not Participating") daily through correspondence with NIPSCO as updated.  Status updates must be received by 8:30 AM Central Standard Time.  Energy Commitment Status may be changed daily with no additional charge to the Customer.  Customers must specify a "Not Participating" status if load reduction is unavailable due to a forced or planned outage/shutdown or other physical operating restriction.  Other offer parameters, including cost parameters, may be updated daily through correspondence with NIPSCO as designated.  Status updates must be received by 8:30 AM Central Standard Time the day prior to the day the status or parameter change will be effective.  Customer shall be entitled to fifteen (15) offer entry changes per calendar month at no additional charge to the Customer. Customer shall pay $100 for each additional change, which shall be included on the Customer's monthly bill and will first be netted against any settlement due to Customer as a result of an EDR Type I Event.  Each offer entry change may cover any number of hourly offers/parameters in a given month, and such an offer entry change shall constitute one change.  All changes are subject to Midwest ISO limitations and will not permanently update the Customer's default offer unless specified by Customer.  Further, if Customer's status changes and Customer cannot provide load reduction as offered, Customer must immediately notify NIPSCO.  Customer is responsible for meeting all offer obligations when the offer is cleared.

4.  CUSTOMER OFFER COST PARAMETERS:  Customer may specify changes to its default offer parameters for each hour as specified relevant Midwest ISO BPM(s).  All costs are subject to Midwest ISO specified limits and Midwest ISO independent market monitor review. NIPSCO reserves the right to review daily offers and reject Customer proposed changes if offers contain errors or may create reliability concerns.  All updates must be received by 8:30 AM

2

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 13 of 27

Central Standard Time the day prior to the day the status or parameter change will be effective. These updates will not permanently change the Customer's default offers unless specified by Customer. If the resource is a Behind the Meter Generator ("BTMG"), the Customer shall follow the requirements set forth in Rider_____, Midwest ISO Schedule 30 and any applicable Midwest ISO BPM.

     5. MEASUREMENT and VERIFICATION: Upon registration by the Customer, NIPSCO shall request a settlement CP Node from Midwest ISO for the EDR resource. NIPSCO will utilize the baseline method as spelled out Rider_____ The Baseline Load will be provided to Customer by 4:30 PM CST following the EDR Event.

       a. Firm Demand Level: To determine the amount of demand reduction for a customer electing to drop load to a firm demand level, the demand level at the time of event will be utilized. If the Customer does not reduce load to that demand level, the Customer will be considered to not be in compliance.

       b. Fixed Reduction Amount: To determine the amount of demand reduction for a Customer electing to reduce load by a fixed amount, the difference between the Baseline Load and the load at the time of the event will be utilized. If the Customer does not reduce load by the fixed amount, the Customer will be considered to not be in compliance.

    6. ENERGY SETTLEMENT:

       a. Customer will be eligible for compensation for a reduction in demand level or load reduction for participating in an EDR event when cleared and dispatched. The Midwest ISO settlement information will be used as the basis for Customer event compensation. NIPSCO will reduce this settlement amount to account for the Marginal Foregone Retail Rate ("MFRR") as defined in NIPSCO's tariff and any applicable fees as defined in NIPSCO's tariff.

       b. In addition, NIPSCO will reduce Customer compensation in the event where additional Midwest ISO costs are incurred as a result of the EDR participation. In the event of such additional costs, NIPSCO shall provide documentation to Customer upon request.

       c. All Midwest ISO charges for non-compliance will be Customer responsibility. This will include, subtracting 5% of the total Cleared Offer for the part of the load that was non-complaint. The remainder shall be remitted as an EDR Event Credit ("Credit") on a monthly basis to the Customer through a bill credit as specified in Rider _____.

       d. In the event that the amount specified in 5 (c) for the month is greater than the amount due to Customer for the month in 5 (a) less any reductions as a result of 5 (b), an EDR Event Debit ("Debit") for the appropriate amount shall appear on the Customer's bill as specified in Rider _____.

e.  In the event that a Customer has a Debit on its bill as described in 5 (d), if the Customer does not pay the undisputed portion of that Debit by the due date indicated on the Customer's bill, the Customer shall be suspended from further participation until such time that the Debit is paid.

f.  Customer will receive Credits or Debits on its NIPSCO-issued electric bill. Depending on the Customer's billing cycle and when EDR Event Credits or Debits are issued, posting of the Credits or Debits to the Customer's bill may be delayed. Customer will notify NIPSCO if Customer disputes any payments and/or charges reflected on the NIPSCO-issued electric bill.  The Parties will attempt to resolve any dispute in accordance with Paragrap 14.

g.  The process for determination of the EDR Event Credit or Debit for each electric bill is established in Rider _____.

7.  POWER INTERRUPTION:  If power is interrupted to Customer during an EDR Event, then NIPSCO shall not be responsible for paying EDR Event Credit for energy reductions in excess of the amount received by NIPSCO from Midwest ISO.  In addition, Customer will not be exposed to any charges for excessive energy from Midwest ISO.  Examples of reasons that power may be interrupted include without limitation accidents, storm outages, equipment failures or malfunctions, and periods of involuntary load curtailment.  Additionally, Customer shall not receive any EDR Event Credit for any EDR Event excluded pursuant to the Midwest ISO Tariff or BPMs.

8.  CUSTOMER MAINTENANCE:  Midwest ISO rules apply.

9.  DAILY CURTAILMENT EVENT LIMITS:  If Customer desires only one curtailment event to be permitted per day then Customer should set offer parameters including Minimum Interruption Duration, Maximum Interruption Duration, and Minimum Non-Interruption Interval to appropriate values.  NIPSCO will not restrict dispatch to only one curtailment per day.

10.  METERING and TELEMETRY REQUIREMENTS:  If a Customer does not have an electric meter capable of providing the load metering frequency and telemetry required by the Midwest ISO in the applicable BPM or tariff provision for each participating account or a more frequent interval, the Customer must install or have installed by NIPSCO, at the Customer's expense, appropriate metering before participation may begin.  NIPSCO shall provide, upon request, the current Midwest ISO requirements. The cost of incremental metering and communication equipment needed to fulfill Midwest ISO requirements will be paid by Customer and NIPSCO shall be the owner of the metering equipment once it is installed.

11.  ANNUAL TESTING:  Customer must demonstrate load reduction capability annually as specified by the Midwest ISO.

4

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 15 of 27

12. ASSIGNMENT:  Neither Party shall assign this Agreement or any portion thereof without the prior written consent of the other Party, which consent shall not be unreasonably withheld and any attempted assignment or transfer without such written consent shall be of no force or effect.  As to any permitted assignment: (a) reasonable prior notice of any such assignment shall be given to the other Party; and (b) any assignee shall expressly assume the assignor's obligations hereunder, unless otherwise agreed to by the other Party in writing.

13. FORCE MAJEURE: For purposes of this Agreement, the term "Force Majeure" means any cause or event not reasonably within the control of the Party claiming Force Majeure, including, but not limited to, the following: acts of God, strikes, lockouts, or other industrial disturbances; acts of public enemies; orders or permits or the absence of the necessary orders or permits of any kind which have been properly applied for from the government of the United States, the State of Indiana, any political subdivision or municipal subdivision or any of their departments, agencies or officials, or any civil or military authority; unavailability of a fuel or resource used in connection with the generation of electricity; extraordinary delay in transportation; unforeseen soil conditions; equipment, material, supplies, labor or machinery shortages; epidemics; landslides; lightning; earthquakes; fires; hurricanes; tornadoes; storms; floods; washouts; drought; arrest; war; civil disturbances; explosions; breakage or accident to machinery, transmission lines, pipes or canals; partial or entire failure of utilities; breach of contract by any supplier, contractor, subcontractor, laborer or materialman; sabotage; injunction; blight; famine; blockade; or quarantine.

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure, both Parties shall be excused from whatever obligations under this Agreement are affected by the Force Majeure (other than the obligation to pay money) and shall not be liable or responsible for any delay in the performance of, or the inability to perform, any such obligations for so long as the Force Majeure continues.  The Party suffering an occurrence of Force Majeure shall, as soon as is reasonably possible after such occurrence, give the other Party written notice describing the particulars of the occurrence and shall use commercially reasonable efforts to remedy its inability to perform; provided, however, that the settlement of any strike, walkout, lockout or other labor dispute shall be entirely within the discretion of the Party involved in such labor dispute.

14. DISPUTES:  In the event of a dispute between the Parties arising out of or relating to this Agreement, the Parties shall agree to seek informal dispute resolution or settlement prior to the institution of any other dispute resolution process.  Should the informal dispute resolution process described herein be unsuccessful, the Parties agree that no written or oral representations made during the course of the attempted dispute resolution shall constitute a Party admission or waiver and that each Party may pursue any other legal or equitable remedy it may have available to it.  The Parties agree that the existence of any dispute or the institution of any dispute resolution process (either formal or informal) shall not delay the performance of each Party's undisputed responsibilities under this Agreement.

15. NOTICE:  Except as otherwise provided in this Agreement, any notice, request, consent, demand, or statement which is contemplated to be made upon either Party hereto by the other Party hereto under any of the provisions of this Agreement, shall be in writing and sent by

5

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 16 of 27

certified mail with a return receipt requested or via overnight courier with tracking capability to the address set forth below:

If notice or other transmittal (other than payment of invoices) is to Company:

_____
_____
_____

Attention:        _____

With a copy to:

_____
_____
_____

Attention:        _____

If notice or other transmittal is to Participant:

_____
_____
_____

Attention:        _____

With a copy to:

_____
_____
_____

Attention:        _____

16.  TERM OF CONTRACT and TERMINATION:  The initial term of this contract will be one (1) year from the commencement of Customer participation, as defined above.  This Service Agreement shall be renewed for up to two additional one-year terms subject to the right of either party to provide notice of termination 60-days prior to the expiration of the initial or any subsequent term.   If the Customer/ARC fails to comply with the provisions of the Curtailment Amount under Rider_____, the Company and the Customer/ARC will discuss methods to comply during future events. If the Midwest ISO terminates the Customer's/ARC's participation, the Company shall immediately terminate the Customer's/ARC's participation. If there are system reliability issues created by the Customer's/ARC's failure to perform the Company reserves the right to suspend participation of the Customer/ARC under this Rider for 90 days or to terminate the Customer/ARC's participation.  The Customer has the right to ask the Commission to review any decision made by the Company.

17.  LIMITATION OF LIABILITY:  To the fullest extent permitted by law, Customer shall indemnify, defend and hold harmless NIPSCO and its parent company, subsidiaries, affiliates and their respective shareholders, officers, directors, employees, agents, representatives, successors and assigns (collectively,  the "Indemnified Parties"), from and against any and all claims, actions, suits, proceedings, losses, liabilities, penalties, fines,

6

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 17 of 27

damages, costs or expenses, including without limitation reasonable attorneys' fees (Claim), resulting from (a) any breach of the representations, warranties, covenants and obligations of Customer under this Agreement, (b) any act or omission of Customer, whether based upon Customer's negligence, strict liability or otherwise, in connection with the performance of this Agreement, or (c) any third party claims of any kind, whether based upon negligence, strict liability or otherwise, arising out of or connected in any way to Customer's performance or nonperformance under this Agreement.  Neither Party to this Agreement shall be liable for consequential damages of any kind related to performance or non-performance under this Agreement.

| For Customer | For NIPSCO |
|---|---|
| | |
| Printed | Printed |
| Date | Date |

7

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 18 of 27

Definitions

| | |
|---|---|
| Baseline Load | The amount of load after calculating the Consumption Baseline as further defined in Rider_____. |
| Behind the Meter Generation | As defined by Midwest ISO |
| Cleared Offer | An offer accepted by  and called upon by Midwest ISO. |
| Curtailment Amount | The amount of load reduced from the Consumption Baseline. |
| EDR Event | When an offer is cleared by Midwest ISO and the ARC is eligible for Credits or Debits based on its compliance or non-compliance. |
| EDR Event Credit | Money due to the ARC for compliance in a DRR Type I Event |
| EDR Event Debit | Money due from the ARC for non-compliance in a DRR Type I Event |
| Energy Commitment Status | Indication from the ARC if its load is eligible for participation on a given day. |
| Marginal Foregone Retail Rate | The amount forgone by the Company because of the lack of energy sales, exclusive of any demand component effects, which if further defined as the full marginal retail rate inclusive of trackers (excluding the Fuel Adjustment Clause) and approved by the Commission. |

8

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 19 of 27

# PROPOSED EDR SERVICE AGREEMENT FOR ARCs

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 20 of 27

**Aggregator of Retail Services
Emergency Demand Response Energy Service Agreement**

This Emergency Demand Response -Energy  ("EDR") Service Agreement ("Agreement") is entered into this _____ day of _____ 20 __ ("Effective Date") and is between _____ serving as an Aggregator of Retail Services ("ARC") for customers  receiving service from the Northern Indiana Public Service Company ("NIPSCO" or "Company") as identified on the ARC information page (hereafter the "ARC") and NIPSCO (collectively, the "Parties").

**General Terms and Conditions**

1.      This Agreement is subject to the terms and conditions of NIPSCO Rider _____ ("Rider _____") and the General Rules and Regulations for Electric Service ("Tariff") and any successor electric tariff, as approved by the Indiana Utility Regulatory Commission and as amended from time to time.  Definitions contained in Rider _____ and the Tariff are incorporated herein by reference.

2.      Service under Rider _____ shall commence upon the later of (i) full execution of this Service Agreement, (ii) acceptance of the resource registration and the EDR offer by Midwest ISO, (iii) installation and operational readiness of required electric metering and dedicated communication links with applicable electric meters, (iv) collected minimum amount of interval meter data to calculate baseline load.  The baseline load shall be the sum of all of the baseline loads for Customers whose load is being aggregated by the ARC.

3.      This Agreement supersedes and replaces any and all other EDR  agreements between the ARC and NIPSCO.

4.      NIPSCO will utilize telephone and electronic communication as the primary means to notify the ARC of events and to process ARC participation updates.  This mechanism for communication may be altered with consent of both Parties. The ARC will be responsible for communicating with individual Customers and providing their own Internet access and a phone number to be used by NIPSCO.  In the event that the Internet system is temporarily unavailable, NIPSCO will notify the ARC of an alternative participation update process.  NIPSCO will provide written documentation and training on the process to be used by the ARC.

5.      This Agreement shall not be construed as any promise or warranty by NIPSCO to provide continuous or uninterrupted power to any Customer.

6.      The ARC shall be subject to testing and metering requirements of the Midwest ISO for EDR resources, as this term is defined by Midwest ISO, as specified in the all applicable Midwest ISO Business Practice Manuals ("BPMs").

**7.**      Customer load curtailment enrolled under this Agreement must be solely committed to NIPSCO and may not participate in any other EDR or Demand Response Resource Type I-Energy Service Agreement either on its own or with another ARC.

1

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 21 of 27

**ARC EDR Energy Terms and Conditions**

1.  EVENT NOTIFICATION:  NIPSCO will notify the ARC within 30 minutes after receiving information on cleared offers and/or dispatch instructions from Midwest ISO regarding the ARC's  EDR offer submitted through NIPSCO.  NIPSCO shall provide such notice in the manner outlined above.

2.  ARC REDUCTION OBLIGATION:  The ARC is obligated to reduce load as communicated by NIPSCO in accordance with the Midwest ISO dispatch instruction.  Deviations in load reductions above or below the dispatch amount may result in charges as described in the applicable BPM(s).  Any charges will be assessed to the ARC and it shall be the ARC's responsibility to determine how to assess those charges to individual customers.

3.  ENERGY COMMITMENT STATUS AND OTHER DAILY CHANGES TO OFFERS:  The ARC may update its Energy Commitment Status ("Participating" or "Not Participating") daily through correspondence with NIPSCO.  Status updates must be received by 8:30 AM Central Standard Time.  Energy Commitment Status may be changed daily with no additional charge to the ARC.   The ARC must specify a "Not Participating" status if load reduction is unavailable due to a forced or planned outage/shutdown or other physical operating restriction.  Other offer parameters, including cost parameters, may be updated daily through correspondence with NIPSCO as designated.  Status updates must be received by 8:30 AM Central Standard Time the day prior to the day the status or parameter change will be effective.  The shall be entitled to fifteen (15) offer entry changes per calendar month at no additional charge to the Customer. The ARC shall pay $100 for each additional change, which shall invoiced to the ARC monthly and will first be netted against any settlement due to the ARC as a result of a EDR event.  Each offer entry change may cover any number of hourly offers/parameters in a given month, and such an offer entry change shall constitute one change.  All changes are subject to Midwest ISO limitations and will not permanently update the ARC's default offer unless specified by the ARC.  Further, if the ARC's status changes and the ARC cannot provide load reduction as offered, the ARC must immediately notify NIPSCO.  The ARC is responsible for meeting all offer obligations when the offer is cleared.

4.  ARC OFFER COST PARAMETERS:  Customer may specify changes to its default offer parameters for each hour as specified in the relevant Midwest ISO BPM(s).  All costs are subject to Midwest ISO specified limits and Midwest ISO independent market monitor review.  NIPSCO reserves the right to review daily offers and reject Customer proposed changes if offers contain errors or may create reliability concerns.  All updates must be received by 8:30 AM Central Standard Time the day prior to the day the status or parameter change will be effective.  These updates will not permanently change the ARC's default offers unless specified by the ARC.

5.  MEASUREMENT and VERIFICATION:  Upon registration by the Customer, NIPSCO shall request a settlement CP Node from Midwest ISO for the EDR resource.

2

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 22 of 27

NIPSCO will utilize the baseline method as spelled out Rider_____  The Baseline Load will be provided to Customer by 4:30 PM CST following the EDR Event.

    a. Firm Demand Level: To determine the amount of demand reduction for the ARC electing to drop load to a firm demand level, the demand level at the time of event will be utilized.  If the ARC does not reduce load to that demand level, the ARC will be considered to not be in compliance.

    b. Fixed Reduction Amount:  To determine the amount of demand reduction for an ARC electing to reduce load by a fixed amount, the difference between the Baseline Load and the load at the time of the event will be utilized.  If the ARC does not reduce load by the fixed amount, the ARC will be considered to not be in compliance.

6. ENERGY SETTLEMENT:

    a. The ARC will be eligible for compensation for load reduction for participating in a EDR event when cleared and dispatched.  The Midwest ISO settlement information will be used as the basis for EDR event compensation.  NIPSCO will reduce this settlement amount to account for the Marginal Foregone Retail Rate ("MFRR") and any applicable fees as defined in NIPSCO's tariff.

    b. In addition, NIPSCO will reduce the ARC's compensation in the event where additional Midwest ISO costs are incurred as a result of the EDR participation.  In the event of such additional costs, NIPSCO shall provide documentation to the ARC upon request.

    c. All Midwest ISO charges for non-compliance shall be the ARC's responsibility.  NIPSCO shall not be responsible for determining the individual Customer(s) responsible for non-compliance, nor shall the Company be responsible for assessing fees to the individual Customer(s).  This will be determined by subtracting 5% of the total Cleared Offer for the part of the load that was non-compliant.  The remainder shall be remitted on a monthly basis to the Customer through an EDR Event Credit ("Credit") as specified in Rider _____.

    d. In the event that the amount specified in 5 (c) for the month is greater than the amount due to the ARC for the month in 5 (a) less any reductions as a result of 5 (b) , an EDR Event  ("Debit") for the appropriate amount shall appear on the ARC's invoice as specified in Rider _____.

    e. In the event that the ARC has a Debit on its invoice as described in 5(d), if the ARC does not pay the undisputed portion of that Debit by the due date indicated on the invoice, the ARC shall be suspended from participation until such time the Debit is paid.

    f. The ARC shall receive payment from NIPSCO and/or an invoice from NIPSCO for EDR Event Credits or Debits as specified in Rider_____.  Depending on

3

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 23 of 27

the time of the month when the EDR Event Credits or Debits are issued, posting of the Credits or Debits to the ARC's account may be delayed.  ARC will notify NIPSCO if Customer disputes any payments and/or charges reflected on the NIPSCO-issued bill.  The Parties will attempt to resolve any dispute in accordance with Paragraph 16.

g.  Payments and invoicing shall take place to the ARC once a month according to the schedule and process set forth in Rider_____.

7.  POWER INTERRUPTION:  If power is interrupted to individual Customer(s) during a EDR Event, then NIPSCO shall not be responsible for paying the ARC for energy reductions in excess of the amount received by NIPSCO from Midwest ISO.  In addition, neither the Customer nor the ARC shall be exposed to any charges for excessive energy from Midwest ISO.  Examples of reasons that power may be interrupted include without limitation accidents, storm outages, equipment failures or malfunctions, and periods of involuntary load curtailment.  Additionally, the ARC shall not receive any Credit for any EDR Event excluded pursuant to the Midwest ISO Tariff or BPMs.

8.  CUSTOMER MAINTENANCE:  Midwest ISO rules apply.

9.  DAILY CURTAILMENT EVENT LIMITS:  If ARC desires only one curtailment event to be permitted per day then ARC should set offer parameters including Minimum Interruption Duration, Maximum Interruption Duration, and Minimum Non-Interruption Interval to appropriate values.  NIPSCO will not restrict dispatch to only one curtailment per day.

10.  METERING and TELEMETRY REQUIREMENTS:  If an individual Customer does not have an electric meter capable of providing the load metering frequency and telemetry required by the Midwest ISO in the applicable BPM for each participating account or a more frequent interval, the ARC shall be responsible for assuring the Customer installs or has installed by NIPSCO, at the Customer's expense, appropriate metering before participation may begin.  NIPSCO shall provide, upon request, the current Midwest ISO requirements. The cost of incremental metering and communication equipment needed to fulfill Midwest ISO requirements will be paid by Customer or ARC and NIPSCO shall be the owner of the metering equipment once it is installed.

11.  REQUIRED NOTICE TO ADD OR DELETE CUSTOMERS:  Once an ARC has entered into the appropriate contractual or other arrangements with each customer whom the ARC represents, the ARC shall deliver to NIPSCO a "Notice to Add or Delete Customers Participating in the EDR Program" signed by the Customer and ARC.  The ARC shall notify NIPSCO that it has dropped a customer service agreement from its portfolio by delivering to NIPSCO a "Notice to Add or Delete Customers Participating in the EDR Program" signed by the Customer and ARC.  With each submission of a "Notice to Add or Delete Customers Participating in the EDR Program," and until such time as ARC submits such Notice for the removal of such Customer from the ARC's representation, ARC represents and warrants that:

4

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 24 of 27

a. Each Customer whom ARC represents is eligible to participate in the EDR program and has elected to participate through the ARC;

b. The ARC has entered into the appropriate contractual or other arrangements with such customer whereby such Customer has authorized the ARC to receive payments from and to pay any fees to NIPSCO on behalf of such Customer in connection with such Customer's participation in the program. The ARC shall make such agreements available to the Company upon request.

12. ANNUAL TESTING: The ARC must demonstrate load reduction capability annually as specified by NIPSCO and Midwest ISO.

13. CONFIDENTIALITY: The ARC shall not disclose any Confidential Information obtained pursuant to this Agreement to any third party, including affiliates of the ARC, without the express prior written consent of the Company. As used herein, the term "Confidential Information" means proprietary business, financial and commercial information pertaining to NIPSCO, Customer names and other information related to Customers, including energy usage data, any trade secrets, and any other information of a similar natures, whether or not reduced to writing or other tangible form. Confidential Information shall not include (a) information known to ARC prior to obtaining the same from the Company; (b) information in the public domain at the time of disclosure by the ARC; (c) information obtained by ARC from a third party who did not receive the same, directly or indirectly, from the Company; or (d) information approved for release by express prior written consent of an authorized representative of the Company.

14. ASSIGNMENT: Neither Party shall assign this Agreement or any portion thereof without the prior written consent of the other Party, which consent shall not be unreasonably withheld, and any attempted assignment or transfer without such written consent shall be of no force or effect. As to any permitted assignment: (a) reasonable prior notice of any such assignment shall be given to the other Party; and (b) any assignee shall expressly assume the assignor's obligations hereunder, unless otherwise agreed to by the other Party in writing.

15. FORCE MAJEURE: For purposes of this Agreement, the term "Force Majeure" means any cause or event not reasonably within the control of the Party claiming Force Majeure, including, but not limited to, the following: acts of God, strikes, lockouts, or other industrial disturbances; acts of public enemies; orders or permits or the absence of the necessary orders or permits of any kind which have been properly applied for from the government of the United States, the State of Indiana, any political subdivision or municipal subdivision or any of their departments, agencies or officials, or any civil or military authority; unavailability of a fuel or resource used in connection with the generation of electricity; extraordinary delay in transportation; unforeseen soil conditions; equipment, material, supplies, labor or machinery shortages; epidemics; landslides; lightning; earthquakes; fires; hurricanes; tornadoes; storms; floods; washouts; drought; arrest; war; civil disturbances; explosions; breakage or accident to machinery, transmission lines, pipes or canals; partial or entire failure of utilities; breach of contract by any supplier, contractor, subcontractor, laborer or materialman; sabotage; injunction; blight; famine; blockade; or quarantine.

5

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 25 of 27

If either Party is rendered wholly or partly unable to perform its obligations under this Agreement because of Force Majeure, both Parties shall be excused from whatever obligations under this Agreement are affected by the Force Majeure (other than the obligation to pay money) and shall not be liable or responsible for any delay in the performance of, or the inability to perform, any such obligations for so long as the Force Majeure continues.  The Party suffering an occurrence of Force Majeure shall, as soon as is reasonably possible after such occurrence, give the other Party written notice describing the particulars of the occurrence and shall use commercially reasonable efforts to remedy its inability to perform; provided, however, that the settlement of any strike, walkout, lockout or other labor dispute shall be entirely within the discretion of the Party involved in such labor dispute.

16.  DISPUTES:  In the event of a dispute between the Parties arising out of or relating to this Agreement, the Parties shall agree to seek informal dispute resolution or settlement prior to the institution of any other dispute resolution process.  Should the informal dispute resolution process described herein be unsuccessful, the Parties agree that no written or oral representations made during the course of the attempted dispute resolution shall constitute a Party admission or waiver and that each Party may pursue any other legal or equitable remedy it may have available to it.  The Parties agree that the existence of any dispute or the institution of any dispute resolution process (either formal or informal) shall not delay the performance of each Party's undisputed responsibilities under this Agreement.

17.  NOTICE:  Except as otherwise provided in this Agreement, any notice, request, consent, demand, or statement which is contemplated to be made upon either Party hereto by the other Party hereto under any of the provisions of this Agreement, shall be in writing and sent by certified mail with a return receipt requested or via overnight courier with tracking capability to the address set forth below:

If notice or other transmittal (other than payment of invoices) is to Company:

_____
_____
_____
Attention:  _____

With a copy to:

_____
_____
_____
Attention:  _____

If notice or other transmittal is to Participant:

_____
_____
_____
Attention:  _____

6

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 26 of 27

With a copy to:

_____

_____

_____

Attention:        _____


18.  TERM OF CONTRACT and TERMINATION:  The initial term of this contract will be one (1) year from the commencement of Customer participation, as defined above.  This Service Agreement shall be renewed for up to two additional one-year terms subject to the right of either party to provide notice of termination 60-days prior to the expiration of the initial or any subsequent term.   If the Customer/ARC fails to comply with the provisions of the Curtailment Amount under Rider_____, the Company and the Customer/ARC will discuss methods to comply during future events. If the Midwest ISO terminates the Customer's/ARC's participation, the Company shall immediately terminate the Customer's/ARC's participation. If there are system reliability issues created by the Customer's/ARC's failure to perform the Company reserves the right to suspend participation of the Customer/ARC under this Rider for 90 days or to terminate the Customer/ARC's participation.  The Customer has the right to ask the Commission to review any decision made by the Company.

19.  LIMITATION OF LIABILITY:  To the fullest extent permitted by law, Customer shall indemnify, defend and hold harmless NIPSCO and its parent company, subsidiaries, affiliates and their respective shareholders, officers, directors, employees, agents, representatives, successors and assigns (collectively,  the "Indemnified Parties"), from and against any and all claims, actions, suits, proceedings, losses, liabilities, penalties, fines, damages, costs or expenses, including without limitation reasonable attorneys' fees (Claim), resulting from (a) any breach of the representations, warranties, covenants and obligations of Customer under this Agreement, (b) any act or omission of Customer, whether based upon Customer's negligence, strict liability or otherwise, in connection with the performance of this Agreement, or (c) any third party claims of any kind, whether based upon negligence, strict liability or otherwise, arising out of or connected in any way to Customer's performance or nonperformance under this Agreement.  Neither Party to this Agreement shall be liable for consequential damages of any kind related to performance or non-performance under this Agreement.

| For Customer | For NIPSCO |
|---|---|
| | |
| Printed | Printed |
| | |
| Date | Date |

7

Northern Indiana Public Service Company
Cause No. 43566-MISO-1
Petitioner's Exhibit No. TRC-2
Page 27 of 27

Definitions

| | |
|---|---|
| Baseline Load | The amount of load after calculating the Consumption Baseline as further defined in Rider_____. |
| Cleared Offer | An offer accepted by  and called upon by Midwest ISO. |
| Curtailment Amount | The amount of load reduced from the Consumption Baseline. |
| Customer | An entity receiving service from the Company as further defined in the Company's Tariff. |
| EDR Type I Event | When an offer is cleared by Midwest ISO and the ARC is eligible for Credits or Debits based on its compliance or non-compliance. |
| EDR Type I Event Credit | Money due to the ARC for compliance in a DRR Type I Event |
| EDR Type I Event Debit | Money due from the ARC for non-compliance in a DRR Type I Event |
| Energy Commitment Status | Indication from the ARC if its load is eligible for participation on a given day. |
| Marginal Foregone Retail Rate | The amount forgone by the Company because of the lack of energy sales, exclusive of any demand component effects, which if further defined as the full marginal retail rate inclusive of trackers (excluding the Fuel Adjustment Clause) and approved by the Commission. |

8