# Exhibit 8

STATE OF INDIANA

INDIANA UTILITY REGULATORY COMMISSION

| | | |
|---|---|---|
| IN THE MATTER OF THE COMMISSION'S INVESTIGATION INTO ANY AND ALL MATTERS RELATED TO COMMISSION APPROVAL OF PARTICIPATION BY INDIANA END-USE CUSTOMERS IN DEMAND RESPONSE PROGRAMS OFFERED BY THE MIDWEST ISO AND PJM INTERCONNECTION | ) ) ) ) ) ) ) ) | CAUSE NO. 43566 MISO 4 |
| | ) | APPROVED: MAR 0 2 2011 |
| RESPONDENTS: INDIANA REGULATED ELECTRIC UTILITIES | ) ) ) | |

BY THE COMMISSION:
David E. Ziegner, Commissioner
Aaron A. Schmoll, Senior Administrative Law Judge

On December 13, 2010, Respondent Southern Indiana Gas and Electric Company d/b/a Vectren Energy Delivery Of Indiana Inc. ("Vectren South" or "Company" or "Respondent") filed its Initial Tariff Compliance Filing and Request for Approval of Rider DR as required by the Commission's July 28, 2010 Order in Cause No. 43566 (the "Generic DR Order").

On January 18, 2011, Energy Curtailment Specialists, Inc. ("ECS") filed verified comments in response to Rider DR. ECS filed a Petition to Intervene on January 28, 2011. Vectren South filed its response on January, 28, 2011. On February 7, 2011, the Indiana Office of Utility Consumer Counselor ("OUCC") prefiled the direct testimony of Ronald L. Keen. The NIPSCO Industrial Group ("Industrial Group") filed its Petition to Intervene and Direct Testimony of James R. Dauphinais on February 9, 2011. On February 17, 2010, Vectren South filed its supportive and responsive testimony.

Pursuant to notice given and published as required by law, proof of which was incorporated into the record of this Cause by reference and placed in the official files of the Commission, a public hearing was held on Tuesday, February 22, 2011 at 9:00 a.m. in Room 224, PNC Center, 101 W. Washington Street, Indianapolis, Indiana. Vectren South, ECS, the Industrial Group and the OUCC participated in the hearing. No members of the general public appeared. At the hearing, the comments and testimony prepared by Vectren South, ECS, the Industrial Group and the OUCC were admitted into evidence.

1. **Notice and Jurisdiction.** Due legal and timely notice of the commencement of the public hearing in this Cause was given and published by the Commission as required by law. Respondent owns and operates a public electric utility and, as such, is subject to the jurisdiction of this Commission as provided in the Public Service Commission Act. The provisions of said Act

authorize the Commission to act in this proceeding. The Commission, therefore, has jurisdiction over the parties and the subject matter herein.

2.    **Background.** Demand response broadly refers to programs designed to motivate retail customers to reduce or shift their consumption of electric energy during high-price or high-demand periods. The Midwest Independent Transmission System Operator, Inc. ("MISO") market began allowing retail customers to participate in demand response programs in 2009.

Our Generic DR Order found that "Indiana end-use customers shall not be enrolled or otherwise participate in Regional Transmission Organization ("RTO") demand response programs directly or through curtailment service providers or other aggregators." Generic DR Order, 51. The Commission instead ordered Vectren South and the other Indiana jurisdictional electric utilities (collectively the "Respondent Utilities") to file with the Commission for approval tariffs or riders authorizing the participation of their respective retail customers in RTO demand response programs through the Respondent Utilities. The Commission initiated two subdockets, one for MISO utilities and one for PJM utilities, to consider development of these tariffs. *Id.* at 51. To assist in establishing an appropriate framework for the development and filing of Respondent Utilities' tariff(s) or rider(s), we held a Prehearing and Technical Conference on September 7, 2010. The Respondent Utilities and interested parties participated in the Technical Conferences.

3.    **Relief Requested.** Vectren South's Rider DR provides qualifying customers the optional opportunity to reduce their electric costs by beneficially augmenting the Company's participation in the MISO wholesale energy market and the Company's efforts to preserve reliable electric service, through customer provision of a load reduction during MISO high price periods and declared emergency events. This initial Rider DR offers two programs, emergency demand response ("EDR") and demand response resource Type 1 ("DRR-1") energy programs. In EDR the participant commits to reduce its load when MISO declares an emergency event in return for a payment of specified shut down costs and compensation for the energy not consumed. In DRR-1, the participant establishes a price for the load they would be willing to reduce and MISO may call on that load reduction when the market meets that price. Rider DR allows the opportunity for qualified aggregators to aggregate demand response of multiple customers and participate in Rider DR with the cumulative load.

4.    **ECS Comments.** Through its January 18, 2011 written comments, ECS commended the Indiana MISO utilities for their inclusion and support of demand response providers, Aggregators of Retail Customers or Curtailment Service Providers ("CSP's"), throughout the collaborative process of DR tariff development. The MISO Utilities included CSPs in both their initial and follow up meetings, worked with CSPs to develop tariff language, which would facilitate the participation of CSPs, and sought amendments and comments on their proposed tariff language prior to filing those tariffs with the Commission. In general, ECS supports the proposed Rider DR but suggested "slight" modifications to provide consistency across the MISO Utilities' service territories, streamlining program implementation not only for CSPs but retail customers as well. ECS contended that the additional consistency amongst MISO utilities DR tariffs would lead to lower

2

transaction costs for CSPs. Specifically, ECS recommended that the energy payment fee of 10% be reduced to 5%.

**5.    OUCC Testimony.** The OUCC sponsored the testimony of Mr. Ronald Keen. He testified the OUCC is convinced that well designed and robust demand response, with the broadest possible participation, is in the best interest of all customers and that energy markets work best when end-use customers can respond to supply. He explained that for customers, demand response offers one more tool in their financial and energy management strategies. He pointed out the customer benefits available from demand response programs increase customer revenue and decrease customer energy expenses.

Like ECS, Mr. Keen indicated the OUCC supports Rider DR, though he too proposed certain modifications to provide for consistency among the Indiana MISO utilities and their service territories. He contended that different tariff offerings will create customer confusion and other issues for customers that may have facilities in more than one electric utility service territory. He recommended that the energy payment fee of 10% be reduced to 5%.

**6.    Industrial Group Testimony.** Industrial Group's witness Mr. Dauphinais testified that Vectren South's Rider DR should be modified to conform with the DR tariff NIPSCO negotiated with Industrial Group. Mr. Dauphinais testified that Industrial Group met with the MISO Utilities as a group on a few occasions to discuss the utilities' drafts and then met with some utilities individually, but did not have the opportunity to meet with IPL or Vectren South.

Mr. Dauphinais noted that Vectren South's Rider DR does not provide a customer on an existing Vectren South interruptible rider the opportunity to also participate in MISO's demand response programs. He also disagreed with the Rider DR Service Agreement language which states, "Company reserves the right to refuse or to terminate participation in this Rider based on Customer or Aggregator credit standing." Mr. Dauphinais questioned the meter reading charge and the 10% fee, versus 5% charged by NIPSCO and Duke. Mr. Dauphinais also contended that Vectren South's Limitation of Liability section should be eliminated as "one-sided." Finally, Mr. Dauphinais recommended that the $500 charge for failure to perform be eliminated.

**7.    Vectren South Testimony.** In its January 28, 2011 written response to ECS's comments, Vectren South pointed out that it is reasonable that the terms of DR tariffs vary between utilities so as to best fit the utilities' different operations and different customer bases. While ECS recommended that the Rider DR be modified so Vectren South receives only 5% of DR revenues rather than the 10% proposed by Vectren South (and IPL) to compensate for costs, Vectren South anticipates the average quantity of DR from its participating customers will be lower than utilities with greater industrial load will enjoy. Thus, with lower DR volumes over which to spread the Rider DR costs, the proposed 10% is warranted. Moreover, Vectren South pointed out that Rider DR encourages customers to participate in the market by awarding credit for any administrative fees the customer previously paid towards the portion of revenue Vectren South retains to cover its costs. This arrangement reduces Vectren South's 10%, sometimes to less than the 5% level. The Company

3

emphasized that ECS may prefer an identical fee structure among Indiana utilities because it will ease ECS's operation and increase their profits. However, such a one-size-fits-all approach would put Vectren, and in turn its customers, at risk of incurring losses from the creation and administration of the same new DR customer market in which ECS will operate and grow its business. Vectren South also pointed out that Indiana's DR future will benefit from affording utilities the opportunity to tailor DR initiatives to their unique service territories. These differing approaches are necessary to accommodate differences in the respective utilities and their service territories.

Vectren South's Ms. Marlene Parsley, Manager of ISO Integration testified that EDR and DRR-1 offer the most appropriate opportunities for initiating Rider DR. She explained that after two years of experience of customer participation, particularly during the summer high load months, it may be appropriate to consider other forms of DR if customers express an interest in them, to evaluate the lessons learned, and to consider appropriate adjustments after the Company and customers have gained that initial experience.

She described the costs that Vectren South will incur to offer Rider DR including but not limited to design and creation of the programs, customer education, program evaluation, gathering of customer data, including load and baseline specifications, test procedures, notification procedures, registration process with MISO, communication of bid information, meter data management, and verification and settlement procedures to name a few.

She testified that the initial Rider DR proposed rates and charges are necessary to insure participants pay the costs that arise from the creation, provision, and administration of Rider DR. She pointed out that given Vectren South's proportionately lower share of industrial customers and smaller industrial loads, the Rider DR program costs will have to be recovered from lower DR volumes. She suggested that after two summer seasons, all stakeholders will be in a better position to measure and understand customer interest in MISO DR, ability to participate, volume of DR, resulting costs, cost recovery, protection of non-participant customers, and benefits to all stakeholders.

Ms. Parsley stated that MISO payments are not provided for any event during which the customer's load is already reduced from their baseline load due to planned or unplanned outage as a result of any event other than the customer's normal operating conditions. In the event there is an unintentional service interruption at the time the DR participant was called by MISO to drop load and Vectren South received payment from MISO for the customer's dropped load, the customer will be paid according to the terms of Rider DR.

Vectren South's Mr. Joseph Rosebrock, Regulatory Affairs Business Partner testified that the Rider DR rate and charges and 10% retention are intended to cover the costs of the DR program thereby insulating non-participants from subsidizing the program. He explained that as of now, customer participation in Rider DR is expected to be slight. However, after two summer seasons, all stakeholders should have a better idea of actual customer participation, DR volumes, programs successes and challenges. He testified at that time it may be reasonable to revisit the initial rates and

charges. He explained that the attraction of MISO DR to customers is the opportunity for additional financial gain. However, while the Company embraces the opportunity to support demand response and create new opportunities for customers, the Company and non-participating customers should not be required to bear the risk of Rider DR costs that are not recovered from its customers participating in Rider DR.

Mr. Rosebrock testified in opposition to the modifications proposed by OUCC and ECS. He explained that this notion of uniformity across Indiana electric service territories does not exist for other rates and charges and should not exist for demand response rates and charges because no utilities are the same and each utility must design DR programs taking into account its individual characteristics. Utilities naturally have different Commission approved rates, different approved programs, and different approved tariff terms, because each utility's customer base, operations, and load characteristics are different. He explained it should not be a problem that the different Indiana MISO utilities have different DR tariffs, just as it is not a problem that they have different retail, interruptible, and wholesale tariffs. Moreover, he pointed out that DR participants, whether industrial customers or aggregators, are sophisticated enough to recognize and understand differences in rates and programs between different utilities. Thus in his view, these differences should not create an obstacle to participation in demand response.

Mr. Rosebrock testified in response to Mr. Dauphinas that there is good reason that customers on existing interruptible riders should not be allowed to participate in Rider DR. He explained Vectren South customers who elect to participate in a Commission approved interruptible rate are already compensated for providing interruptibility that Vectren South uses to meet its reliability requirements and planning needs for all customers. The discount from the Company's existing interruptible programs automatically accrues to the participant regardless of whether the customer is interrupted. He pointed out that these riders were carefully crafted and approved by the Commission with the interests of all customers in mind. Allowing interruptible customers who benefit from the Company's interruptible tariff programs to also participate in the MISO demand response market through Rider DR is inconsistent with the Company's Commission approved current interruptible programs.

Mr. Rosebrock further stated that the right to refuse participation based on credit standing is similar to other credit protections that any prudent entity would undertake. A customer's Rider DR participation includes the potential for material penalties for non-performance, which will be assessed by MISO to Vectren South, not to the non-performing customer. He concluded it is appropriate that Vectren South and its customers be protected from exposure to those potential charges via appropriate credit requirements. In addition he testified Aggregators should also be subject to appropriate credit requirements for the same reasons. Mr. Rosebrock did agree that meter reading would not typically be charged.

With respect to fees, he noted that unlike NIPSCO and Duke Energy Indiana, Vectren South will credit back to customers the proposed administrative fees out of the 10% of retention fee. Thus under this methodology, customers receiving less than $20,000 from MISO DR will net more

revenues from Vectren South's proposal than from Industrial Group's 5% proposal. Further, Mr.Rosebrock testified that to the extent that a customer's failed efforts at participating in the MISO DR market may create liabilities, those liabilities should rest squarely on the shoulders of the participating customer, not upon Vectren South, nor in turn upon nonparticipating customers.

**8.** **Discussion and Findings.** In the "Generic DR Order, we required the filing of "tariffs or riders authorizing the participation of [its] retail customers in Midwest ISO demand response programs through the Respondent Utility[.]" Generic DR Order at 51. We find that Vectren South has not only complied with that requirement through the proposed Rider DR submitted in this proceeding, it has taken additional steps toward implementation of customer access to these programs through the development and submission of proposed standard agreements for both customers and ARCs. We also recognized that "each utility is different with unique load characteristics, cost structures and tariffs." Generic DR Order at 48. We believe that allowing differences in the tariffs also permits experimentation with the methodologies that can lead to adoption of best practices when the tariffs are revisited in 2 years.

It is evident that there was a significant degree of engagement and cooperation by the parties involved in this subdocket to develop a program that attempts to address a majority of the needs of potential participants while allowing Vectren South the opportunity to learn more about demand response programs and customer interest before offering additional products. While parties suggested changes to the proposed rider, no party argued for wholesale rejection of the proposed Rider DR. As noted above, we believe that the best approach is a conservative one that allows the utilities to implement their proposed demand response tariffs and report on their respective experience over the next two years before considering whether changes are appropriate. We find that the riders and service agreements proposed by Vectren South are supported by the evidence of record, consistent with our findings in Cause No. 43566 and should be approved.

Finally, in order to provide the Commission additional data concerning the distinctions among the demand response tariffs offered by the various Respondents, on or before October 31, 2012, Respondent shall file a report with the Commission, under this Cause, describing its experience with the rider and outlining the costs and expenses associated with the rider and the administrative charges collected. Respondent shall also provide discussion on the following issues, in addition to any other issues the utility finds appropriate:

1) how often the participants exceeded 10 or 15 offer changes per month;
2) how often the economic offers were accepted in the MISO markets;
3) how often the reliability offers were called on;
4) how the load reductions were measured or documented, and issues with customers meeting their commitments and whether this improved as customers gained experience;
5) the number of aggregators, the number of customers being served by the aggregators, the types of customers being served by aggregators, and how this compares to those customers participating directly with the utility.

Within 30 days of filling its report, the OUCC and intervenors may file comments on the report and addressing other issues with the rider.

**IT IS THEREFORE ORDERED BY THE INDIANA UTILITY REGULATORY COMMISSION that:**

1.      Vectren South's Proposed Rider DR filed as Exhibit JER-5 shall be and hereby is approved.

2.      Within two (2) business days of the effective date of this Order, Vectren South shall file Rider DR as approved herein with the Electricity Division of the Commission prior to placing it into effect.

3.      Vectren South shall file its report, under this Cause and as addressed herein, with the Commission on or before October 31, 2012.

4.      This Order shall be effective on and after the date of its approval.

**ATTERHOLT, LANDIS, AND ZIEGNER CONCUR; BENNETT ABSENT, MAYS NOT PARTICIPATING:**

**APPROVED:** MAR 0 2 2011

**I hereby certify that the above is a true and correct copy of the Order as approved.**

*Brenda A. Howe*

Brenda A. Howe
Secretary to the Commission

7