# Exhibit 11

**STATE OF INDIANA**

**INDIANA UTILITY REGULATORY COMMISSION**

| | |
|---|---|
| IN THE MATTER OF THE COMMISSION'S ) | |
| INVESTIGATION INTO ANY AND ALL ) | |
| MATTERS RELATED TO COMMISSION ) | |
| APPROVAL OF PARTICIPATION BY INDIANA ) | CAUSE NO. 43566 MISO 2 |
| END-USE CUSTOMERS IN DEMAND ) | |
| RESPONSE PROGRAMS OFFERED BY THE ) | APPROVED: MAR 0 2 2011 |
| MIDWEST ISO AND PJM INTERCONNECTION ) | |
| ) | |
| RESPONDENTS: INDIANA REGULATED ) | |
| ELECTRIC UTILITIES ) | |

**BY THE COMMISSION:**
**Carolene R. Mays, Commissioner**
**Aaron A. Schmoll, Senior Administrative Law Judge**

On December 13, 2010, Respondent Indianapolis Power & Light Company ("IPL" or "Respondent") filed with the Indiana Utility Regulatory Commission ("Commission") its initial tariff compliance filing requesting approval of Rider 23 as required by the Commission's July 28, 2010 Order in Cause No. 43566 (the "Generic DR Order").

On January 18, 2011 Energy Curtailment Specialists, Inc. ("ECS") filed its Comments in Response to IPL's Tariff Compliance and Request for Approval of Demand Response Service Tariff's. On January 28, 2011 IPL filed its Response to ECS' comments. ECS petitioned to intervene on January 28, 2011. The Indiana Office of Utility Consumer Counselor ("OUCC") filed the testimony of Ronald L. Keen on February 7, 2011. The Indiana Industrial Group ("Industrial Group") filed its Petition to Intervene and the Direct Testimony of James R. Dauphinais on February 9, 2011. IPL filed the testimony of John E. Haselden on February 16, 2011 which included a revised tariff and proposed service agreements.

Pursuant to notice given and published as required by law, proof of which was incorporated into the record of this Cause by reference and placed in the official files of the Commission, a public hearing was held on Tuesday, February 22, 2011 at 10:00 a.m. in Room 224, PNC Center, 101 W. Washington Street, Indianapolis, Indiana. IPL, ECS, the Industrial Group and the OUCC participated in the hearing. No members of the general public appeared. At the hearing, the comments and testimony prepared by IPL, ECS, the Industrial Group and the OUCC were admitted into evidence.

Based upon the evidence of record and the applicable law, the Commission now finds:

1.      **Commission Jurisdiction and Notice.** Proper notice in this Cause was given as required by law. IPL is a "public utility" within the definition thereof in the Public Service Commission Act, as amended, and as such, is subject to the jurisdiction of the Commission in the manner and to the extent provided by law. Therefore, the Commission has jurisdiction over IPL

and the subject matter of this Cause.

2.    **Background.** Demand response broadly refers to programs designed to motivate retail customers to reduce or shift their consumption of electric energy during high-price or high-demand periods. IPL has offered a variety of demand response programs for many years that were designed to help IPL cope with emergency demands. The Midwest Independent Transmission System Operator, Inc. ("MISO") market began allowing retail customers to participate in demand response programs in 2009.

Our Generic DR Order found that "Indiana end-use customers shall not be enrolled or otherwise participate in Regional Transmission Organization ("RTO") demand response programs directly or through curtailment service providers or other aggregators." Generic DR Order, 51. The Commission instead ordered IPL and the other Indiana jurisdictional electric utilities (collectively the "Respondent Utilities") to file with the Commission for approval tariffs or riders authorizing the participation of their respective retail customers in RTO demand response programs through the Respondent Utilities. The Commission initiated two subdockets, one for MISO utilities and one for PJM utilities, to consider development of these tariffs. *Id.* at 51. To assist in establishing an appropriate framework for the development and filing of Respondent Utilities' tariff(s) or rider(s), we held a Prehearing and Technical Conference on September 7, 2010. The Respondent Utilities and interested parties participated in the Technical Conferences.

3.    **Relief Requested.** Through its initial tariff filing, IPL requests approval of Rider 23 providing its customers an option to participate in the MISO Ancillary Services Market ("ASM") as a demand response resource. Rider 23 enables participation in MISO's Emergency Demand Response ("EDR") and economic energy Demand Response Resource Type 1 ("DRR-1") programs.

EDR demand response requires a customer to reduce the load it takes from the electric grid when MISO declares an emergency event. Customers are compensated for their load reduction. Under Rider 23, IPL would offer this load into the MISO market on behalf of participating retail customers.

DRR-1 is similar to EDR in that a customer agrees to reduce the load it takes from the electric grid in return for compensation. Unlike EDR, DRR-1 is not dependent on MISO declaring an emergency. Instead, the customer establishes a price for the load they would be willing to reduce and IPL will offer that price into the MISO market. If the bid is accepted, the customer must reduce its load and will receive a payment for doing so.

4.    **Comments and Testimony in Response to IPL's Rider.** ECS, the Industrial Group and the OUCC filed comments and testimony concerning Rider 23. ECS commended the MISO utilities for allowing aggregators of retail customers ("ARCs") to coordinate with the MISO utilities to provide demand response. *ECS Verified Comments*, 2. ECS believes that ARCs are necessary to enroll smaller to mid-size customers that do not have the time or resources to independently participate in demand response programs. *ECS Verified Comments*, 2. ARCs provide support to their customers with demand response activations, program enrollment and facilitation of program rules, installation of additional energy monitoring

2

equipment and shielding customers from non-performance penalties. *ECS Verified Comments*, 2-3. While ECS in general supported Rider 23, ECS believed that slight modifications to Rider 23 were necessary to foster robust demand response programs. *ECS Verified Comments*, 3. Specifically, ECS advocated modifying IPL's additional day-ahead bid entry to allow 15 changes per month without incurring a charge and to increase the charge for changes beyond 15 to $100 per change. *ECS Verified Comments*, Attachment A. ECS also advocated reducing the fee assessed on bids accepted into the market from 10% to 5% as Duke Energy Indiana, Inc. ("Duke") and Northern Indiana Public Service Company ("NIPSCO") proposed. *ECS Verified Comments*, Attachment A. This change would also eliminate the credit of administrative fees IPL proposed to provide against any fees assessed on demand response revenues. ECS contended that these revisions would provide consistency across the MISO utilities service territories and minimize customer confusion and transaction costs for ARCs. *ECS Verified Comments*, 3.

OUCC witness Ronald L. Keen testified that the OUCC is convinced well-designed and robust demand response with the broadest possible participation is in the best interests of all customers and that energy markets work best when end-use customers can respond to supply. *Public's Exhibit 1*, 3-4. He explained that demand response participation has the effect of contributing to grid stability and potentially lowering market prices. Demand response provides customers one more tool in their financial and energy management strategies to increase revenues and reduce energy expenses. *Public's Exhibit 1*, 4. Mr. Keen believed that ARCs may be able to contract with clients in multiple programs in more than one region, allowing customers to increase revenue potential. He explained that the OUCC agreed with the Commission that ARCs may facilitate demand response participation by small and medium sized commercial and industrial customers that may be underserved by traditional utility demand response programs *Public's Exhibit 1*, 4-5. Mr. Keen recommended that ARCs be allowed to help the Respondent Utilities offer specific end-use customer-targeted energy management services that provide the ability to help optimize generation and operations through strategic and tactical initiatives. *Public's Exhibit 1*, 5.

Like ECS, Mr. Keen indicated the OUCC supported Rider 23 but recommended certain modifications. The OUCC advocated the same changes outlined in ECS' Verified Comments. *Public's Exhibit 1*, 6. He explained that the OUCC supported consistency across the MISO service territories to streamline implementation of the programs for ARCs and retail customers. He expressed concern that dissimilar tariff offerings will only create confusion and other issues for customers with facilities in more than one MISO territory. *Public's Exhibit 1*, 5-6. He recommended that the proposed 10% fee structure be reduced to 5%.

Mr. Dauphinais identified changes the Industrial Group believed were necessary to the tariff. *Dauphinais Direct*, 2. He attached marked-up versions of Rider 23 and associated service agreements to reflect the changes advocated by the Industrial Group. He explained that a major disagreement with the proposed Rider was that it did not allow a customer on an IPL interruptible tariff to also participate in MISO's demand response programs. *Dauphinais Direct*, 3. Mr. Dauphinais acknowledged that only NIPSCO's tariff allowed such participation and only as long as participation is not inconsistent with NIPSCO's interruptible rates. *Dauphinais Direct*, 3. He did not believe that a legitimate reason exists to prohibit an end user from taking advantage of a MISO program provided that the end user remains obligated first to meet its

3

existing obligations to the utility. *Dauphinais Direct,* 3.

Mr. Dauphinais explained that a second major disagreement is the percentage of the demand response revenues that IPL was proposing to retain. He testified that the higher the amount withheld, the less participation there will be. *Dauphinais Direct,* 3. He advocated that IPL be required to receive 5% of the net payment to the participant. *Dauphinais Direct,* 3. The mark-up of the Rider attached to Mr. Dauphinais' testimony also proposed removing the credit of administrative fees against the revenues kept by IPL.

The attachments to Mr. Dauphinais' testimony proposed further revisions related to the term of the agreement including IPL's reservation of right to limit participation, elimination of the $500 fee imposed on customers who incur penalties, a right to dispute settlement amounts and allowing 15 day-ahead bid entry charges per calendar month without charge. In the proposed service agreements, the Industrial Group proposed requiring communication by phone and extending the daily deadline for changes to a participant's status.

5. **IPL's Testimony.** John E. Haselden sponsored a revised Rider and service agreements for IPL. He explained there are many unknowns about how demand response will work in Indiana because retail customers have not historically participated in economic RTO demand response programs. *Respondent's Exhibit JEH-1,* 6. He noted that the MISO demand response programs are a fairly recent development and that it is difficult to determine customers' interest in participating and how participation will impact IPL and its other customers. Mr. Haselden did not believe that IPL's customers will be interested in all four flavors of demand response permitted by MISO due to the cost and complexity of participation. For that reason, IPL worked collaboratively with other MISO utilities to identify the currently available demand response options that are most likely to be of interest to customers and which can be implemented without significant investment in equipment. He stated that all stakeholders agreed to "walk before we run" and build on the success of starting simple. IPL does not believe this proceeding is the final chapter in demand response. *Respondent's Exhibit JEH-1,* 6-7.

Mr. Haselden testified that the MISO utilities proposed starting with EDR and DRR-1 because, while complex, they are less onerous to administer than more advanced forms of demand response that would require special communications equipment. He further testified that many utilities either have no or very few customers with the necessary attributes to participate in the more complex forms of demand response. He did not believe it was prudent to invest in an expensive framework if there would be little or no participation. *Respondent's Exhibit JEH-1,* 7. Mr. Haselden stated that IPL was open to offering other forms of demand response in the future if there is interest by its retail customers. He noted that Rider 23 authorized IPL to agree to provide additional programs with the approval of the Commission. *Respondent's Exhibit JEH-1,* 7-8.

Mr. Haselden addressed comments by the OUCC and ECS that dissimilar tariff offerings will create confusion and cause other issues for customers with facilities in more than one MISO territory. He noted that IPL had worked closely with the other MISO utilities in developing its Rider and had, in many instances, borrowed language from the other drafts as appropriate and practical to promote consistency. However, he believed that the objective of consistency should not disregard differences among the utilities' service territories. *Respondent's Exhibit JEH-1,* 9.

4

One potential difference he highlighted was the presence or absence of customers capable of generating significant demand response revenue due to their large energy usage and ability to quickly reduce load. He explained that IPL did not believe that its customers were likely to generate large revenues and that IPL had tailored its cost structure to the smaller revenues its customers are likely to generate. *Respondent's Exhibit JEH-1*, 9. Mr. Haselden pointed-out that one benefit of allowing reasonable differences among the utilities is to evaluate whether different practices have different impacts on demand response participation. *Respondent's Exhibit JEH-1*, 10.

Mr. Haselden also addressed the proposed modifications to IPL's Rider and service agreements by ECS, the OUCC and the Industrial Group. Rider 23 and service agreements attached to Mr. Haselden's testimony as *Respondent's Exhibits JEH-2 through -7* incorporated many of the comments raised by the Industrial Group. Modifications include authorizing customers served by IPL's interruptible Rider 14 to participate in DRR-1, allowing annual renewals of the agreement, providing a right to dispute settlement amounts and extending the time for changes to a participant's status. Mr. Haselden attached redlined drafts of Rider 23 and the service agreements to reflect the changes that IPL made.

Mr. Haselden addressed comments from the OUCC, ECS and the Industrial Group regarding its proposed fees and charges that IPL is not proposing to revise. He explained that IPL will incur new costs to develop systems and to perform the activities necessary to facilitate participation in the MISO market such as registration and qualification of the proposed demand response asset with MISO; developing communications protocols to submit offers, notifications and instructions to customers; and verifying performance. IPL is proposing to recover these costs from participants. *Respondent's Exhibit JEH-1*, 10-11. No opposition was raised to this framework. However, specific changes to the charges were proposed by the OUCC, ECS and Industrial Group. Mr. Haselden addressed opposition from the other parties to IPL's proposal to charge for each day-ahead bid entry change rather than providing 15 each month free of charge. He noted that IPL incurs the same costs for each day-ahead bid entry charge and that those costs do not depend on whether a customer only submits one change or sixteen. He testified that IPL was expecting smaller demand response revenues for the customers in its service territory due to its customer base making it more difficult for IPL to recover the costs it incurs to facilitate day-ahead bid entry charges, especially if it permits 15 free change orders per month. *Respondent's Exhibit JEH-1*, 11-12.

Mr. Haselden also responded to the proposal to reduce the portion of the settlement retained by NIPSCO to compensate it for the costs of enabling demand response to its retail customers. While NIPSCO and Duke have agreed to accept only 5% of the revenues, IPL (and Southern Indiana Gas & Electric Company d/b/a Vectren Energy Delivery of Indiana, Inc. ("Vectren")) have proposed a different structure. IPL and Vectren are proposing to charge customers 10% of the revenues generated by demand response participation but to credit any administrative fees already paid by the customer. *Respondent's Exhibit JEH-1*, 12-13. Mr. Haselden explained that IPL has structured its Rider differently due to the unique characteristics of its service territory. He testified that IPL does not have the types of customers (*e.g.* steel mills) that are likely to offer large demand response reductions and generate larger demand response revenues. He believed that NIPSCO and Duke, which IPL understands do have the type of customers that may generate larger demand response revenues, can retain a lower

5

percentage of the net settlement and still recover the costs. *Respondent's Exhibit JEH-1*, 12. Furthermore, he noted that neither NIPSCO nor Duke will credit the other administrative fees against their percentage of the settlement.

Mr. Haselden explained that IPL's methodology actually was a more attractive option for customers with smaller revenues. He testified that for customers generating less than $20,000 annually in demand response revenues, IPL's credit results in customers paying less to participate in IPL's program than they would in NIPSCO's or Duke's program. He explained that IPL customers generating $10,000 in revenues paid $500 less in fees to IPL than the same customer would pay to NIPSCO or Duke. *Respondent's Exhibit JEH-1*, 12-13.

Mr. Haselden also addressed the Industrial Group's proposed changes to incorporate a definition of the retail rate that will be subtracted from the MISO settlement. He testified that MISO and IPL adhered to the guiding principle that a customer must own something before they can sell it. Consistent with this principle, IPL requires that the customer purchase the energy that it is selling back into the MISO market. *Respondent's Exhibit JEH-1*, 13. MISO adheres to this principle for retail customers directly participating in the MISO market by deducting the Marginal Foregone Retail Rate ("MFRR") from settlements and returning that payment to the Load Serving Entity ("LSE"). Mr. Haselden testified that IPL also proposes to deduct the retail rate, but it is not using the term MFRR because MISO's interpretation of that term will have a different meaning. IPL's definition of the retail rate is the last (lowest) tier of any declining block energy rate applicable to the customer's retail rate, inclusive of riders. *Respondent's Exhibit JEH-1*, 13-14.

In opposition to the Industrial Group's recommendation to remove IPL's proposed $500 fee for customers that cause penalties to be imposed by MISO, Mr. Haselden testified that the purpose of this fee is to compensate IPL for the costs it incurs due to the penalty, including carrying costs and efforts to determine which participant caused the penalty. *Respondent's Exhibit JEH-1*, 14.

Mr. Haselden also explained IPL's opposition to allowing customers participating in its interruptible riders to also participate in Rider 23. He indicated that IPL does agree to allow customers who wish to participate as a DRR-1 resource to participate in both Rider 23 and Rider 14, Interruptible Power, since Rider 14 does not provide additional energy payments to the participant when called upon. However, IPL did not agree to allow simultaneous participation in Rider 23 and Riders 15, 16, 17 and 18. Mr. Haselden accounted for the distinction with Riders 15, 16, 17 and 18 in that they included an energy payment for customers that reduced load. He testified that participation in these riders and Rider 23 would produce a double payment for energy. *Respondent's Exhibit JEH-1*, 14-15.

Finally, Mr. Haselden responded to the Industrial Group's proposal that IPL communicate with customers about demand response load reduction by telephone. He believed that other forms of technology are more reliable and accurate than voice communication. Communication by facsimile and electronic mail provides the documentation needed for the transaction. He expressed concern that voice communication may be too slow and subject to errors if reception is poor or information is misunderstood or omitted in the conversation. He noted that IPL receives instructions from MISO via electronic XML interface and that if the

6

customer was participating directly in the MISO market, it would be required to do so electronically. *Respondent's Exhibit JEH-1*, 15-16.

**6.** **Discussion and Findings.** In the "Generic DR Order, we required the filing of "tariffs or riders authorizing the participation of [its] retail customers in Midwest ISO demand response programs through the Respondent Utility[.]" Generic DR Order at 51. We find that IPL has not only complied with that requirement through the proposed Rider 23 submitted in this proceeding, it has taken additional steps toward implementation of customer access to these programs through the development and submission of proposed standard agreements for both customers and ARCs. We also recognized that "each utility is different with unique load characteristics, cost structures and tariffs." Generic DR Order at 48. We believe that allowing differences in the tariffs also permits experimentation with the methodologies that can lead to adoption of best practices when the tariffs are revisited in 2 years.

It is evident that there was a significant degree of engagement and cooperation by the parties involved in this subdocket to develop a program that attempts to address a majority of the needs of potential participants while allowing IPL the opportunity to learn more about demand response programs and customer interest before offering additional products. While parties suggested changes to the proposed rider, no party argued for wholesale rejection of the proposed Rider 23. As noted above, we believe that the best approach is a conservative one that allows the utilizes to implement their proposed demand response tariffs and report on their respective experience over the next two years before considering whether changes are appropriate. We find that the riders and service agreements proposed by IPL are supported by the evidence of record, consistent with our findings in Cause No. 43566 and should be approved.

Finally, in order to provide the Commission additional data concerning the distinctions among the demand response tariffs offered by the various Respondents, on or before October 31, 2012, Respondent shall file a report with the Commission, under this Cause, describing its experience with the rider and outlining the costs and expenses associated with the rider and the administrative charges collected. Respondent shall also provide discussion on the following issues, in addition to any other issues the utility finds appropriate:

1) how often the participants exceeded 10 or 15 offer changes per month;
2) how often the economic offers were accepted in the MISO markets;
3) how often the reliability offers were called on;
4) how the load reductions were measured or documented, and issues with customers meeting their commitments and whether this improved as customers gained experience;
5) the number of aggregators, the number of customers being served by the aggregators, the types of customers being served by aggregators, and how this compares to those customers participating directly with the utility.

Within 30 days of filling its report, the OUCC and intervenors may file comments on the report and addressing other issues with the rider.

7

**IT IS THEREFORE ORDERED BY THE INDIANA UTILITY REGULATORY COMMISSION that:**

1.    IPL's Proposed Rider 23 filed as Respondent's Exhibit JEH-2 shall be and hereby is approved.

2.    IPL's proposed Emergency Demand Response Agreement and Demand Response Resource Type 1 Agreement files as Respondent's Exhibits JEH-4 and -6 shall be and hereby are approved.

3.    Within two (2) business days of the effective date of this Order, IPL shall file Rider 23 as approved herein with the Electricity Division of the Commission prior to placing it into effect.

4.    IPL shall file its report, under this Cause and as addressed herein, with the Commission on or before October 31, 2012.

5.    This Order shall be effective on and after the date of its approval.

**ATTERHOLT, LANDIS, MAYS AND ZIEGNER CONCUR; BENNETT ABSENT:**
**APPROVED:**    MAR 0 2 2011

**I hereby certify that the above is a true and correct copy of the Order as approved.**

*Brenda A. Howe*

**Brenda A. Howe**
**Secretary to the Commission**

8