# Exhibit 13

ORIGINAL

STATE OF INDIANA

INDIANA UTILITY REGULATORY COMMISSION

IN THE MATTER OF THE COMMISSION'S )
INVESTIGATION INTO ANY AND ALL )    CAUSE NO. 43566 PJM 1
MATTERS RELATED TO COMMISSION )
APPROVAL OF PARTICIPATION BY INDIANA )    PHASE I ORDER
END-USE CUSTOMERS IN DEMAND )
RESPONSE PROGRAMS OFFERED BY THE )    APPROVED:   APR 2 7 2011
MIDWEST ISO AND PJM INTERCONNECTION   )

**BY THE COMMISSION:**
**David E. Ziegner, Commissioner**
**Jeffery A. Earl, Administrative Law Judge**

On October 18, 2010, Respondent Indiana Michigan Power Company ("I&M") filed its Initial Tariff Compliance Filing and Request for Approval of Rider D.R.S. 1 (Demand Response Service – Emergency), initiating this subdocket, as required by the Commission's July 28, 2010 Order in Cause No. 43566 (the "Generic DR Order"). *Commission's Investigation Into Any and All Matters Related to Commission Approval of Participation by Indiana End-Use Customers in Demand Response Programs*, Cause No. 43566, 2010 Ind. PUC LEXIS 255 (IURC July 28, 2010). The filing included I&M's Demand Response Service – Emergency ("D.R.S. 1") Tariff. In subsequent phases of this Cause, I&M will also submit proposed tariffs for customer participation in PJM's economic demand response program and ancillary service demand response program.

On November 8, 2010, the Office of the Utility Consumer Counselor ("OUCC"), Energy Curtailment Specialists, Inc. ("ECS"), and Constellation New Energy, Inc. ("Constellation") each filed verified comments in response to I&M's Tariff Compliance Filing. I&M filed its Verified Reply Comments on November 19, 2010.

On November 22, 2010, I&M submitted a Proposed Order. The OUCC and ECS filed exceptions to I&M's Proposed Order on December 15, 2010, and I&M filed its Reply on December 22, 2010. At the conclusion of the parties' briefing, the Commission determined several issues regarding the D.R.S. 1 Tariff were in dispute and scheduled an Evidentiary Hearing to allow the parties to present evidence in support of their respective positions.

Pursuant to notice given and published as required by law, proof of which was incorporated into the record of this Cause by reference and placed in the official files of the Commission, a public hearing was held on February 10, 2011 at 9:30 a.m. in Hearing Room 222, 101 W. Washington Street, Indianapolis, Indiana. I&M, the OUCC, ECS, and the Indiana Industrial Group participated in the hearing. No members of the general public appeared. At the hearing, the comments and testimony prepared by I&M, the OUCC, and ECS were admitted into evidence.

Based on the law and the evidence of record, the Commission now finds:

1.    **Notice and Jurisdiction.**  Due, legal and timely notice of the hearing in this Cause was given as required by law.  Petitioner is a "public utility" as defined in Ind. Code § 8-1-2-l(a) and is subject to the jurisdiction of this Commission in the manner and to the extent provided by Indiana law.  The Commission has jurisdiction over Petitioner and the subject matter of this Cause.

2.    **Background.**  In the Generic DR Order, the Commission ordered that "Indiana end-use customers shall not be enrolled or otherwise participate in [Regional Transmission Organization ("RTO")] demand response programs directly or through curtailment service providers or other aggregators."  Generic DR Order, 2010 Ind. PUC LEXIS 255, at *149. The Commission further ordered I&M (and the other Respondent Utilities) to file with the Commission for approval tariffs or riders authorizing the participation of their respective retail customers in Regional Transmission Organization ("RTO") demand response programs through their Respondent Utility. *Id.*  These matters were further discussed with the Commission and its staff and the parties at a technical conference on September 7, 2010.  Thereafter, I&M discussed the development of its compliance filing and its proposed schedule with parties interested in the PJM subdocket.

3.    **Relief Requested.**  I&M seeks approval of Rider D.R.S. 1 (Demand Response Service – Emergency), which provides for end-use customer participation through I&M in the PJM Emergency Demand Response Program.  I&M will request approval of additional riders to provide for end-use customer participation in other PJM demand response programs in subsequent phases of this Cause.

4.    **Evidence Presented.**

    a.    **I&M's Case-in-Chief.**  In its compliance filing, I&M explained that the proposed Rider D.R.S. 1 qualifies under the current PJM Emergency Demand Response Program.  I&M added that the proposed Rider D.R.S. 1 mirrors the provisions of the PJM Emergency Demand Response Program while reflecting the unique needs and requirements applicable to I&M as an Indiana utility.  Rider D.R.S. 1 includes provisions regarding the term of contract, the customer's options under the rider, the determination of curtailed demand and energy curtailment that is eligible for compensation, curtailment credits for demand and energy, and the ramifications if a customer chooses not to curtail.  Under Rider D.R.S. 1, I&M reserves the right to limit the aggregate amount of demand response capacity contracted for under Rider D.R.S. 1, Tariff C.S.-IRP, and Tariff C.S.-IRP2 to 235 MVA.  The proposed Rider also reflects that I&M will take requests for service under Rider D.R.S. 1 in the order requests are received. In its compliance filing, I&M reminded the Commission that I&M meets its PJM capacity obligations through the fixed resource requirement ("FRR") alternative.  Because Rider D.R.S. 1 meets the requirements of the PJM Emergency Demand Response Program, I&M may count enrolled demand response service ("DRS") capacity towards its FRR capacity obligations. Therefore, I&M's other non-participating customers will not be adversely affected by approving Rider D.R.S. 1.

2

**b.**    **OUCC's Case-in-Chief.**  The OUCC asserted that the broadest possible participation in demand response is in the best interests of all customers, both for economic and environmental reasons.  Noting the Generic DR Order's interest in providing demand response opportunities for small and medium sized customers through the use of Curtailment Service Providers ("CSPs"), the OUCC criticized I&M's failure to commit to more than exploring strategies and partnership opportunities with CSPs.  The OUCC specifically objected to I&M reserving the right to partner with CSPs based upon I&M's determination of whether such partnering was appropriate.  The OUCC suggested instead that a range of offerings by different CSP providers – subject to compliance with tariff requirements – would be preferable to single source offerings selected by I&M.  The OUCC concluded that a more concrete commitment to CSP participation was desirable, and that the Commission should order I&M to work with the OUCC, interested CSPs, and any interested customers in providing additional accommodation to CSP participation.

**c.**    **ECS's Case-in Chief.**  ECS objected to I&M's failure to explicitly allow participation by CSP providers in the tariff.  ECS argues that third-party aggregator services provide multiple benefits to end-use customers including:  assisting customers with DR activations; assisting customers with program enrollment; installing additional energy monitoring equipment; and shielding customers from non-performance penalties.  ECS believes that small to mid-sized customer classes will forgo enrollment in DRS programs without the ability to participate through CSPs.

ECS also took issue with two aspects of the proposed D.R.S. 1 Tariff.  First, ECS pointed out the tariff requires participants to give a three year notice before leaving the program.  ECS argues that many aggregators, itself included, offer end-users the option to participate in PJM programs on a year-to-year basis.  ECS proposes the tariff allow an individual customer, who is participating through a CSP, to withdraw upon less than a three-year notice, providing the CSP enrolls sufficient additional capacity to replace the withdrawn customer.  ECS also took issue with I&M's proposal to limit the total DRS capacity to 235 MVA.  ECS argues the capacity limit needlessly restricts the ability of end-use customers to utilize the DR market and particularly limits participation through third-party CSPs.

**d.**    **I&M's Rebuttal Evidence.**  In rebuttal, I&M argued the tariff does not foreclose the participation of end-use customers through CSPs.  I&M states the tariff simply requires that such participation must go through the CSP to I&M rather than directly to PJM.  Nonetheless, I&M revised the language of the tariff to clarify that end-use customers are not prohibited from working with CSPs so long as the customer's DRS capacity is not enrolled directly with PJM.

With respect to the capacity limit, I&M indicated that only 107,817 kVA of the 235 MVA capacity limit is currently registered in I&M's Indiana territory.  Therefore, I&M argues, a significant capacity remains.  I&M also stated the limitation is subject to future review and revision.  I&M also argued the three-year notice of withdrawal was reasonable in light of its integrated resource planning process ("IRP").  I&M stated it treats a customer's pledged interruptible service as a reduction in load requirements.  Therefore, the removal of such a

3

pledge required I&M to adjust its IRP accordingly. I&M indicated the three-year period gives it sufficient time to adjust its IRP.

I&M also discussed the pricing of its tariff in its rebuttal evidence. I&M argued the pricing is within the range of previous offerings approved by the Commission for I&M customers over the past fifteen years and higher than the RPM market. In response to a Docket Entry request from the Commission, I&M submitted additional data detailing its past interruptible service discounts.

5.    **Commission Discussion and Findings.** In the Generic DR Order, we required the filing of tariffs or riders authorizing the participation of I&M's retail customers in PJM demand response programs through I&M. We also recognized that each utility is different with unique load characteristics, cost structures and tariffs. We believe that allowing differences in the tariffs also permits experimentation with the methodologies that can lead to adoption of best practices when the tariffs are revisited in 2 years. We find that I&M's proposed Rider D.R.S. 1 as revised in Respondent's reply brief complies with the language set forth in the Commission's Generic DR Order and reasonably sets forth the terms and conditions applicable to a retail end-use customer.

We further find that the proposed Rider, as revised, reasonably addresses the concerns raised in the Comments filed by the other parties. I&M's proposed Rider D.R.S. 1 does not foreclose I&M's Indiana retail customers from entering into their own arrangements with a CSP of their own choosing for any services other than actual enrollment in a RTO demand response program. However, we strongly encourage I&M to continue, with the participation of the OUCC, exploring opportunities with CSPs that may further enhance participation in demand response by customers of all sizes, classes and sophistication as contemplated by the Generic DR Order. Accordingly, we find that the proposed Rider D.R.S. 1 as presented in I&M's Reply is supported by the evidence of record, consistent with our findings in Cause No. 43566, and should be approved.

Finally, in order to provide the Commission additional data concerning the distinctions among the demand response tariffs offered by the various Indiana regulated utilities, on or before October 31, 2012, I&M shall file a report with the Commission, under this Cause, describing its experience with the tariff and outlining the costs and expenses associated with the tariff and the administrative charges collected. I&M shall also provide discussion on the following issues, in addition to any other issues the utility finds appropriate:

1)  how often the emergency demand response offers were called upon;
2)  how the load reductions were measured or documented, and issues with customers meeting their commitments and whether this improved as customers gained experience;
3)  the number of aggregators, the number of customers being served by the aggregators, the types of customers being served by aggregators, and how this compares to those customers participating directly with the utility.

Within 30 days of filing its report, the OUCC and intervenors may file comments on the report and addressing other issues with the tariff.

**IT IS THEREFORE ORDERED BY THE INDIANA UTILITY REGULATORY COMMISSION that:**

1.      I&M's Proposed Rider D.R.S. 1 attached as <u>Exhibit A</u> to I&M's Reply shall be and hereby is approved.

2.      I&M shall file Rider D.R.S. 1 as approved herein with the Electricity Division of the Commission prior to placing it into effect.

3.      As discussed above, I&M shall file its report under this Cause with the Commission on or before October 31, 2012.

4.      This Order shall be effective on and after the date of its approval.

**ATTERHOLT, LANDIS, MAYS, AND ZIEGNER CONCUR; BENNET NOT PARTICIPATING**

**APPROVED:**      APR 2 7 2011

**I hereby certify that the above is a true
and correct copy of the Order as approved.**


_____
Shala M. Coe
**Acting Secretary to the Commission**

5