UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| MIDWEST RENEWABLE ENERGY ASSOCIATION, INC., and CITIZENS ACTION COALITION OF INDIANA, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:26-cv-00632-RLY-MKK |
| ANDREW ZAY, Chairman, Indiana Utility Regulatory Commission, and DAVID VELETA, DAVID ZIEGNER, ROBERT DEIG, and ANTHONY SWINGER, Commissioners, Indiana Utility Regulatory Commission, | ) ) ) ) ) | |
| Defendants. | | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS**

Plaintiffs lack standing to seek relief on behalf of their members because neither organization identified at least one member with standing to sue on their own. Throughout their complaint, Plaintiffs speak of their members only as a collective. But an alleged generalized harm to members collectively is not enough to confer standing. Plaintiffs' failure to establish the "irreducible constitutional minimum" of standing renders this Court without jurisdiction. By failing to assert any injury to any member, Plaintiffs pled themselves out of court. Therefore, the Court should dismiss Plaintiffs' Complaint for Declaratory and Injunctive Relief under Federal Rule of Civil Procedure 12(b)(1).

**BACKGROUND**

I.       **Statutory and Regulatory Background**

Energy regulation is divided between federal and state authorities. *See Ark. Elec. Co-op Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983). In the early 20th century, state and local regulators oversaw nearly all generation, transmission, and distribution of electricity. *FERC*

1

*v. Elec. Power Supply Ass'n*, 577 U.S. 260, 265–66 (2016). After the U.S. Supreme Court held that the "Commerce Clause bars the States from regulating certain interstate electricity transactions," however, Congress enacted the Federal Power Act. *Id.* The Federal Power Act gave what is now the Federal Energy Regulatory Commission the authority "'to regulate the transmission of electric energy in interstate commerce' and the 'sale of electric energy at wholesale in interstate commerce.'" *Id.* at 266 (quoting 16 U.S.C. § 824(b)(1)). FERC is required by the FPA to "oversee all prices for those interstate transactions and all rules and practices affecting such prices," which includes ensuring that "'any rate [or] charge' or 'any rule, regulation, practice, or contract affecting such rate [or] charge,'" is "just and reasonable." *Id.* (quoting 16 U.S.C. §§ 824d, 824e). FERC's authority, however, is limited to interstate wholesale sales of electricity. *Id.* State utility commissions, like the Indiana Utility Regulatory commission, retain their traditional regulatory authority over intrastate wholesale sales and retail sales of electricity. *Id.* at 267 (citing *New York v. FERC*, 535 U.S. 1, 17 (2002)).

The Federal Power Act also commanded FERC to "divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy." 16 U.S.C. § 824a(a). To that end, FERC has promoted the formation of regional transmission organizations ("RTO") and independent systems operators ("ISO"), entities which would take over operational control of transmission facilities to coordinate planning and operation in their controlled region. Order No. 888, FERC ¶ 61, 680, 61 Fed. Reg. 21,540, 21550–560, 31,655 (1996); *See Ill. Commerce Comm'n v. FERC*, 721 F.3d 764, 70 (7th Cir. 2013). Relevant here, these RTOs and ISOs hold competitive auctions to set the wholesale prices of electricity. *Electric Power Supply Ass'n*, 577 U.S. at 268. "These auctions balance supply and demand continuously by matching bids to provide electricity from generators with orders from

2

utilities and other 'load-serving entities' ("LSEs") that buy power at wholesale for resale to users." *Id.* at 268.

When electricity is at peak demand, such as hot summer days when consumers run their air conditioning, the RTO or ISO will accept more expensive bids from suppliers, which can simultaneously increase the wholesale cost of electricity for LSEs and place greater strain on transmission infrastructure. *Id.* at 269. Meanwhile, consumers are often insulated from the increase wholesale prices because State regulators frequently require LSEs to set stable retail prices. *Id.* at 270. Because consumers do not feel the effects of wholesale price increases, they often fail to adjust their electricity use, placing greater strain on LSEs and transmission infrastructure as demand remains high. *Id.* Wholesale demand response programs counter these rising wholesale prices and consumer demand during peak electricity usage by paying consumers for "commitments to curtail their use of power, so as to curb wholesale rates and prevent grid breakdowns." *Id.*. Demand response programs participate in the RTO's or ISO's auctions but bid to *refrain* from electricity usage, not for greater electricity production. *Id.* at 270-71. Both aggregators of multiple users of electricity and large-scale individual users participate in these auctions. *Id.* at 270. In addition to wholesale demand response programs, retail customers can receive reduced rates if they enter into an agreement to reduce their usage when the local utility is experiencing high electricity usage that can threaten local reliability. *See* 170 IAC 4-8-1(f), (g).

To encourage demand response programs, Congress declared that demand response "shall be encouraged" in the Energy Policy Act of 2005. *Id.* at 271. In 2008, FERC issued Order No. 719, which requires RTOs and ISOs to "accept bids from an aggregator of retail customers that aggregates the demand response of the customers of utilities" unless "the relevant electric retail regulatory authority prohibits such customers' demand response to be bid in organized markets by

an aggregator of retail customers." 73 Fed. Reg. 64119, ¶ 154 (codified at 18 C.F.R. § 35.28(g)(1)(iii)).

## II.    Utilities Regulation and Demand Response in Indiana

The Indiana Utility Regulatory Commission regulates electric energy and utilities in the state. The IURC primary serves as a fact-finding body that has the power and duty to adjudicate "controversial proceedings" that come before it, as well as institute its own prosecutions, hearings, and investigations on its own motion. Ind. Code § 8-1-1-5. The IURC "shall formulate rules necessary or appropriate to carry out" its duties under Indiana law. *Id.* § 8-1-1-3(g).

In response to FERC Order No. 719, in 2008, the IURC initiated an investigation "into any and all matters relating to participation by Indiana end-customers in demand response programs" offered by the two RTOs/ISOs operating in Indiana—then the Midwest Independent System Operator, Inc., now the Mid-continent Independent System Operator, Inc. ("MISO"); and PJM Interconnection ("PJM"). Dkt. 1-1 at 2. To allow for more time to address the "important factual, legal, and policy issues" associated with demand response, the IURC "issue[d] an order requiring the status quo be maintained" and prohibited costumers from participating in wholesale demand response programs. Dkt. 1-1 at 8.

In 2010, the IURC issued another order regarding customer participation in wholesale demand response in Indiana. *See* Dkt. 1-2. The IURC recognized that Indiana utilities, "as the mandatory providers of electric service to all customers within their certified service areas, have the obligation to plan for and serve end-use customers demand." Dkt. 1-2 at 43. This includes "programs designed to foster demand response," which Indiana electric utilities had "obtained . . . from retail customers through tariff-based demand response options" "for many years." Dkt. 1-2 at 43–44. After notice and comment, the IURC concluded that "[a]lthough direct customer

participation may make sense for customers in competitive retail and wholesale markets, we lack the evidence necessary to determine this structure would work effectively for customers in Indiana's traditionally regulated retail jurisdiction." Dkt. 1-2 at 51.

The IURC ordered that "Indiana end-use customers shall not be enrolled or otherwise participate in RTO demand response programs directly or through curtailment service providers or other aggregators," but encouraged Indiana utilities to "continue to provide retail customers opportunities to participate in LSE-provided demand response programs." *Id.* The IURC also ordered Indiana utilities operating in both MISO's and PJM's territories to file tariffs or riders with the IURC "authorizing the participation of its retail customers" in RTO demand response programs through their LSEs. *Id.* Consistent with the IURC's 2010 order, Indiana utilities submitted tariffs and riders outlining demand response participation for their end-use customers and the IURC issued subsequent orders approving those tariffs and riders in 2011. *See* Dkt. 1-3; Dkt. 1-4; Dkt. 1-5; Dkt. 1-6; Dkt. 1-7; Dkt. 1-8; Dkt. 1-9; Dkt. 1-10; Dkt. 1-11; Dkt. 1-12; Dkt. 1-13; Dkt. 1-14; Dkt. 1-15; Dkt. 1-16; Dkt. 1-17.

### III.    Plaintiffs' Complaint

Plaintiffs Midwest Renewable Energy Association ("MREA") and Citizens Action Coalition of Indiana, Inc. ("CAC") filed their Complaint for Declaratory and Injunctive Relief, Dkt. 1, on March 31, 2026, nearly five years after the last challenged IURC order was issued. Plaintiffs allege that these IURC orders (collectively, the "Challenged Orders") regulation of Indiana customers' participation in demand response programs violate the dormant Commerce Clause of the United States Constitution and the Privileges and Immunities Clause of the Indiana Constitution. Dkt. 1 at 2, 23–32. The two Plaintiff organizations do not claim they have suffered any organizational injury from the Challenged Orders, instead  their members have suffered an

injury. MREA alleges that the Challenged Orders "discriminate against MREA's members and prevent them from aggregating demand response from Indiana businesses and families," causing them economic harm. Dkt. 1 at 4. CAC similarly alleges that the Challenged Orders harm its members because "[m]any CAC members would seek to provide demand response through competitive demand response aggregators who are currently blocked or dissuaded from doing business in Indiana." *Id.* CAC also alleges the Challenged Orders "cause secondary harm to consumers, including CAC members, by preventing competition in wholesale power markets that would drive down power costs." *Id.* at 4–5. Plaintiffs seek a declaratory judgment declaring the Challenged Orders unconstitutional and a statewide injunction barring the Defendants from enforcing the Challenged Orders.[1]

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) permits a party to assert the court's "lack of subject-matter jurisdiction" as a defense. Jurisdictional objections may be raised at any time in litigation, *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006), and a court must dismiss an action if it " determines at any time that it lacks subject-matter jurisdiction." Fed. R. Civ. P. 12(h)(3). A plaintiff bears the burden of establishing standing "at each stage of the litigation." *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1007 (7th Cir. 2021) (quoting *Bazile v. Finance System of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020)). "In deciding whether the plaintiff has carried this burden, the court must look to the state of affairs as of the filing of the complaint; a justiciable controversy must have existed at that time." *Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1210 (7th Cir. 1980). For facial standing challenges, courts employ

---

[1] If Plaintiffs are indeed seeking statewide declaratory and injunctive relief, they have failed to indicate so on the Civil Cover sheet filed with the Complaint, Dkt. 1-18, and in the caption of their Complaint, Dkt. 1 at 1, as required by Local Rule 5.1-2.

the same "plausibility" standard used to evaluate claims under Rule 12(b)(6). *Prairie Rivers Network*, 2 F.4th at 1008).

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). But where a defendant raises external facts that call the court's jurisdiction into question, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir. 1977)). Instead, on a factual challenge to a plaintiffs' standing, the court may "properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.*

## ARGUMENT

### I.       Plaintiffs lack associational standing to bring this lawsuit.

Plaintiffs' complaint should be dismissed because they have failed to establish they have standing to bring any claims on behalf of their members. Plaintiffs must identify at least one member would have had standing to bring suit in their own right. Plaintiffs have failed to make that showing in their complaint.

Standing is an "irreducible constitutional minimum," requiring the plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Associational standing "requires factual allegations showing that (1) at least one of the association's members would otherwise have standing to sue in their own right; (2) the interests sought to be protected by the lawsuit are germane to the association's purpose; and (3) neither the claims asserted nor the relief sought requires the participation of individual members in the lawsuit." *Parents Protecting Our Children, UA v. Eau Claire Area Sch. Dist.*, *Wis.*, 95 F. 4th 501 (7th Cir. 2024), cert. denied, 145 S. Ct. 14 (2024) (citing *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L.Ed.2d 383 (1977)). To establish that a member of an organization has "standing to sue in their own right," the Supreme Court has "required plaintiff-organizations to make specific allegations establishing that at least one identified member ha[s] suffered or w[ill] suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Evidence of a "generalized harm to a group of individual members" will not suffice. *Prairie Rivers Network*, 2 F.4th at 1010. Rather, an organization must "name the individuals who were harmed" and show that the named individuals would have standing. *Summers*, 555 U.S. at 498–99.

Plaintiffs have failed to identify a single member, of either MREA or CAC, that has been harmed or will be harmed by the Challenged Orders and would otherwise have standing to sue. MREA alleges that their members include out-of-state companies who wish to "develop and implement competitive demand responsive services." Dkt. 1 at 4. But MREA does not identify any company or other member that has been prevented from participating in demand respond programs due to the Challenged Orders. Likewise, CAC claims "[m]any members would seek to provide demand response through competitive demand response aggregators who are currently blocked or dissuaded from doing business in Indiana" by the Challenged Orders. *Id.* Thus, CAC claims, the Challenged Orders "directly injure those CAC members" "by depriving them of direct financial compensation." Dkt. 1 at 4. But CAC does not name a single member who has been deprived of

8

financial compensation as a result of the Challenged Orders. Plaintiffs' failure to identify a single member who has been harmed by the Challenged Orders is fatal to their standing. *See Summers*, 555 U.S. at 498–99.

Instead of identifying just one member of each of their organizations, Plaintiffs rely on the "generalized harm to a group of individual members" approach that has been repeatedly rejected by federal courts. *See e.g.*, *Prairie Rivers Network*, 2 F.4th at 1009–1010. MREA claims that some of their members are companies that wish to provide demand response aggregation, and that the Challenged Orders "discriminate against MREA's members and prevent them from aggregating demand response." Dkt. 1 at 4. CAC only states that "many CAC members" would participate in demand response programs but for the challenged Orders. *Id.* But speaking of Plaintiffs' "individual members only as a collective" is not enough to establish associational standing. *Prairie Rivers Network*, 2 F.4th at 1009–10. Even at the pleadings stage, permitting an organization to establish associational standing on behalf of "those individual members as a group," rather than showing an individual member would have standing on their own, is " akin to impermissible speculation rather than permissible presumption, thus 'stop[ping] short of the line between possibility and plausibility.'" *Id.* at 1010.  While "[o]ther facts relevant to associational standing could be discernible only after discovery begins . . . standing for at least one individual member of an association is not one of them." *Id.* at 1010. Plaintiffs "need not establish associational standing at a level sufficient for summary judgment," but their complaint must "provide some way of showing that *at least one* individual member has standing to sue on their own." *Id.*; *see Summers*, 555 U.S. at 499 ("[T]he Court has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm."). Plaintiffs have failed to make such a showing; thus the case should be dismissed.

## CONCLUSION

The Court should dismiss this case for lack of jurisdiction because Plaintiffs have failed to identify a single member who has allegedly been harmed by the Challenged Orders. Because of their failure to demonstrate an individual member has standing to sue, Plaintiffs lack standing to bring their claims.

Respectfully submitted.

THEODORE E. ROKITA
Indiana Attorney General
Attorney No. 18857-49

Date: June 5, 2026            By:      Bradley S. Davis
                                       Deputy Attorney General
                                       Attorney No. 38172-53

Office of Attorney General Todd Rokita
IGCS 5th Floor
302 W. Washington St.
Indianapolis, IN  46204
(317) 233-5601
Bradley.Davis@atg.in.gov

10